BC



RECEIVED AXK

4/1/2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Rebekah Katherine Brewis, Pro Se
230 E Ohio St, Suite 410 PMB1901
Chicago, IL 60611
Phone: 872-222-7490
Email: owner@aeroswift.org

## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF ILLINOIS

## EASTERN DIVISION

| | |
|---|---|
| REBEKAH KATHERINE BREWIS AKA KARISSA KATHERINE BEACH, PRO SE<br><br>**PLAINTIFF**<br><br>vs.<br><br>JENNIFER LAMB PETERSON; AARON LARON PETERSON, ALSO KNOWN AS R.J. ELLIOT, HUNTINGTON BANCSHARES INCORPORATED  (DOING BUSINESS AS HUNTINGTON BANK); PAYPAL, INC.; JONATHAN BUMSTEAD; RICHARD RAFAELLI; MIKE AGOSTA; CURTIS BURDETTE; CURTIS VANDERWALL; JACOB A. DROPPERS, NICHOLAS B. MISSAD; KATHERINE ROSKAM; LINDA A. PETERSON; EARL L. PETERSON, GABRIELA PETERSON; MARK PETERSON; SPORTSMAN TRACKER, INC.; SARAH M. SCHLUKEBAR; PFI HOLDCO, LLC; FRESH INNOVATIONS, LLC; OCEANA COUNTY FREEZER STORAGE, INC.; LAKEWOOD ORGANICS, LLC; PETERSON FARMS FRESH, LLC; PPETERSON BRANDS, LLC, | Case No.Case No.: _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION**<br><br><br>1:25-cv-03513<br>Judge Sara L. Ellis<br>Magistrate Judge Daniel P. McLaughlin<br>RANDOM/ Cat. 2 |

PETERSON FARMS, INC.; MEDC; OCEANA COUNTY DEVELOPMENT CORPORATION, A GOVERNMENTAL ENTITY OF OCEANA COUNTY, MICHIGAN; OCEANA COUNTY ECONOMIC ALLIANCE, A GOVERNMENTAL ENTITY OF OCEANA COUNTY, MICHIGAN; SHELBY ACRES CONDOMINIUM ASSOCIATION; JVC LOGISTICS, LLC; JVC ENTERPRISES LLC; BENTLER AUTOMOTIVE; THE RIGHT PLACE; VARNUM, LLP; MARK AND GABRIELA PETERSON FOUNDATION; AIRBNB, INC.; RYCRE, LLC; NATHAN BROWN, ANDREW TWYMAN, VICEROY HOTEL MANAGEMENT, LLC; WILLIAM GRAHAM RUMBLE; JOHN & JANE DOES #1-20. **DEFENDANTS.**

<mark>**NOTICE: THIS LEGAL DOCUMENT CONTAINS SENSITIVE CONTENT INCLUDING ALLEGATIONS OF SERIOUS CRIMINAL CONDUCT AND SEXUAL OFFENSES.**</mark>

**VERIFICATION**

I, Rebekah Katherine Brewis, being first duly sworn and competent to testify, declare under 28 U.S.C. Section 1746 (declarations under penalty of perjury) that I am competent to testify in these matters and hereby declare under the penalty of perjury that the statements made in this complaint are made in good faith based on beliefs formed after reasonable inquiry and are true and correct to the best of my knowledge and belief. The

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 2 OF 241

allegations contained herein are based on my personal knowledge and information available to me.

*Executed under penalty of perjury on:* April 1, 2025, at 230 E Ohio Street, Suite 410 PMB1901, Chicago, IL 60611, Rebekah Katherine Brewis

Plaintiff, REBEKAH KATHERINE BREWIS, pro se ("Plaintiff" or "Brewis"), is a protected person under various federal and state laws, and other applicable laws, including but not limited to the Violence Against Women Act (VAWA) (18 U.S.C. §§ 2265-2266; 42 U.S.C. § 13925), the Trafficking Victims Protection Act (TVPA) (18 U.S.C. § 1591; 18 U.S.C. § 1595), the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.), the Fair Housing Act (FHA) (42 U.S.C. § 3601 et seq.), the Elliott-Larsen Civil Rights Act (ELCRA) (MCL 37.2103), and the Illinois Human Rights Act (IHRA) (775 ILCS 5). She files this verified Complaint against the defendants, which include, but are not limited to, the following individuals and entities in their respective legal capacities, using their full legal names without abbreviations.

The following individuals and entities are named as defendants because of their direct involvement in or facilitation of the alleged sexual assaults, trafficking, harassment, cyberstalking, breach of contract, and related offenses:

Aaron Leroy Peterson (a. k. a. "R. J. Elliot") is alleged to have committed multiple acts of sexual assault, sexual abuse, trafficking, breach of contract, cyberstalking, sex

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 3 OF 241

discrimination, breach of duty, fraudulent misrepresentation, and related criminal offenses against Plaintiff Rebekah Katherine Brewis in person from November 2023 through March 6, 2024, online, via text messages and email, and through his subordinate employees and directors of associated companies and organizations of Peterson Farms Fresh, LLC, continues to engage in cyberstalking activities, further detailed in the factual allegations, to this day. Aaron Leroy Peterson is an individual alleged to have neglected his supervisory duties as director of Peterson Farms Fresh, LLC, and several related family-owned businesses that comprise Peterson Farms Fresh, LLC. He is also alleged to have aided in trafficking the plaintiff by neglecting her supervisory duties as director of OCDC and several related family-owned businesses that comprise Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and financial associations with the Oceana County Economic Alliance, both state of Michigan entities). They are also alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, creating fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of unlawfully disseminating and distributing the plaintiff's shared data without permission from the plaintiff, Brewis. On information and belief, plaintiff Brewis was targeted and marginalized using State of Michigan resources and connections to interfere with her banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct while protecting company and shareholder assets. ***Jennifer Lamb Peterson***, an individual alleged to have

committed tortious interference by disrupting the execution of key provisions of the March 21, 2024 NDA. **Earl Peterson,** an individual, a Director, and CFO, is alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as COO of Peterson Farms Fresh, LLC and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and the Oceana County Economic Alliance, both state of Michigan entities) are also alleged to have violated the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets. **Richard Raffaelli**, an individual, a Director, and CFO, is alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as COO of Peterson Farms Fresh, LLC and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and the Oceana County Economic Alliance, both state of Michigan entities) are also alleged to have violated the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 5 OF 241

Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets. *Michigan State Senator Jon Bumstead, R-Muskegon*, an individual and official of the State of Michigan, is alleged to have neglected supervisory duties as Director of the Oceana County Development Corporation. By association, several related family-owned businesses, which include Peterson Farms Fresh, LLC, and Peterson Farms, Inc., may have contributed to and enabled the alleged trafficking of the plaintiff. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; *Republican House Rep. Dist-102, Curtis Vanderwall*, an individual and Official of the State of Michigan; Officer, Michigan Bankers Association, is alleged to have neglected supervisory duties as Director of Oceana County Economic Alliance. By association, several related family-owned businesses, which include Peterson Farms Fresh, LLC, and Peterson Farms, Inc., may have contributed to and enabled the alleged trafficking of

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 6 OF 241

the plaintiff. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; **Curtis Burdette**, Executive Director, OCEA, a state of Michigan entity, an individual and director of the Oceana County Economic Alliance and Development Director at The Right Place, is alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as Executive Director of OCEA, and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and the Oceana County Economic Alliance, both state of Michigan entities) are also alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized using State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets. **Sarah M. Schlukebar is** an individual and Director, and is alleged to have neglected supervisory duties as Director of

Peterson Farms Fresh, LLC and several related family-owned businesses that constitute Peterson Farms Fresh, LLC, is alleged to have aided in trafficking the plaintiff by neglecting her supervisory duties as Director of OCDC, and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and financial association with the Oceana County Economic Alliance, both state of Michigan entities) are also alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; ***Linda Peterson***, an individual alleged to have neglected supervisory duties as Director of Peterson Farms Fresh, LLC and several related family-owned businesses that constitute Peterson Farms Fresh, LLC, is alleged to have aided in trafficking the plaintiff by neglecting her supervisory duties as Director of OCDC, and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and financial association with the Oceana County Economic Alliance, both state of Michigan entities) are also

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 8 OF 241

alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; *Randy Thelen*, Executive Director, The Right Place; *Michigan Economic Development Corporation*; *Mike Agosta*, is an individual and CFO, is alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as CFO of Peterson Farms Fresh, LLC, and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; *Gabriela Peterson*, an individual who is alleged to have aided in trafficking the plaintiff by neglecting supervisory duties as Director of Oceana County Development Corporation an operational partner of multiple related family-owned businesses that constitute Peterson Farms Fresh, LLC and Peterson Farms, Inc, is

alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as Executive Director of OCEA, and several related family-owned businesses that make Peterson Farms Fresh, LLC and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County Development Corporation and the Oceana County Economic Alliance, both state of Michigan entities) are also alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; *Mark Peterson*, The former Vice President of Peterson Farms Fresh, LLC is an individual who serves as a Director of the Mark Peterson and Gabriela Foundation, is the Owner of Sportsman Tracking, a syndicated TV hunting show sponsored by Cabela's, and is the brother of Aaron Peterson. He is also alleged to have aided in trafficking the plaintiff by neglecting his supervisory duties as Director of the Mark and Gabriela Peterson Foundation, as well as in several financially related or associated family-owned businesses that include Peterson Farms Fresh, LLC and Peterson Farms, Inc. This includes but is not limited to, directorships at the Oceana County Development Corporation and the Oceana County Economic Alliance, both

Michigan state entities. Furthermore, they are alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, causing fear and trepidation about being cyberstalked due to the exercise of protected legal rights. They are also accused of unlawfully disseminating and distributing the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with her banking under the direction and influence of defendant Aaron Leroy Peterson and the collective defendants. This furthered the effort to silence and prevent the plaintiff from evading accountability, concealing defendant A. Peterson's illegal sexual conduct, and protecting company and shareholder assets.

***Jacob A. Droppers***, an individual and Partner at Varnum, LLP, who is alleged to have violated the plaintiff's constitutional rights to access the courts, and who assisted in entrapment of the plaintiff in an unconscionable NDA agreement and legally intimidated the plaintiff from reporting the criminal acts of defendant A. Peterson; ***Katherine Roskam***, an individual and Partner at Varnum, LLP, who is alleged to have violated the plaintiff's constitutional rights to access the courts, and who assisted in entrapment of the plaintiff in an unconscionable NDA agreement and legally intimidated and deterred the plaintiff from reporting criminal acts of defendant A. Peterson; ***Nicholas B. Missad***, an individual and Partner at Varnum, LLP who is alleged to have violated plaintiff's constitutional rights to access the courts, and who assisted to entrap plaintiff in an unconscionable NDA agreement and legally intimidate plaintiff from reporting criminal acts of defendant A. Peterson; ***Myra Staten***, an individual alleged to have violated the NDA agreement between defendant Aaron Peterson and plaintiff by searching for

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 11 OF 241

plaintiff's Facebook profile and accessing it's public information, creating fear and trepidation of

being cyberstalked as a result of exercising protected legal rights, and the unlawful dissemination

and distribution of plaintiff's shared data without permission of plaintiff Brewis; ***John and Jane***

***Doe #1-20***, who are alleged to have violated the NDA agreement between defendant Aaron

Peterson and plaintiff by searching for plaintiff's Facebook profile and accessing it's public

information, creating fear and trepidation of being cyberstalked as a result of exercising

protected legal rights, and the unlawful dissemination and distribution of plaintiff's shared data

without permission of plaintiff Brewis Peterson Farms Fresh, LLC, a Michigan limited liability

company; ***Nathan Brown***, an individual and Director of RYCRE, LLC who is alleged to have

harassed and unlawfully evicted plaintiff from her 6 month reservation and lease at 1 Lakeside

Lane, Fox Lake, IL through Airbnb hosting; ***Andrew Twyman***, an individual and former Director

of RYCRE, LLC who is alleged to have been liable for the harassment and unlawful eviction

plaintiff from her 6 month reservation and lease at 1 Lakeside Lane, Fox Lake, IL through

Airbnb hosting; ***RYCRE, LLC***; ***Airbnb, Inc.*** is a; ***PFI HOLDCO, LLC***, is a Michigan, Texas and

Florida foreign limited liability company and AP (Authorized Person) of Lakewood Organics,

LLC, is a for profit corporation incorporated in Delaware an individual alleged to have neglected

supervisory duties as AP of Lakewood Organics, LLC of Peterson Farms Fresh, LLC and several

related family-owned businesses that constitute Peterson Farms Fresh, LLC, is alleged to have

aided in trafficking the plaintiff by neglecting their supervisory duties as AP of Lakewood

Organics, and several related family-owned businesses that make Peterson Farms Fresh, LLC

and Peterson Farms, Inc. (including but not limited to directorships at the Oceana County

Development Corporation and financial association with the Oceana County Economic Alliance,

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 12 OF 241

both state of Michigan entities) are also alleged to have violated and breached the NDA agreement between defendant Aaron Peterson and the plaintiff by searching for the plaintiff's Facebook profile and accessing its public information, which created fear and trepidation about being cyberstalked as a result of exercising protected legal rights. Moreover, they are accused of the unlawful dissemination and distribution of the plaintiff's shared data without permission from plaintiff Brewis. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; **Sportsman Tracker Inc**, a Michigan corporation; **Huntington Bancshares Incorporated,** an Ohio state domestic profit corporation incorporated in XXX, Ohio; **Varnum LLP**, a Michigan limited liability partnership; **Viceroy Hotel Management, LLC,** is an Illinois limited foreign liability company incorporated in Delaware, with its principal place of business in Irving, Texas. It is alleged to have neglected supervisory duties as the manager of the Viceroy Hotel and to have aided in trafficking the plaintiff by failing to fulfill these duties at the hotel on February 26-28, 2024, in Chicago, Illinois. This neglect allegedly caused personal injury to the plaintiff by enabling defendant Peterson's fraudulent misrepresentations, including directing hotel staff to identify plaintiff Brewis and specifically address her as "Mrs. Peterson." This tactic was used as psychological manipulation to further sexual exploitation of the plaintiff's naivete. **Willliam Graham Rumble** is an individual and Manager of Viceroy Hotel Management, LLC. It is alleged that the manager of the Viceroy Hotel neglected supervisory duties and aided trafficking the

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 13 OF 241

plaintiff by failing to fulfill these duties at the hotel on February 26-28, 2024, in Chicago, Illinois. This neglect of properly identifying plaintiff Rebekah Katherine Brewis caused personal injury to the plaintiff by enabling defendant Peterson's fraudulent misrepresentations and subsequent sexual assaults over 2 nights and 3 days, including, on information and belief, directing hotel staff to identify plaintiff Brewis and specifically address her as "Mrs. Peterson.", without verifying her identity using her Illinois license or US Passport. This tactic was used as psychological manipulation to further sexual exploitation of the plaintiff's naivete, among other individuals and entities mentioned in the following paragraphs:

- Regarding John and Jane Does #1-20: Their identities and addresses remain unknown. The plaintiff reserves the right to amend this complaint upon discovering their identities and hereby requests the court's permission to do so. For all other parties whose addresses are not included in this complaint, the plaintiff will make diligent efforts to obtain and submit this information to the court promptly. A comprehensive list of all known addresses for these parties will be attached as ==Exhibit: AAA== to this complaint. Current addresses are as follows:

1. Aaron Leroy Peterson (also known as R.J. Elliot) currently resides at 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County. A. Peterson's registered agent corporate addresses are:

- Peterson Farms Fresh, LLC, President/CEO: 3104 W Baseline Rd, Shelby, MI 49455

- Peterson Farms, Inc., President, Treasurer, Secretary, and Director: 3104 W Baseline Rd, Shelby, MI 49455

- Oceana County Freezer Storage, LLC, President: 4730 W Shelby, MI 49455

- Peterson Brands, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

- Lakewood Organics, LLC, AP: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455. CT and Corporation System, 1200 S Pine Island Rd, Plantation, FL 33324.

- PFI HOLDCO, LLC, AP: THE CORPORATION TRUST COMPANY, CORPORATION TRUST CENTER, 1209 ORANGE ST, WILMINGTON, New Castle County, DE 19801

- Fresh Innovations, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

- PFI Leverage Lender, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

- JVC LOGISTICS, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

- JVC ENTERPRISES LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

2.  Jennifer Lamb Peterson's current residential address is:

- 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 15 OF 241

3. Curtis Burdette's registered agent corporate addresses are:

   • 844 S Griswold St, STE 500, Hart, MI 49420

4. Sarah Schlukebar's current residential address is:

   • 929 W Woodrow Road, Shelby, MI 49455.

S. Schlukebar's registered agent corporate addresses are:

   • Director, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI

   • Director, Oceana County Freezer Storage, LLC: 4730 W Shelby Road, Shelby, MI 49455.

5. Earl Peterson's current residential address is 1105 S 88th Ave, Shelby, MI 49455S.

   E. Peterson's registered agent corporate addresses are:

   • Director, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI 49455

   • Director, Oceana County Freezer Storage, LLC: 2999 Timber Dunes Road, Shelby, MI 49455

   • President & Treasurer, Oceana County Development Corporation: 2999 Timber Dunes Road, Shelby, MI 49455

   • Director, Oceana County Freezer Storage, LLC: 4730 W Shelby Road, Shelby, MI 49455

6. Linda Peterson's current residential address is 1105 S 88th Ave, Shelby, MI 49455.

   L. Peterson's registered agent corporate addresses are:

Treasurer & Secretary, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI 49455

- Director, Shelby Acres Condominium Association: 2999 S Timber Dunes Road, Shelby, MI 49455

- Treasurer & Secretary, Oceana County Freezer Storage, LLC: 4730 W Shelby Road, Shelby, MI 49455

7. Mike Agosta's current corporate address is:

- 3104 W Baseline Rd, Shelby, MI 49455

8. Richard Raffaelli's current residential address is 975 S. 96th Ave, Shelby, MI 49455. R. Raffaelli's registered agent corporate addresses are:

- Director of Shelby Acres Condominium Association: 975 S. 96th Ave, Shelby, MI 49455

- Director of Oceana County Development Corporation: 975 S. 96th Ave, Shelby, MI 49455

- COO, Peterson Farms Fresh, LLC: 975 S. 96th Ave, Shelby, MI 49455

9. Gabriela Peterson's current residential address is 3025 S Scenic Drive, Shelby, MI 49455. G. Peterson's registered agent corporate addresses are:

- Director, Oceana County Development Corporation: 3025 S Scenic Drive, Shelby, MI 49455.

- Director, Mark and Gabriela Peterson Foundation: 975 S. 96th Ave, Shelby, MI 49455

10. MARK AND GABRIELA PETERSON FOUNDATION: 3025 S Scenic Drive, Shelby, MI 49455

11. Defendant Mark Peterson's current residential address is 3025 S Scenic Drive, Shelby, MI 49455. M. Peterson's registered agent corporate addresses are:

- MARK AND GABRIELA PETERSON FOUNDATION: 3025 S Scenic Drive, Shelby, MI 49455

- Owner, Sportsman Tracker Inc.: C T CORPORATION SYSTEM, 40600 ANN ARBOR RD E STE 201, Plymouth, MI 48170

12. Jacob A. Droppers's current corporate address is:

- Varnum, LLP, 333 Bridge Street NW #1700, Grand Rapids, 49504

13. Katherine Roskam's current corporate address is:

- Varnum, LLP, 333 Bridge Street NW #1700, Grand Rapids, 49504

14. Nicholas B Missad's current residential address is:

- Varnum, LLP 333 Bridge Street NW #1700, Grand Rapids, 49504

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 18 OF 241

15. Nathan Brown's current residential and corporate addresses are:

- 1464 W. Webster Avenue, Chicago, IL 60614

16. Andrew Twyman's current residential address is:

- 2036 Melrose St, Chicago, IL, 60618

17. Myra J. Dudley-Staten's current residential and work addresses are:

- 1512 Van Auken St SE, Grand Rapids, MI 49508
- Benteler Automotive Corporation, Grand Rapids plant, 3721 Hagen Dr SE, Grand Rapids, MI 49548

18. Peterson Farms Fresh, LLC's registered agent and address for service are:

- C T Corporation System: 3104 W Baseline Road, Shelby, MI 49455

19. Peterson Brands, LLC's registered agent and address for service is:

- C T Corporation System: 3104 W Baseline Road, Shelby, MI 49455

20. Huntington Bancshares Incorporated, doing business as Huntington Bank, has the following registered agent and address for service:

- CT Corporation System, Resident Agent: 4400 Easton Commons Way, Suite 125, Columbus, OH 43219

21. PayPal, Inc. registered agent and address for service is:

- C T Corporation System, Resident Agent: 208 South Lasalle St, Suite 814, Chicago, IL 60604

22. Fresh Innovations, LLC's registered agent and service address are:

  • Ashlee Lange, resident agent: 3104 W Baseline Road, Shelby, MI 49455

23. Lakewood Organics, LLC, operating as King Brands, LLC; registered agent and service address are:

- Aaron Peterson: 3104 W Baseline Rd, Shelby, MI 49455 & CORPORATION SYSTEM, 1200 S PINE ISLAND RD, PLANTATION, FL 33324

24. PFI Leverage Lender, LLC's registered agent and service address are:

  • CT Corporation System: 1200 S Pine Island Rd, Plantation, FL 33324

25. PFI HOLDCO, LLC's registered agent and address for service are:

- THE CORPORATION TRUST COMPANY, CORPORATION TRUST CENTER, 1209 ORANGE ST, WILMINGTON, New Castle County, DE 19801, Phone: 302-658-7581

26. Shelby Acres Condominium Association's registered agent and address for service are:

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 20 OF 241

- Earl Peterson, President, 2999 S Timber Dunes Road, Shelby, MI 49455.

27. BENTLER AUTOMOTIVE FUNDING NAO, LLC's registered agent and address for service are:

- DANIEL SARBANDI, 1780 POND RUN, AUBURN HILLS, MI 48326-2752

28. The Right Place's registered agent and address for service are:

- Randy Thelen, 125 OTTAWA AVE. NW SUITE #450
  GRAND RAPIDS, MI 49503

29. Oceana County Development Corporation's registered agent and address for service are:

- Earl L. Peterson, 2999 S Timber Dunes Road, Shelby, MI 49455

30. JVC Logistics, LLC's registered agent and address for service are:

- Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

31. JVC Enterprises, LLC's registered agent and address for service are:

- Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

32. Peterson Farms, Inc's registered agent and address for service are:

- Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 21 OF 241

33.  Oceana County Freezer Storage, Inc's registered agent and address for service is:

- Aaron L. Peterson, 4730 W Shelby Rd, Shelby, MI 49455

34. Airbnb, Inc.'s registered agent and address for service are:

- Rebecca Vang, 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA 95833

35. RYCRE, LLC's registered agent and address for service are:

- Nathan Brown, Manager, 1464 W. Webster Avenue, Chicago, IL 60614.

36. Defendant Sportsman Tracker Inc's registered agent and address for service are:

- C T CORPORATION SYSTEM, 40600 ANN ARBOR RD E STE 201, Plymouth, MI 48170

37. Defendant Viceroy Hotel Management, LLC's principal place of business is

- 545 E JOHN W CARPENTER FWY, SUITE 1400, IRVING, TX 75062. The Manager is WILLIAM GRAHAM RUMBLE, and the registered agent address for service is:

-  REGISTERED AGENT SOLUTIONS, INC. 901 S 2nd St. Suite 201, Springfield, IL 62704

38. Defendant WILLIAM GRAHAM RUMBLE, Manager of Viceroy Hotel Management, LLC's registered agent address for service is:

- REGISTERED AGENT SOLUTIONS, INC. 901 S 2nd St. Suite 201, Springfield, IL 62704

39. Varnum LLP's registered agent and address for service are:

- 333 BRIDGE STREET, N.W. SUITE 1700, GRAND RAPIDS, MI 49504,

The Plaintiff brings this action against the named Defendants, both in their individual and official capacities, and alleges as follows: (Named defendants on file with the court will be used for service of process. If any addresses are unknown at this time, they will be provided to the court as soon as they become available.)

**JURISDICTION**

1. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 as they relate to the federal claims. The United States District Court has jurisdiction over this action under the Racketeer Influenced and Corrupt Organizations (RICO) Act (18 U.S.C. § 1962) and 28 U.S.C. § 1331. Specifically, it has jurisdiction over sex trafficking claims, according to part of the same case controversy.

Additionally, this Court has diversity jurisdiction under 28 U.S.C. § 1332, as the

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 23 OF 241

parties are citizens of different states, and the amount in controversy exceeds $75,000, with the plaintiff experiencing property and monetary losses in the approximate amount of $200,000 between March 2024 to present.

2..   This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1591 and § 1595 of the Trafficking Victims Protection Act ("TVPA"). The TVPA explicitly provides for civil remedies and preempts any conflicting forum selection clauses or contractual provisions, specifically authorizing private rights of action regardless of any purported contractual limitations. These provisions ensure victims can pursue justice in appropriate federal venues regardless of any attempted contractual restrictions by defendants.

2.   This Court has jurisdiction over this action pursuant to 18 U.S.C. § 2255 (civil remedy for personal injuries) and the Clayton Act (15 U.S.C. § 15).

3.   This Court has jurisdiction over this action pursuant to 18 U.S.C. § 1595, the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.)

4.    This Court has jurisdiction over this action under 42 U.S.C. § 1983 for civil rights violations under the color of state law. Additionally, this Court has jurisdiction over claims arising from interstate commerce and trafficking, per Article III of the United States Constitution.

5.   This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367, as they relate to the federal claims, forming part of the same case controversy.

6.   This Court has personal jurisdiction over the defendants pursuant to Fed. R. Civ. P. 4(k), 735 ILCS 5/2-209(a)(1)-(2), (b)(4), and (c), as well as the Illinois long-arm statute. The defendants have engaged in systematic and continuous contacts, such as on February 26th-28th, 2024, in Chicago, IL, at the Viceroy Chicago located at 1118 N State Street, conducting business as an official for Peterson Farms Fresh, LLC. Additionally, they purchased over $4,000 in gifts for the plaintiff at the 900 North Michigan Shops luxury mall, including black lambskin Louis Vuitton Sunset Flats from Louis Vuitton Chicago on Michigan Avenue, costing approximately $ 1,499.99 and a white gold commitment ring with diamonds from David Yurman located at 919 Michigan Ave, Chicago, IL, costing around $2,000. These actions satisfy both general and specific jurisdiction requirements under International Shoe and its progeny. The venue is proper in this jurisdiction because the events giving rise to the lawsuit occurred here. The defendants maintain substantial business operations and contacts, having sufficient minimum contacts through their systematic and continuous business activities, property ownership, and tortious conduct within this jurisdiction, ensuring that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

7. Venue is proper in this district under 28 U.S. Code § 1391(b) because a substantial part of the events or omissions that give rise to the claims occurred in this district.

## INTRODUCTION

8. Plaintiff Brewis is a qualified individual with disabilities as defined by the Americans with Disabilities Act, 42 U.S.C. § 12102, experiencing substantial limitations in multiple major life activities and requiring reasonable accommodations, which the Defendants were aware of and deliberately exploited. These include but are not limited to, gender dysphoria, autism spectrum disorder, Complex PTSD, and ADHD, all of which directly impacted the events described herein. The plaintiff alleges a series of experiences involving the defendants that she believes warrant legal review and constitute violations of her rights.

9. Plaintiff Brewis was systematically exploited through Defendant A. Peterson's calculated and deliberate targeting of her known disabilities and vulnerabilities, which

he was specifically aware of and used to his advantage. He exploited his access to the plaintiff through financial coercion and fraudulent misrepresentation. These alleged violations occurred from November 2023 to the present, initially involving only defendant Aaron Peterson, CEO of Peterson Farms, LLC, and subsequently expanding to include additional defendants, thus creating an ongoing legal controversy between plaintiff Rebekah Brewis and the defendants collectively.

10.  The defendants are connected to the allegations due to their failure to adequately fulfill their legal obligations in their supervisory roles with Aaron Peterson and Peterson Farms Fresh, LLC, as well as Peterson Farms, Inc. Their related employment and ownership as directors of the conglomerate of companies creates liability.

11. This action seeks compensatory and punitive damages arising from the defendants' alleged pattern of misconduct from November 2023 to March 2025, including but not limited to: sexual assault, specifically the incidents occurring on February 26-28, 2024, at the Viceroy Hotel in Chicago; February 20, 2024, at the defendant Airbnb's location at 1556 Michigan St NE #4, Grand Rapids, MI 49503; false imprisonment at Airbnb locations in Grand Rapids and Grand Haven, Michigan, as well as Fox Lake, Illinois, between January 2024 and July 2024; online stalking via Facebook from July 2024 to the present; coerced execution of an unconscionable NDA on March 19- 21, 2024; breach of NDA contract from June 2024 to the present; and attempted suppression of criminal evidence by A. Peterson, Peterson Farms Fresh, LLC, and

Varnum, LLP, on March 19-21, 2024, and again via attorney letter on June 25, 2024; Tortious interference by defendants A. Peterson, Peterson Farms Fresh, LLC, and Varnum, LLP with banking and professional relationships from January 2024 to the present; fraudulent misrepresentation regarding the defendant's intent to divorce his wife, defendant Jennifer Lamb Peterson, in order to defraud plaintiff Brewis of her time, business, bodily autonomy, and cause permanent loss and separation from her service animals; intentional infliction of emotional distress from October 2023 to the present by ignoring the plaintiff for five days following a humiliating rape on March 6, 2024, and during the period from March 11 to March 16, 2024, when the defendant purposefully socially isolated the plaintiff, who is autistic, and traumatized by the defendant's actions into "freezing" due to the defendant's deliberate tactics of sexually aggressive trauma bonding over a span of three months, knowing she was so ill that she could not reach out to anyone else for help while living at 521 Miller Ave #211, Grand Haven, Michigan. "Just stopping talking to me and cutting me off, when I didn't do anything to you to cause you harm, feels very strong and extreme and is punitive in nature, " the plaintiff told defendant A. Peterson on Saturday, March 16, 2024, at 1:10 AM; violations of the ADA occurred when defendants Nathan Brown, Andrew Twyman, RYCRE, LLC, A. Peterson, and Peterson Farms Fresh, LLC evicted or caused the plaintiff to be trespassed from her housing due unlawful disability discrimination, sex, sexual harassment to the active symptoms of her disabilities between March 27, 2024 to June 30, 2024. Defendant A. Peterson booked a six-month lease at 1 Lakeside Lane, Fox Lake, IL 60020, a spacious waterfront three-bedroom

retreat Airbnb property, from March 27 to September 26, 2024, for $33,208.09, as indicated in an email receipt sent by Aaron Peterson (See, **Exhibit AAF**).

12. Additionally, defendants A. Peterson and Peterson Farms Fresh, LLC violated federal and state human trafficking laws and the TVPRA by systematically grooming and coercing the plaintiff into interstate travel for sexual exploitation, leveraging their corporate resources and commercial activities through their family-owned company and conglomerate of companies, specifically from October 2023 to March 2024, in violation of the Trafficking Victims Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1591 et seq.

13. Defendant A. Peterson exploited his corporate authority as CEO, Founder, and Chairman of Peterson's conglomerate of businesses, including but not limited to Peterson Farms Fresh, LLC and PFI HOLDCO, LLC, to perpetrate sexual assaults against Plaintiff, using his institutional power and control over the company resources to facilitate these attacks. He then used intimidation letters from his attorneys at Varnum, LLP, to compel Plaintiff Brewis to remain silent in subsequent months and go into hiding, as he feared having his true sexuality revealed to family, friends, and professional connections, operating in a conservative business climate. Defendant A. Peterson disclosed to plaintiff Brewis that, in business, he was a "Republican, but in social matters, progressive," highlighting the complexities. Peterson navigated to fulfill his self-professed sexual needs.

14. The facts of Peterson's ownership, executive positions, and controlling interest in the Peterson Corporations provided him with institutional power, resources, and authority, which he exploited to commit unlawful sexual violence, domestic violence, abuse, and discrimination against the Plaintiff. He subsequently used corporate resources, including legal counsel and the involvement of the state of Michigan and Oceana County government Directors (Earl Peterson, Curtis Burdette, Gabriel Peterson, Linda Peterson) who work for or fall directly under the control of Aaron Leroy Peterson, to cyberstalk, breach the identity of, harass, intimidate, and coerce plaintiff Brewis into silence following the sexual assaults. This included the involvement of Michigan state and Oceana County governmental organizations acting under the color of state law to conceal criminal conduct and obstruct investigations and accountability.

15. The defendant's father, Earl Peterson, is the Executive Director and Treasurer of OCDC, a nonprofit organization associated with the state of Michigan. Additionally, three family members and two current active Michigan state politicians occupy two other Board seats. Peterson Farms Fresh, LLC received a $35,000,000, 15-year development grant for worker's water from the MEDC through OCDC and the Right Place in February 2025 (See article XXX).

16. Coercive institutional control was employed through the weaponization of the law firm Varnum, LLP, which exerted legal intimidation by threatening civil actions and

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 30 OF 241

pursuing criminal charges in June 2024 via an email addressed to the plaintiff, Brewis, alongside an ongoing breach of NDA agreements dated March 19 and 21, 2024. In addition to these encounters, the plaintiff faced coercive sexual conduct from defendant A. Peterson, which framed a pseudo-relationship aimed at isolating the plaintiff and exerting control over her financial and housing circumstances, including health and transportation. The defendant intruded on the plaintiff's privacy by exploiting her disabilities and gathering her personal information and health data. Peterson schemed deliberately and fraudulently to control, abuse sexually, and traffic the plaintiff from Michigan to Illinois, where he abused her for two consecutive nights and over three days in Chicago, Illinois, at the Viceroy Hotel before subsequently "discarding" the plaintiff following the negative outcome of his scheme, directly causing all of the plaintiff's significant losses.

17.  Peterson utilized company resources, including corporate counsel and financial leverage, to conceal his criminal activities against plaintiff Brewis by coercing the execution of an unconscionable NDA agreement designed to restrict the plaintiff's protected speech rights and legitimate business activities while using the threat of legal action to maintain control over plaintiff.

18. Since this controversy has not undergone any legal review due to the defendants' sabotage tactics, the plaintiff has been severely hindered in accessing the courts to achieve justice and public recognition for the offenses committed against plaintiff

Brewis. On information and belief, defendant A. Peterson has claimed tax write-offs at the expense of plaintiff Brewis by misrepresenting the actual narrative of events between the parties to deceive and conceal his illegal activities against plaintiff Brewis. The defendant is suspected of fraudulently persuading others as necessary that it constitutes a nontaxable "covered loss," which aligns with the timeline of events, as both plaintiff's banks were attacked and closed within two months before the 2025 tax season, from January to March 2025.

19. Defendant A. Peterson's systematic and premeditated pattern of sexual assault, rape, and coercive behaviors, executed through his position of authority and ***leveraging*** of corporate resources, who engaged in these acts while married to Defendant Jennifer Lamb Peterson, as evidenced by Defendant A. Peterson's text messages, directly caused plaintiff's severe emotional distress, as evidenced by subsequent psychological evaluations. The coercive sexual interactions and trafficking of the plaintiff for sexual gratification utilizing his company and resources led to a diagnosis of suicidality and long-term mental health disability.

20. Furthermore, the persistent harassment and assaults directly interfered with the plaintiff's business operations, resulting in revenue losses for her drone and legal consulting business, Aero Swift LLC, which can be traced to the emotional and psychological trauma caused directly by the defendant's actions and or inactions.

**PARTIES**

21. Defendant Jane Doe #1-10 is a female who resides in Michigan. Defendant organizational Jane Does #1-10 are currently unknown entities owned by and/or employed by Defendant A. Peterson and enabled the commission of the conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to make a motion to amend the Complaint to add these entities by name.

22. Defendant John Doe #1-10 is a male who resides in Michigan. Defendant organizational John Does #1-10 are currently unknown entities owned by and/or employed by Defendant A. Peterson and enabled the commission of the conduct complained of herein. As the parties engage in discovery, Plaintiff retains the right to make a motion to amend the Complaint to add these entities by name.

23. Defendant Aaron Leroy Peterson ("A. Peterson") is a married male who resides at 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County, and is subject to personal jurisdiction in this Court through his substantial contacts with this district and the commission of tortious acts herein. On information and belief, at all relevant times, Defendant A. Peterson owned and/or controlled FRESH INNOVATIONS, LLC; KING BRANDS, LLC; PFI LEVERAGE LENDER, LLC; PETERSON BRANDS, LLC; PETERSON FARMS FRESH, LLC; PETERSON

FARMS FRESH, INC; OCEANA COUNTY DEVELOPMENT CORPORATION; OCEANA COUNTY FREEZER STORAGE, INC.; JVC LOGISTICS, LLC; and JVC ENTERPRISES LLC, (all together, the "Peterson Corporations").

24. The facts of Peterson's ownership, executive positions, and controlling interest in the Peterson Corporations provided him with institutional power, resources, and authority which he exploited to commit unlawful sexual violence against Plaintiff and subsequently used corporate resources, including legal counsel and state of Michigan and Oceana County government entangled Directors (Earl Peterson, Curtis Burdette, Gabriel Peterson, Linda Peterson) who work for or are under direct control of Aaron Leroy Peterson, to cyberstalk, breach the identity of, harass, intimidate, and coerce plaintiff Brewis into silence after the sexual assaults, including Michigan state and Oceana County governmental involvement through Directorships of County organizations acting under color of state law to conceal criminal conduct and thwart investigations and accountability, through the weaponization of law firm, Varnum, LLP, exerting legal intimidation threatening civil actions and criminal pursuit, and ongoing present day breach of NDA agreements dated March 19th and 21st, 2024.

25. Defendant A. Peterson materially breached the mutual NDA agreement dated March 21, 2024 ("Agreement"), which was executed under duress and through coercion, rendering it void ab initio, between plaintiff Brewis and defendant A. Peterson, through specific acts including, on information and belief, dispersing and

leaking plaintiff Brewis' name to an individual "friend" named John/Jane Doe #1, who on information and belief has engaged with and benefitted from defendant A. Peterson historically:

26. "I see a couple of other local women on a regular basis (monthly or so). These are people with whom I have formed connections over time and still enjoy seeing occasionally. These are all completely protected encounters. "

27. Based on information and belief, defendant John/Jane Doe #1, representing defendant A. Peterson, or a Benteler executive employee, aimed to benefit defendant Aaron Leroy Peterson in exchange for a "kickback." Defendants shared such information with selected work associates at Benteler Automotive, which then leaked and reached various individuals involved in or associated with street gang activity. This endangered the plaintiff's life and violated her privacy rights as a survivor of sexual assault and domestic violence. From August 2024 to the present, multiple individuals from Benteler Automotive, five of whom are friends, including John Doe #1, John Doe #2, and John Doe #3, as well as Jane Doe #1 and Jane Doe #2, among many others from Muskegon, MI, Grand Rapids, MI, and Kentwood, MI, came into contact with the plaintiff by visiting her Facebook profile due to targeted, group-led cyberstalking. This was allegedly done to determine the plaintiff's location with the intent to cause her harm, including currently unidentified individuals designated as

John Does #1-10 and Jane Does #1-10, whose identities will be amended upon

discovery;

28. Plaintiff Brewis recently became aware of a jarring discovery upon making dual

Facebook posts about stalking law protections, including the plaintiff's public profile

for domestic and sexual abuse survivors, as well as recent news of plaintiff Brewis

becoming homeless and what had led to it. See,

29. "Any information obtained from this profile may not be disclosed, copied, or

distributed without explicit written consent from the owner. Violations of these terms

may result in legal action under the Digital Millennium Copyright Act (DMCA), 17

U.S.C. § 512, and other applicable laws. This profile and its contents are governed by

the laws of the United States, including but not limited to the Privacy Act of 1974, 5

U.S.C. § 552a, and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030"

Karissa Beach, Facebook.com.

30. Plaintiff Brewis issued this public notice upon seeing multiple related Peterson Farms

Fresh, LLC directors, officers, or family members being suggested simultaneously

within the previous 2 weeks of March 2025 approximately, including "R.J. Eliot,"

defendant A. Peterson's alter name as evidenced from a payment record from him

from PayPal as "R.J. Elliot", which was transacted on December 23, 2024. beginning

in January 2025 and continuing through February 18, 2025, when defendant Earl

Peterson as a suggested user "you may know." These online breaches of the plaintiff's identity and of the NDA agreement entered into by defendant Aaron Leroy Peterson on March 19th and 21st, 2024, alarmed the plaintiff.

31. Defendant A. Peterson, acting in concert with Varnum, LLP and other defendants, engaged in a civil conspiracy under 42 U.S.C. § 1983 and § 1985(3) and violated 18 U.S.C. § 1591 (sex trafficking) to deprive the plaintiff of her constitutional rights under the First and Fourteenth Amendments through intentional acts of oppression, intimidation, and retaliation designed to chill her exercise of protected rights, including her right to speak about matters of public concern and seek redress for grievances.

32. Defendant Jennifer Lamb Peterson is a married female who resides at 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County. On information and belief, at all relevant times, defendant Jennifer Peterson knew about the active NDA agreement with defendant A. Peterson, with its associated contractual obligations. She committed tortious interference between the private parties of plaintiff Rebekah Katherine Brewis by hindering the execution of the said legal agreements, notwithstanding the coercive elements Brewis was forced to endure in signing the NDA with defendant A. Peterson, which had unlawfully limited her articulated rights of free speech and association.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 37 OF 241

33. Defendant Aaron Peterson, employed at the time and on information and belief, continues to principally employ and direct the law firm of Varnum, LLP in his day-to-day business activities, to wit, corporate, divorce, and criminal attorneys, licensed and barred to practice in the state of Michigan: JACOB A. DROPPERS, ASSOCIATE, VARNUM LLP; NICHOLAS B. MISSAD, PARTNER, VARNUM, LLP; and KATHERINE KOSKAM, ASSOCIATE, VARNUM LLP. On information and belief, the defendants collectively worked during the out-of-state work period with defendant A. Peterson. On February 26-28, 2024, the plaintiff was lured through commercial sex arrangements by Defendant A. Peterson across state lines to downtown Chicago, Illinois, in violation of the Mann Act (18 U.S.C. § 2421). at the Viceroy Hotel for defendant Peterson's sexual gratification to coerce, intoxicated with alcohol, and then sexually abuse the plaintiff for 2 nights straight.

34. Plaintiff Brewis was "discarded" by defendant A. Peterson, within 2 weeks of the trip to Chicago, IL, demonstrated the insincerity and fraudulent misrepresentations by defendant A. Peterson to cover up a trafficking scheme just to avoid accountability from his wife and avoid extramarital detection.

35. Following the Chicago, IL trip, defendant A. Peterson abruptly terminated all contact with Plaintiff Brewis in June 2024, demonstrating a pattern consistent with sex trafficking whereby victims are exploited and then abandoned to avoid detection and

accountability, mainly to conceal the criminal enterprise from the defendant's spouse and business associates.

36. On information and belief, at least one of three Varnum defendants knew about Miss Brewis accompanying defendant A. Peterson at the Viceroy Hotel after being "scheduled to work" with defendant A. Peterson on the extended and overnight out-of-state business trip, and the true nature of the arrangement being a charade, condoned Defendant A. Peterson's illegal actions during her overnight "work visit" with defendant Aaron Peterson and Petersons Brands, LLC on February 26th, 2024.

37. On information and belief, Defendant Droppers and other unidentified Peterson Brands, LLC employees, directors, and subcontractors had actual knowledge of and facilitated the coercive relationship between Defendant A. Peterson and Plaintiff before February 21, 2024, violating Plaintiff's explicit wishes for privacy and confidentiality as well as demonstrating evidence of condoning and assisting with covering up evidence of exploitation and abuse by defendant of plaintiff Brewis.

38. Defendant Earl Peterson is a married male who resides at 1105 S 88th Ave, Shelby, MI 49455, Oceana County. On information and belief, at all relevant times, Defendant Earl Peterson owned and/or controlled FRESH INNOVATIONS, LLC; KING BRANDS, LLC; PFI LEVERAGE LENDER, LLC; PETERSON BRANDS, LLC; PETERSON FARMS FRESH, LLC; PETERSON FARMS FRESH, INC; OCEANA

COUNTY DEVELOPMENT CORPORATION; OCEANA COUNTY FREEZER STORAGE, INC.; JVC LOGISTICS, LLC; and JVC ENTERPRISES LLC, (all together, the "Peterson Corporations"). The facts of Petersons' ownership and titles at the Peterson Corporations enabled Aaron Peterson to commit the unlawful sexual violence against Plaintiff described herein with institutional strength and/or to harass and subsequently intimidate her into silence after the sexual assaults. Defendant E. Peterson also violated the mutual NDA agreement between plaintiff Brewis and Aaron Peterson on multiple occasions, endangering plaintiff's life and personal welfare, including violating the NDA by breaching plaintiff's identity and personal information to his father, defendant Earl Peterson in January 2025, when Facebook suggested Earl Peterson as a friend, which plaintiff saved as a screenshot, and can be proven through Facebook activities on a user's account profile in discovery, along the other defendant's collective stalking patterns, and while in their capacities as directors for Peterson Farms Fresh, LLC and parent companies. Defendant Earl Peterson is being sued in both his personal and corporate capacities as an officer and director of the various Peterson Corporations.

39. Defendant Linda A. Peterson is a married female who resides at 1105 S 88th Ave, Shelby, MI 49455. Linda Peterson is the Secretary & Treasurer Oceana County Freezer Storage, LLC, and the registered agent is defendant Aaron Peterson, 4730 W SHELBY RD, Shelby, MI 49455; Secretary & Treasurer Peterson Farms Fresh, LLC, and the registered agent is defendant Aaron Peterson, 3104 W BASELINE RD,

Shelby, MI 49455; Secretary & Treasurer, Ocean County Development Corporation and the registered agent is defendant Aaron Peterson, 4730 W SHELBY RD, Shelby, MI 49455; and lastly, the Director, Treasurer and Secretary, Peterson Farms, Inc, and the registered agent is defendant Aaron Peterson, 4730 W SHELBY RD, Shelby, MI 49455. On information and belief, at all relevant times, Defendant Linda A. Peterson owned and/or controlled FRESH INNOVATIONS, LLC; KING BRANDS, LLC; PFI LEVERAGE LENDER, LLC; PETERSON BRANDS, LLC; PETERSON FARMS FRESH, LLC; PETERSON FARMS FRESH, INC; OCEANA COUNTY DEVELOPMENT CORPORATION; OCEANA COUNTY FREEZER STORAGE, INC.; JVC LOGISTICS, LLC; and JVC ENTERPRISES LLC, (all together, the "Peterson Corporations"). The facts of Petersons' ownership and titles at the Peterson Corporations without the proper monitoring and supervision by the Petersons' Corporations enabled defendant Aaron Peterson to commit the unlawful sexual violence and coercion against Plaintiff Brewis described herein with institutional strength and/or to harass and subsequently intimidate her into silence after the sexual assaults. Defendant Linda Peterson is being sued in both her personal and corporate capacities as an officer and director of the various Peterson Corporations.

40. Defendant Gabriela Peterson is a married female residing at 3025 S. Scenic Drive, Shelby, MI 49455. Gabriela Peterson is the Director of Oceana County Freezer Storage, LLC, and the registered agent is defendant Aaron Peterson, 4730 W. Shelby Rd., Shelby, MI 49455. The facts of Petersons' ownership and titles at Peterson

Corporations without the proper monitoring and supervision by the Petersons' Corporations enabled defendant Aaron Peterson and Peterson Farms Fresh, LLC to commit unlawful sexual violence and coercion against Plaintiff Brewis described herein with institutional strength and/or to harass and subsequently intimidate her into silence after the sexual assaults. Defendant Gabriela Peterson is being sued in both her personal and corporate capacities as an officer and director of the various Peterson Corporations.

41. Defendant Mark Peterson is a married male and brother of the lead defendant Aaron Peterson, who resides at 3025 S Scenic Drive, Shelby, MI 49455. M. Peterson is the owner of Sportsman Tracking and the PRESIDENT, TREASURER, SECRETARY, DIRECTOR of MARK AND GABRIELA PETERSON FOUNDATION, a domestic nonprofit association incorporated in the state of Michigan.

42. Defendant Huntington Bancshares Incorporated d/b/a Huntington Bank('s) is a domestic profit corporation incorporated at 4400 Easton Commons Way, Columbus, Ohio 43219. The registered agent and address for service are CT CORPORATION SYSTEM, Resident Agent: 4400 EASTON COMMONS WAY, SUITE 125, COLUMBUS, OH 43219. Defendant Huntington Bancshares Incorporated d/b/a Huntington Bank, acting in concert with other defendants and without any legitimate business justification, preemptively closed the plaintiff's bank accounts on January 15, 2025, as advised via mailed letter to the plaintiff's office at Aero Swift, LLC, causing

significant financial harm and disruption to plaintiff's business operations. On information and belief, Huntington Bank is a major partner of Peterson Farms Fresh, LLC. Based on this banking relationship and the defendant's preemptive reports attacking the plaintiff's relationship with Huntington Bank, the plaintiff's accounts were contemplated to be shut down. However, they all had positive balances with zero adverse banking history, and despite having over $140,000 deposited into the plaintiff's previous accounts with Huntington Bank, such as on March 21, 2024, for over $120,000 and on June 17, 2024, for $20,000. The majority of this money was used for investments in the plaintiff's health, including health devices, and for capital to start her business, Aero Swift, LLC, which the plaintiff incorporated in Illinois on August 1, 2024.

43. Defendant PayPal Inc PayPal, Inc. is a domestic for-profit corporation incorporated in San Jose, CA. The registered agent and address for service is C T Corporation System, Resident Agent: 208 South Lasalle St, Suite 814, Chicago, IL 60604. PayPal materially interfered with the plaintiff's business activities abruptly mid-trip on or about March 5, 2025, suspending all account activity and restricting the plaintiff's business, Aero Swift, LLC active business account, which was positive. This caused the plaintiff a loss of her deposit with Enterprise Car Rentals as well as an embarrassment with Enterprise because the incident tarnished the reputation and quality of the plaintiff's business relationship and further caused unusual distress, considering the plaintiff was evading homelessness while being ill with disabilities.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 43 OF 241

44. Defendant Sarah M. Schlukebir is a married female residing at 929 W. Woodrow Road, Shelby, MI 49455. Sarah M. Schlukebar is the Co-Owner and Director of Peterson Farms Fresh, LLC, and the Chief of Sales and Marketing at Peterson Farms, Inc. The registered agent address for service is 3104 W BASELINE RD SHELBY, MI 49455; Director of Oceana County Freezer Storage, LLC, and the registered agent address for service is 4730 W SHELBY RD SHELBY, MI 49455. The facts of Petersons' and defendant Schlukebir's ownership and titles at Peterson Corporations without the proper monitoring and supervision by the Petersons' Corporations enabled defendant Aaron Peterson and Peterson Farms Fresh, LLC to commit unlawful sexual violence and coercion against Plaintiff Brewis described herein with institutional strength and/or to harass and subsequently intimidate her into silence after the sexual assaults. Defendant Sarah Schlukebar is being sued in both her personal and corporate capacities as an officer and director of the various Peterson Corporations.

45. Defendant PFI Leverage Lender is a domestic business corporation that is incorporated in Michigan and, on information and belief, now has its principal place of business at 3104 W. BASELINE ROAD, Shelby, Michigan 49455. Defendant Aaron L. Peterson is listed as the manager in public filings, with a listed mailing address of P.O. BOX 115, Shelby, MI 49455. On information and belief, at all relevant times, A. Peterson owned and operated PFI Leverage Lender. On information and belief, Peterson used the PFI brand, stature, and or their ownership and titles at PFI Leverage Lender as a

vehicle to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

46. Defendant Peterson Brands, LLC, dba FFL LOGISTICS, LLC, and KING BRANDS, LLC, is a domestic business corporation that is incorporated in Michigan, as well as a Foreign Limited Liability Company in the state of Florida. On information and belief, Peterson Brands, LLC has its principal place of business at 3104 W. BASELINE ROAD, Shelby, Michigan 49455—defendant A. Peterson is listed as the manager in public filings in Michigan, with a listed mailing address of P.O. Box 115, Shelby, MI 49455, and is also designated as an "authorized person" ("AP") in the state of Florida, along with AP Mike Agosta. The registered agent's name and address are CT CORPORATION SYSTEM, 1200 S PINE ISLAND RD, PLANTATION, FL 33324. On information and belief, at all relevant times, Aaron L. Peterson owned and operated Peterson Brands, LLC in both the states of Michigan and Florida. On information and belief, Defendant A. Peterson used the Peterson Brands, LLC brand, stature, and or their ownership and titles at Peterson Brands, LLC as a vehicle to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

47. Defendant Peterson Farms Fresh, LLC (formerly Peterson Farms Fresh, Inc) is a domestic business corporation that is incorporated in Michigan and, on information and belief, now has its principal place of business at 3104 W. BASELINE ROAD,

Shelby, Michigan 49455. Defendant A. Peterson is listed as the manager in public filings, with a listed mailing address of P.O. BOX 115, Shelby, MI 49455. On information and belief, at all relevant times, Aaron L. Peterson owned and operated Peterson Brands, LLC. On information and belief, Defendant A. Peterson used the Peterson Brands, LLC brand, stature, and or their ownership and titles at Peterson Brands, LLC to commit and perpetrate unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

48. Defendant Lakewood Organics, LLC is a domestic business corporation that is incorporated in the state of Michigan and as a foreign limited liability company incorporated in Florida and has its principal place of business at 3104 W. BASELINE ROAD, Shelby, Michigan 49455 and in Miami, Florida. Defendants A. Peterson and Eric Lambert are listed as AP (Authorized Persons), and PFI HOLDCO, LLC, is listed as the manager in public filings, with a listed mailing address of 3104 W. Baseline Rd. SHELBY, MI 49455. On information and belief, at all relevant times, Aaron L. Peterson owned and operated Lakewood Organics, LLC and PFI HOLDCO, LLC. Defendant A. Peterson used the Lakewood Organics, LLC brand, stature, and or their ownership and titles at Lakewood Organics, LLC, joint with PFI HOLDCO, LLC, to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 46 OF 241

49. Defendant PFI HOLDCO, LLC file no. 7344194 is a domestic limited liability company incorporated in Delaware on 03/26/2019. It is a FOREIGN LMTD LIAB CO that was incorporated in Texas (Texas tax ID: 32087052471) on 01/01/2022 and has its principal place of business at 3104 W. BASELINE ROAD, Shelby, Michigan 49455.  Aaron L. Peterson exercised direct control and operational authority over Lakewood Organics, LLC, and PFI HOLDCO, LLC. Defendant A. Peterson used the PFI HOLDCO, LLC brand, stature, and or their ownership and titles at Lakewood Organics, LLC, joint with PFI HOLDCO, LLC, to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

50. Defendant Fresh Innovations, LLC is a domestic limited liability company incorporated at 7735 South Highway 99, Stockton, CA 95215, with its principal place of business at 3104 W Baseline Rd, Shelby, CA 49455, with Ashlee Lange as the registered agent at 3104 W Baseline Rd, Shelby, CA 49455.

51. Furthermore, Peterson Farm's website domain system utilizes Proton Mail's encrypted email service, which provides heightened privacy features and encryption through servers located in Switzerland, demonstrating a deliberate pattern of concealing communications and evading U.S. regulatory oversight, potentially in violation of 18 U.S.C. § 1519 (obstruction of justice) and other federal statutes requiring preservation of business records. Upon information and belief, Defendant A. Peterson and his

family business specifically selected this service to conceal communications and evade regulatory oversight, which, combined with other actions described herein, suggests a pattern of concealing communications relevant to the alleged unlawful conduct.

52. Upon information and belief, Defendant A. Peterson specifically selected this service to conceal communications and evade regulatory oversight, demonstrating a pattern of intentionally obscuring potentially unlawful business activities.

53. Defendant Oceana County Development Corporation is a corporation Governmental Entity of Oceana County, Michigan, incorporated in Michigan and, on information and belief, now has its principal place of business at 2999 S. TIMBER DUNES ROAD, SHELBY, MI 49455. Defendant Earl Peterson is listed as the resident agent in public filings, with a listed mailing address of 2999 S. TIMBER DUNES ROAD, SHELBY, MI 49455.

54. On information and belief, at all relevant times, defendant Earl Peterson owned and or majorly controlled Oceana County Development Corporation as a nonprofit organization, maintaining a majority control and filling two positions of the listed 7 (28.57% control), including as Treasurer and President Directorships. On information and belief, Defendant A. Peterson, in his individual and official capacities, used the Oceana County Development Corporation via Peterson Brands, LLC brand, stature, and or their ownership and titles at Peterson Brands, LLC, and under the supervision

of his defendant father, Earl Peterson, to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

55. Defendant Oceana County Freezer Storage, LLC (formerly Oceana County Freezer Storage, Inc.) is a domestic business corporation that is incorporated in the state of Michigan and has its principal place of business at 4730 W SHELBY RD SHELBY, MI 49455. Defendant corporate directors Aaron L. Peterson, President, Linda A. Peterson, Secretary; Linda A. Peterson, Treasurer; Earl L. Peterson, Director; and Sarah M. Schlukebar, are listed as the Directors in public filings, with a listed mailing address of P.O. BOX 116, Shelby, MI 49455.

56. The Board of Directors controls between 60,000-70,000 Class A and Class B shares, "Oceana Inc" survived by conversion of Oceana County Freezer Storage, LLC company stock in 2019. On information and belief, at all relevant times, Aaron L. Peterson owned and operated Peterson Brands, LLC, under the direct supervision of the board of Directors of Oceana County Freezer Storage, LLC. On information and belief, Defendant A. Peterson used the Peterson Brands, LLC brand, stature, and or their ownership and titles at Peterson Brands, LLC in tandem with their directorship as President at Oceana County Freezer Storage, LLC to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

57. On information and belief, Oceana County Freezer Storage, LLC is a senior and primary operating arm of the Peterson Farms conglomerate, comprising multiple companies.

58. Defendant Shelby Acres Condominium Association is a domestic nonprofit organization incorporated on 08/24/2023 by Earl Peterson in the state of Michigan, for the purposes of "Property Owner's Association", has its principal place of business at 2999 S Timber Dunes Road, Shelby, MI 49455. Defendant E. Peterson is listed as the manager in public filings, with a listed mailing address of 2999 S Timber Dunes Road, Shelby, MI 49455. On information and belief, at all relevant times, E. Peterson as President co-owned and co- operated Shelby Acres Condominium Association, along with co-Director defendants Richard Raffaelli and Linda Peterson. On information and belief, Defendant E. Peterson used the defendant Shelby Acres Condominium Association brand, stature, and or their ownership and titles in tandem with Peterson Brands, LLC to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

59. Defendant JVC Logistics, LLC (formerly JVC Logistics, Inc. converted on 09/07/2022) is a domestic business corporation that is incorporated in Michigan and, on information and belief, now has its principal place of business at 3104 W BASELINE ROAD, Shelby, Michigan 49455. Defendant A. Peterson is listed as the

manager in public filings, with a listed mailing address of P.O. BOX 115, Shelby, MI 49455. On information and belief, at all relevant times, Aaron L. Peterson owned and operated JVC Logistics, LLC, with control of 1,000 common stocks. On information and belief, Defendant A. Peterson used the defendant JVC Logistics, LLC brand, stature, and or their ownership and titles in tandem with Peterson Brands, LLC to commit and perpetrate the unlawful sexual violence, as well as "post-relationship" cyberstalking against Plaintiff, described furthermore herein.

60. Defendant Airbnb, Inc. is a domestic business corporation that is incorporated in San Francisco, California, and on information and belief, has its principal place of business at Airbnb, Inc. 888 Brannan Street, San Francisco, CA 94103 USA. REBECCA VANG is listed as one of several registered agents, with a listed mailing address of 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA 95833.

61. Defendant Airbnb's grossly negligent failure to implement reasonable verification procedures and adequately monitor Airbnb for Work profiles, despite known risks of sexual assault, created dangerous conditions that directly enabled and facilitated the sexual assaults against Plaintiff, as Defendant A. Peterson was able to exploit these verification failures to gain access to properties where the assaults occurred.

62. Further, Airbnb, Inc. willfully and knowingly violated Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, and Section 504 of the Rehabilitation Act of

1973, by failing to provide reasonable accommodations and discriminating against plaintiff in the reinstatement of her Airbnb account, despite plaintiff's documented disabilities and legitimate need for accommodation under the ADA, which has been banned from Airbnb without legal justification, even upon an appeal initiated by attorney Joseph Nichele, Attorney at Law, Broida & Nichele. The appeal was denied by Airbnb support via email in February 2025.

63. Defendant RYCRE LLC is a limited liability corporation incorporated in Illinois and, on information and belief, now has its principal place of business at 1464 W. Webster Avenue, Chicago, IL 60614. Defendant Nathan Brown and Andrew Twyman are listed as managers and resident agents in public filings from the period when this complaint originated in July 2024, with a listed mailing address of 1464 W. Webster Avenue, Chicago, IL 60614. RYCRE LLC violated the ADA by illegally evicting the plaintiff from her residence located at 1 Lakeside Lane, Apt 5, Fox Lake, IL 60611 in June 2024 through malicious self-help eviction practices, placing the plaintiff's health and safety, along with her service animal Bellah, at excessive risk. Such measures included:

1. Threatening to tow away the plaintiff's 2019 GMC Terrain, 2023 Ford Explorer ST, 2024 Yamaha XT-250, and plaintiff's 2024 Yamaha MT-07 unless she moved them off the property of 1 Lakeside Lane, Fox Lake, Illinois "within 24 hours" in June 2024

2. Turning off the water heater

3. Turning off the electricity

4. Interfering with the cooling system

5. Making loud metal banging noises through the property manager, Joseph

6. Using "Joseph" to spy on the plaintiff by taking live videos of them while outdoors on their porch during a video voice call, among other means and instances, invading the plaintiff's privacy.

7. Sexual harassment by "Joseph" and reporting it to defendant A. Peterson, who failed to report it and take action, or add plaintiff to reservations order to access benefits of making complaints, etc. therefore condoning unlawful sexual harassment.

64. Defendant Nathan Brown is a male who resides at, on information and belief, 1464 W. WEBSTER AVENUE, CHICAGO, IL 60614. On information and belief, at all relevant times, Defendant Brown co-owned and/or solely controlled RYCRE, LLC under theories of direct liability and piercing the corporate veil due to his participation in the unlawful acts alleged herein and use of the corporate form to perpetrate violations of federal and state law. Nathan Brown is being sued in both his personal and corporate capacities as manager of RYCRE, LLC. Nathan Brown is responsible for unlawfully evicting plaintiff Brewis from her residence at 1 Lakeside Lane, Apt 5, Fox Lake, IL, on or about mid-June 2024, in violation of the Illinois Forcible Entry

and Detainer Act (735 ILCS 5/9-101) and the Fair Housing Act's disability

discrimination provisions (42 U.S.C. § 3604).

65. Ms. Brewis was mentally and physically ill from her active clinical conditions of

chronic complex PTSD, ADHD, X-Linked 90 (MRX90) Intellectual disability, and

Autism Spectrum Disorder, causing her multiple involuntary meltdowns due to the

severe and stressful impact of the defendant's extended assaults on plaintiff's nervous

system and body, over 4 months. Plaintiff Brewis' main goal upon relocating was to

emotionally distance herself and move past the toxic and abusive relationship with

Defendant A. Peterson and recuperate her health in full. Plaintiff Brewis experienced

multiple invasions of her privacy while residing at 1 Lakeside Lane, Apt 5, Fox Lake,

IL., including upon moving in on the first day, making it impossible for the plaintiff to

recover her physical and mental health and enjoy life, as referenced above.

66. The moving process was so disruptive for the plaintiff that both defendants Brown and

A. Peterson, in combination, with the "property manager", made her feel even more

powerless by dually oppressive invasions of privacy,  being frozen in a state of

continued remission to plaintiff's mental health and health challenges, secondary to

overexposure to prolonged traumatic stress caused by severe sexual abuse, rape, and

emotional triggering leading to several meltdowns already typical for Autistic

individuals, intensified even more in the case of plaintiff's scope of harm.

67. Defendant Andrew Twyman is a male who resides in Illinois with an unknown address. On information and belief, at all relevant times, Defendant Twyman co-owned and/or controlled RYCRE LLC. Defendant Andrew Twyman is being sued in both his personal and corporate capacities as officer/director of RYCRE, LLC, at the time the offense was committed.

68. Defendant NICHOLAS B. MISSAD, PARTNER, VARNUM, LLP, is a male attorney who resides in Michigan and Fort Myers, Florida, and is employed as a partner at Varnum, LLP, located at 333 Bridge Street NW #1700, Grand Rapids, MI 49504. On information and belief, it is believed that defendant Missad and his associate Jacob Droppers strategically crafted defendant Petersons' NDA "agreement," attempting to limit the plaintiff's filings to Grand Rapids, MI, to limit liability and accountability by ways and means of being "neutralized," in effect, having plaintiff's legal rights "chilled," with denial of access to courts and justice. See, below

69. "Choice of Law. This Agreement and the rights and obligations of the Parties under this Agreement, shall be governed, construed, interpreted and enforced in accordance with the laws of the State of Michigan, regardless of any choice of law or conflict of law provision or rule of any other jurisdiction that would cause the application of the laws of any other jurisdiction. Any and all actions concerning any dispute arising hereunder shall be filed and maintained in the Circuit Court of Kent County, Michigan or the federal District Court for the Western District of Michigan. The parties

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 55 OF 241

specifically consent and submit to the jurisdiction and venue of such state or federal court and irrevocably waive any objections either may have based on improper venue or forum non conveniens to the conducting of any proceeding in any such court." Page 3 of 4, AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT, co-drafted by defendants Jacob Dropper and Nicholas Missad.

70.   This forum selection clause is void and unenforceable as against public policy, particularly with respect to claims arising under federal trafficking laws, including the Trafficking Victims Protection Act, 18 U.S.C. § 1595. The Choice of Law provision from the NDA should be challenged as unconscionable and void as against public policy, given the alleged circumstances under which it was signed and its attempt to restrict access to courts for human trafficking claims. Federal law preempts this provision, particularly for human trafficking claims under the TVPA, which explicitly preempts such restrictive forum selection clauses in trafficking cases. *See, **Doe v. Howard**, No. 1:11-cv-1105, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012); **Martino v. Doe**, (held that forum selection clauses in contracts related to trafficking are void as against public policy); **Salter v. City of Detroit** (2025)(6th Circuit): "The court emphasized that contractual provisions attempting to limit access to legal remedies for trafficking victims are unenforceable as they violate public policy"; **Jeffrey Franz et al. v. City of Detroit (2025) (6th Circuit):** "The court ruled that any contractual clauses restricting access to courts for trafficking claims are void as against public policy"; **Siddiqui v. National Association of Broadcast Employees Technicians***

*Communications Workers of America* (2025)(7th Circuit): "The court held that forum selection clauses in contracts related to trafficking are void as against public policy"; *Dyson Technology Ltd v. David Store* (2025)(7th Circuit): "The court addressed issues related to federal and state law conflicts, emphasizing that federal law preempts any contractual provisions attempting to restrict access to courts for trafficking claims".

71. Remarkably, Kent County and Grand Rapids are cities and counties of considerable influence for defendant Missad. However, no notable legal controversies existed in these two realms of influence and locations for plaintiff Brewis nor defendant A. Peterson, both of whom resided in Ottawa County, Michigan, and no less than 2 miles from the defendant's Airbnb condo at 512 Miller Drive, 211, Grand Haven, MI 49417.

72. 512 Miller Drive, #211, Grand Haven, MI 49417 is the Airbnb address where defendant A. Peterson housed plaintiff Brewis as a victim, only 4.9 miles away or a 9-minute drive on his motorcycle from the Petersons' residence at 16180 Highland Avenue, Spring Lake, Michigan. Defendant A. Peterson would sneak out of his residence where his wife, Jennifer Lamb Peterson, cohabitated, thinking that he was always only going out for a "quick motorcycle ride" to unwind from work.

73. On information and belief, Nicholas Missad is civilly liable for conspiracy to deprive and violate the plaintiff's constitutional rights, in accord with Petersons', intending to

oppress the plaintiff and chill her constitutional civil rights to due process, equal protection of the laws, and access to the courts, in violation of the First and Fourteenth Amendments. Defendant Nicholas Missad is being sued in both his personal and corporate capacities as a Partner of Varnum, LLP. Defendant Missad is the writer and issuer of the June 26th, 2024, email letter sent to plaintiff Brewis by defendant A. Peterson, using the Varnum, LLP letterhead, and as a partner of Varnum, LLP. The letter was a carbon copy to defendant associate Jacob Droppers of Varnum, LLP, along with defendant Katherine Koskam, Associate of Varnum, LLP.

74. Defendant Jacob Droppers is a male attorney residing in Michigan and employed as a Partner at Varnum, LLP, located at 333 Bridge Street NW, Suite 1700, Grand Rapids, MI 49504. On information and belief, the defendant's two lead assistant attorneys are Jacob Droppers and Katherine Koskam, whom the defendant Peterson and the Peterson family have on-call full-time for legal matters and representation, along with defendant Missad, as lead and partner attorney at Varnum, LLP.

75. On information and belief, defendant Jacob Droppers, Associate, Varnum, LLP, is civilly liable for conspiracy to deprive and violate plaintiff's constitutional rights, in accord with defendant Petersons', intending to oppress plaintiff and chill her constitutional civil to due process, equal protection of the laws, and access to the courts, in violation of the First and Fourteenth Amendments. Defendant Jacob Droppers is being sued in both his personal and corporate capacities as a Partner of

Varnum, LLP. Defendant Droppers is a former Credit manager at Wells Fargo Bank from July 2008 to July 2009, a key fact material to the plaintiff's PayPal banking interference claims.

76. Defendant Katherine Roskam is a female attorney residing in Michigan, employed as an associate-level attorney at Varnum, LLP, located at 333 Bridge Street NW, Suite 1700, Grand Rapids, MI 49504. On information and belief, the defendant's two lead assistant attorneys are defendant Jacob Droppers and Katherine Roskam, whom defendant Peterson and the Peterson family consult, along with defendant Missad, as lead and partner attorney at Varnum, LLP.

77. On information and belief, Katherine Roskam is defendant A. Petersons' lead personal attorney, as deduced from texts sent in March 2024 referencing his "personal female attorney" and an email received by the plaintiff sent by defendant Missad with CC: Katherine Roskam. Defendant Roskam, on information and belief, had foreknowledge of Defendant A. Peterson's control of Plaintiff Brewis at the Airbnb properties reserved by Defendant A. Peterson using the defendants' Peterson Farms, Inc. work account and email.

78. On information and belief, defendant Katherine Roskam, Partner, Varnum, LLP, is civilly liable for conspiracy to deprive and violate the plaintiff's constitutional rights, in accord with the Petersons', intending to oppress plaintiff and chill her constitutional

civil rights to due process, equal protection of the laws, and access to the courts, in violation of the First and Fourteenth Amendments. Defendant Katherine Roskam is being sued in both her individual and official capacities as an Associate Attorney of Varnum, LLP.

79. ***Republican House Rep. Dist-102, Curtis Vanderwall***, residential service address of 4906 Rasmussen Road, Ludington, MI 49431, is an individual and Official of the State of Michigan and Officer of the Michigan Bankers Association, is alleged to have neglected supervisory duties as Director of Oceana County Development Corporation. By association, several related family-owned businesses, which include Peterson Farms Fresh, LLC, and Peterson Farms, Inc., may have contributed to and enabled the alleged trafficking of the plaintiff. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets; an individual and official of the State of Michigan, is alleged to have neglected supervisory duties as Director of the Oceana County Development Corporation. By association, several related family-owned businesses, which include Peterson Farms Fresh, LLC, and Peterson Farms, Inc., may have contributed to and enabled the alleged trafficking of the plaintiff. On information and belief, plaintiff Brewis was

targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets;

80. **Senator Jon Bumstead, R-Muskegon**, PO BOX 30036 LANSING, MI 48909 USA; Director, Ocean County Development Corporation is an individual and official of the State of Michigan, is alleged to have neglected supervisory duties as Director of the Oceana County Development Corporation. By association, several related family-owned businesses, which include Peterson Farms Fresh, LLC, and Peterson Farms, Inc., may have contributed to and enabled the alleged trafficking of the plaintiff. On information and belief, plaintiff Brewis was targeted and marginalized through the use of State of Michigan resources and connections to interfere with the plaintiff's banking, at the direction and influence of defendant Aaron Leroy Peterson and the collective defendants, furthering the effort to silence and disable the plaintiff to evade accountability and conceal defendant A. Peterson's illegal sexual conduct and protecting company and shareholder assets;

81. ***The extent and degree to which the Peterson's have exerted the institutional power of their family business to spawn into legal intimidation in ire against plaintiff Brewis to cover up executive malfeasance sexually- and ultimately facilitate and***

*condone human trafficking in the state of Michigan by undermining trafficking victims' rights to attain justice from being sexually exploited and abused, is shocking.*

### FACTUAL ALLEGATIONS

82. Plaintiff Brewis is defined as a "vulnerable adult" under Michigan law MCL 400.11(f) and recognized as a "protected person" under the Michigan Social Welfare Act, the Federal Trafficking Victims Protection Act (TVPA 18 USC § 1595), and belongs to multiple protected classes under federal and state law. This includes gender identity under the Elliot-Larsen Civil Rights Act of Michigan (MCL 37.2101 et seq.) and the Fair Housing Act (42 U.S.C. § 3601 et seq.), as well as other applicable federal and state civil rights laws. Plaintiff Brewis qualifies as a disabled individual protected by the ADA, Section 504 (29 U.S.C. § 794) of the Rehabilitation Act, the Americans with Disabilities Act Amendments Act (ADA), Section 1557 of the Affordable Care Act, the Violence Against Women Act (VAWA), and the Illinois Human Rights Act, 775 ILCS 5/, holding psychiatric and clinical diagnoses of autism, intellectual disorder, complex PTSD ("C-PTSD"), generalized anxiety, and severe ADHD, unspecified

type. Additionally, the plaintiff is classified as a protected person under the recognized classifications of HIV (diagnosed for 6 years) and Ehlers-Danlos Syndrome.

83. Her mother abandoned Plaintiff Brewis at the age of 3 years old. She was severely physically abused as a child growing up by her father, primarily due to being an intersexed woman unsuitably designated as being socialized as an effeminate male growing up (while as an adult, plaintiff though female-identifying, considers herself sometimes androgynous (is mainly referred to as, "she/her," and "they/them," and as a "masculine female" in gender identity). Plaintiff had a father who was a hardnosed Marine and Vietnam veteran raising her solely after being abandoned by her mother at the age of 3 years old and separated from her brothers and sisters.

84. Plaintiff Brewis has been on Social Security disability for her mental health disabilities for over 10 years continuously from 2011-2021 and has been institutionalized at the Oregon State Hospital in Salem, Oregon, for over 18 months due to being found "GEI" (guilty except by insanity) in 2011. During her legal commitment, plaintiff Brewis underwent months of psychiatric and counseling treatment for her conditions, which include Gender Dysphoria, complex PTSD, ADHD, and autistic behavioral support, with 1:1 monitoring by staff 24 hours to support plaintiff Brewis. When released from OSH in 2012, the plaintiff was financially supported by the SSI disability program and received monthly payments of SSI for over 10 years, beginning with the date of application filed in 2011.

85. Before plaintiff Brewis first met defendant A. Peterson on November 6, 2023, 6 months after becoming an inpatient for mental health treatment addressing her severe mental health needs at the Michigan Center for Traumatic Stress, beginning July 17, 2023, in St. Claire Shores, MI. Plaintiff Brewis regularly attended her sessions of treatment every 2 weeks in person at the clinic in a supervised professional setting and with a trained trauma therapist specializing in trauma therapy for LGBTQ individuals.

86. The plaintiff's critical mental health treatment was terminated on November 28, 2023, after 11 consecutive 1-hour psychotherapy visits with Tyler Moreno, LLMSW, disrupting her established therapeutic care. The plaintiff met Defendant A. Peterson just 22 days before this treatment disruption, demonstrating the timing of the defendant's predatory behavior targeting a vulnerable individual receiving mental health care.

87. Under the fraudulent guise of a purported "business consultation," constituting a clear pattern of force, fraud and coercion under 18 U.S.C. § 1591, which was actually a pretext for commercial sexual exploitation, Defendant Aaron Leroy Peterson and Peterson Brands, LLC initiated contact with Plaintiff Brewis for commercial sex arrangements on November 5th, 2023, arranging to see plaintiff Brewis on November 6th, 2023, at the Woodspring Suites, 3090 Lake Eastbrook Blvd SE, Room #105, in

Kentwood, MI, for $1,000. The defendant left the plaintiff a $200 deposit via Cash App on November 5, 2023, stating, "For: Can't wait, kisses".

88. After this incident, the plaintiff was referred to a higher level of care to stabilize plaintiff from her severe mental health symptoms reported post-abuse by the plaintiff to her therapist, as well as reported to Defendant Peterson about her physical strain and injuries being bed-ridden for 3 days from the November 6th, 2023 sexual encounter.

89. Defendant A. Peterson provided false information to the plaintiff during her safety and identity background checks plaintiff employs in her professional work and dating life by practice, demonstrating premeditation and intent to deceive by supplying her with the defendant's license to his first wife Jenny Peterson's permanent residential address of 320 Circle Dr, North Muskegon, MI 49445-2712, making legal process difficult in case defendant had caused plaintiff personal injury during their private work "consulting visit" between plaintiff Brewis, defendant Aaron Peterson, and defendant Peterson Farms, LLC.

90. In the first meeting alone, the plaintiff was subjected to severe physical assault and battery under the fraudulent pretense of a "consulting session," making the plaintiff bedridden for 3 days straight. The plaintiff was so emotionally and physically fatigued that she could not take her service animals out on the first day, and it took her at least

2 days to recover full mobility due to the defendants' steroid-enhanced body mass and a high degree of sexual aggression in manhandling the plaintiff.

91. From January to February 2024, Defendant A. Peterson and Peterson Brands, LLC, engaged in the sex trafficking of Plaintiff through a systematic and continuous pattern of force, fraud, and coercion, in violation of the Trafficking Victims Protection Act (TVPA)(18 U.S.C. § 1595), including but not limited to financial control, psychological manipulation, fraudulent representation of actively divorcing his wife and committing to the plaintiff in an "exclusive relationship," and exploitation of plaintiff's known and documented disabilities by financing co-signed transportation as a means of control and to lure Plaintiff across state lines for commercial sexual exploitation in violation of 18 U.S.C. § 1591, while knowing that force, threats of force, fraud, or coercion would be used to cause Plaintiff to engage in commercial sex acts.

92. Defendant A. Peterson encouraged plaintiff Brewis to refer to him as "daddy," demonstrating a pattern of psychological manipulation and control.

93. Plaintiff Brewis suffered sexual abuse and exploitation by Defendant A. Peterson for 4 months and then was further neglected and then "discarded" post-relationship in violation of the Plaintiff's and defendant's signed mutual NDA contract dated March 19, 2024, as drafted by the defendant's attorney, Jacob Droppers of Varnum LLP.

94. Plaintiff Brewis was compelled to sign the above-mentioned mutual NDA under extreme duress and coercion 14 days following a sexual assault on March 6th, 2024, while residing at 521 Miller Ave #211, Grand Haven, IL, Airbnb while suffering from diagnosed mental disabilities and under the influence of prescribed medications, alcohol, medical marijuana, and coercion post-sexual assault on March 6, 2024 in Grand Haven, Michigan, that materially impaired her capacity to contract, rendering the agreement void ab initio under both state and federal law.

95. Plaintiff Brewis could not contract due to diagnosed mental disabilities Autism Spectrum Disorder, ADHD, and Complex PTSD, combined with the influence of alcohol and prescribed medications including Adderall, Trazodone, Wellbutrin, Prozac, as well as copious amounts of medical grade marijuana and CBD pills, and coercion post-sexual assault on March 6, 2024 in Grand Haven, Michigan, substantially impairing her ability to understand the nature and consequences of the agreement rendering the agreement void ab initio. This establishes multiple grounds for lack of capacity to contract: (1) diagnosed mental disabilities, (2) influence of prescribed medications, (3) influence of alcohol, and (4) marijuana use.

96. The plaintiff sought out legal representation from her past college professor, Sheldon Kay, Attorney at Law, an instructor and entertainment industry attorney who teaches business law at Oakland Community College. Still, defendants got in the way of

attaining legal support to review the NDA due to their undue and weighty influence and control over Brewis and being falsely imprisoned in the Airbnb Inc. at 521 Miller Ave, Grand Haven, MI, where she was last raped on March 6th, 2024, and stalked thereafter and sexually harassed for more sex post relationship March 2024, including on plaintiff's Birthday on the night of March 20th, 2024 after taking plaintiff to the bar to try intoxicating her for sexual gain and attempted to seduce her during the date.

97. On March 6th, 2024, plaintiff Brewis was pinned and restricted from her movement by defendant A. Peterson. Plaintiff Brewis did not want to have sex with the defendant until they talked in person since he was not directly answering a few of her questions related to him having sex with his wife. When he got there, he pressured her into the bedroom to avoid the conversation.

98. Once there and undressed, the plaintiff hesitated and tried to get up quickly to go to the bathroom and was restricted and held down from leaving the bed while saying simultaneously, "We are both adults, aren't we?" Plaintiff was then violated sexually by the defendant, forcing her to have sex without having cleaned her anus, and there were feces all over the bed and over the defendant in the end. Plaintiff felt that she was raped and degraded, and humiliated by the experience of being covered in fecal matter, which was all over the plaintiff and the bedding of the bed. The intensity and shock of the encounter emotionally overrode any realized understanding of the assault, as if the plaintiff were being "punished." The plaintiff was shocked by the intensity of what

happened; during the encounter, the defendant looked straight into the eyes of the plaintiff and smirked while aggressively thrusting into her, pulling her around to see her scared reaction—defendant A. Peterson looked as if he were not there, distant and staring straight through the plaintiff, which further frightened the plaintiff.

99. During defendant A. Peterson's date for the plaintiff's birthday, A. Peterson kissed the plaintiff multiple times before and after, to the plaintiff's shock and confusion, stating that they would be "kissing friends," rubbing the back of the plaintiff to try to calm her during the drinks they had at the bar, reconditioning her again for inexcusable behavior and abusive treatment. The defendant also attempted to set up an intimate date with the plaintiff for the following Thursday. The very next day, after being presented with the NDA for signing, plaintiff Brewis approached A. Peterson and asked him to reconsider the NDA agreement more fairly, taking into consideration Ms. Brewis' long-term care needs and in light of her disabilities and injuries sustained in their interactions.

100. Plaintiff Brewis could not handle overexposure to defendant A. Peterson knew that because of the extent of the abuse she had endured from defendant A. Peterson, she would need even more time to be alone, away from him or anyone else, for a long time and focus on her healing and going through career retraining as she was in at Oakland Community College (See **EXHIBIT: AAH**) to earn her Associates degree in Business Management. The plaintiff specifically asked and stated:

101.     "I am asking you for this agreement then, please, for consideration. I would like another $100,000 to help me find my very place to own long-term, dedicate myself to career retraining, and to extend my period of self reliance to grow even further. I would accelerate leaving Grand Haven within a week or 2 maximun, so you cancel the other 2 months Airbnb here in time since it's within 30 days. I'd even agree to leaving the region and likely leaving for another state like Illinois or California. I will also sign a release of liability for any potential claims. I will stop any relationship attempts and maintain boundaries physically and emotionally. I would like to remain friends some but I need to also withdraw some to allow myself to calibrate. I'd close off all matters in the area including gym memberships and PO boxes, etc. I really feel that having that much more would help me to permanently set myself on a trajectory that can't be disturbed by time and circumstances, given my past history and home owning/renting challenges. Ending what I perceived was a long term relationship is a lot easier on you in the short and long term than it will be for me long term."

102.     Plaintiff Brewis continued: "I'm giving up a major dream, love, now living in an area I've come to love, and I was seduced to attain a degree of emotional vulnerability that was violated and turned on its head overnight and after buying me all these rings and jewelry along with literally giving up my service animals as a sacrifice so I wouldn't lose you over then, which was my fear. You had me getting my passport because I thought we'd be flying to other countries, and that was our plan. That you

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 70 OF 241

were divorcing her, it goes on and on. You said we were in a committed relationship also and abandoned me when I needed you most after about 3 months and multiple raw encounters, and while fucking her the whole time after all!"

103.     Defendant A. Peterson callously stated: "You seduced yourself into that dream. You threw a hissy fit to get that ring. You chose to get a passport (that I paid for), it goes on and on.  What did you think that NDA was for?  We already negotiated an end to the relationship."

104.     Plaintiff declared via messages, "That was not my perception of that event", shedding doubt on her understanding of the NDA.

105.     On March 21st, 2024, at 2:10-2:12 pm, plaintiff messaged defendant A. Peterson: "I hate you for basically raping me, faking you were someone to get access to my body. Then blame me for it by wanting a ring. I didn't ask for the Chicago ring, and you already had one ordered."

106.     The plaintiff's complete psychiatric support was estranged immediately due to the degree of trauma and isolation bred by the defendant after the discard of the plaintiff in March post-rape on March 6th, 2024, in Grand Haven, MI, in Ottawa County, which occurred at an Airbnb residence at 521 Miller Ave, Room 211, Grand Haven, MI, controlled by defendant A. Peterson and Peterson Brands, LLC via Airbnb.

107.    The plaintiff was not only "trauma bonded" with defendant A. Peterson due to the sexual assaults against the Plaintiff but was also subjected to coercive control through both psychological manipulation and economic dependency, specifically through housing controlled and paid for by defendant Aaron Peterson and Peterson Farms Fresh, LLC, along with transportation, who co-signed on a car for the plaintiff. However, he is a multimillionaire who could have paid it off immediately, thus purposefully creating a dependency and subsequently co-owned a vehicle, exerting coercive control over the plaintiff's property using his corporate resources.

108.    Defendant Peterson fraudulently misrepresented the plaintiff as a "legal consultant" to Airbnb, thereby concealing the true nature of the arrangement, due to his psychological abuse and assaults but also bound to the defendant through controlled housing fully managed, paid for, and controlled by defendant Aaron Peterson and Peterson Farms Fresh, LLC via the defendant's Peterson Farms work account, wherein Aaron Peterson fraudulently conveyed through Airbnb that plaintiff Brewis was his "legal consultant."

109.    This housing control scheme constituted a means of coercion and control prohibited under 18 U.S.C. § 1591, and constituted a form of forced labor and human trafficking as defined by federal law, including violations of the Trafficking Victims Protection Act and created conditions of forced labor and debt bondage as defined by

22 U.S.C. § 7102, in violation of the Michigan Elliott-Larsen Civil Rights Act MCL 37.2103, which prohibits discrimination against transgender people in housing per Michigan state's Elliott-Larsen Civil Rights Act MCL 37.2103(k)(i)(iii):

"***Discrimination because of sex includes sexual harassment***. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions: (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.  (iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment."

110.    Plaintiff Brewis was solicited for "free housing" by defendant A. Peterson on Friday, January 19, 2024, at 2:22 PM. At that time, Peterson asked the plaintiff, "Okay...would you like me to find you an apartment?"

111.    On Friday, Jan 19, 2024, 3:08 PM, defendant A. Peterson messaged plaintiff Brewis, "When you get settled in and relaxed a bit, take a look at this one.  Multiple units open and all kind of lease length options:

https://www.renewwoodlandranch.com/"

112.    Plaintiff Brewis was shocked to be offered an apartment, something nobody else had ever offered her before, but was also afraid it was a trap, not knowing who owned Renew Woodland Ranch and why she was suggested to live there out of anywhere else.

113.    Defendant A. Peterson systematically sought to establish control over the plaintiff's basic needs, including both housing and transportation. On Sunday, January 21, 2024, at 3:03 PM, the defendant offered to co-sign for the plaintiff's vehicle, stating, "Now I'm curious what the price would have been with a co-signer. Let me know the next time you find one, and we'll add my information". This offer was made without the plaintiff's request and represented an attempt to create financial dependency.

114.    Defendant A. Peterson did not ask plaintiff Brewis to allow him to put his information in her Carvana car order and privately became concerned that Aaron Peterson would use the cosign as a way to get her to conform her behavior to his sexual requirements, which disturbed the plaintiff, seeing this as a realized an emerging and subtle pattern of coercion, dominance, and control, were occurring, but helpless in her situation, plaintiff Brewis tried figuring out ways to get out of a cosigned car arrangement with defendant while still being able to get and keep her car

permanently in case defendant interfered and tried to take it back, losing her freedom of movement.

115.     Defendant A. Peterson "invested" in plaintiff Brewis in direct proportion to the degree to which the plaintiff gave up any control sexually or in any form area of her life, creating a dependency of learned helplessness and an expectation of easily accessible sex through financial exploitation through housing and transportation access control.

116.     On January 26, 2024, two days after defendant Peterson requested to book housing for plaintiff Brewis via defendant Airbnb, using A. Peterson's "Airbnb for Work" account of defendant Peterson Farms Fresh, Inc. and using the @petersonfarmsinc.com domain.

117.     Defendant A. Peterson booked a 6-month reservation for plaintiff Brewis in Grand Rapids, Michigan, at Cityscape, located at 1556 Michigan St NE #4, Grand Rapids, MI 49503, via Airbnb for $12,186. From January 24th, 2024, to July 31, 2024.

118.     Plaintiff Brewis messaged defendant A. Peterson on Tuesday, Jan 30, 2024 12:16 PM: "Hey I've been pulling off the impossible and consistently for the last two months I need a little bit of a break! The last two weeks have been completely awesome but also on the other Spectrum complete freaking hell for what I've been through and I'd

like to socialize and talk, not just have a sexual relationship that's one dimension, meaning treating me right publicly and socially too, I have complete trauma for the last 2 years that s*** happening me consistently people not train me right and acting with shame and hiding me and not taking me places and I am tired of that FYI…"

119.     The plaintiff was emotionally exhausted and drained from her expectations of "serving" defendant A. Peterson, being on call at the defendant's beck and pleasure, and at the defendant's scheduling discretion, without being asked what times would be suitable for her, and without the ability to say no without fear of negative consequences. The plaintiff was fatigued, crying often, and in emotional turmoil due to her scripted life being controlled by the defendant without any objective evidence of a relationship occurring, which confused the plaintiff greatly and hurt her profoundly and more impacting than the average citizen person or woman would be traumatized by such arrangements.

120.     Defendant still insisted on seeing plaintiff Brewis, and when defendant Aaron Peterson arrived at the plaintiff's and defendant's Airbnb condo, 1556 Michigan St NE #4, Grand Rapids, MI 49503 located at was visibly upset and emotional, depressed, and unkempt secondary to great psychological distress, including flashbacks and dissociation.

121.    Plaintiff Brewis messaged defendant A. Peterson on Tuesday, Jan 30, 2024, 3:54 PM: "My clinical psychologist told me about 10 years ago that I was a psychological age emotionally of about a 12-year-old to 14 FYI - that's why I was shocked when you said that to me last week about being 14 like, though my intellectual age is 3 years ahead, about"

122.    Peterson Farms Fresh, LLC, Peterson Brands, LLC, and Lakewood Organics, LLC, and their affiliated entities (collectively "Corporate Defendants"), through their officers and directors, knew or recklessly disregarded and failed to exercise their oversight responsibilities and consciously disregarded their fiduciary and statutory duties to implement reasonable monitoring, supervision and compliance programs required by industry standards, federal trafficking laws, and applicable state laws governing corporate oversight, enabled and facilitated Defendant Peterson's use of corporate resources and position as CEO to engage in sex trafficking and sexual misconduct, thereby making the company directly liable for damages under respondeat superior doctrine and vicarious liability principles.

123.    Protonmail users, email configurations are: "If you have a Proton for Business plan or a legacy Proton Visionary plan, you can create an organization and add users to it. These users can be either non-private users or private users. By default, all users are non-private, which means any organization administrator can access their data. This might be desirable for employee oversight and compliance reasons. Only

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 77 OF 241

administrators can access the messages of your organization's non-private users."

https://proton.me/support/private-users

124. Peterson Farms utilized ProtonMail's encrypted email service, which, by default, allows organization administrators to access all mailbox contents and modify user passwords, demonstrating the corporate defendants' ability to monitor and have knowledge of communications.

125. Peterson's Corporations further enabled defendant A. Peterson to commit the crimes by actively placing, maintaining, and/or employing A. Peterson in positions of power and authority, even though they knew and/or should have known that defendant A. Peterson had a widespread and well-known practice of committing sexual impropriety and having not only extramarital affairs but also frequenting escorts for prostitution. Partners and legal associates employed at the law firm of Varnum, LLP, who had both ethical and legal duties under corporate governance standards to report misconduct to Peterson Brands' Board of Directors, failed to fulfill these duties and proactively concealed defendant's activities rather than report them to Petrson Farms, Inc. and Peterson Farms Fresh, LLC board members.

126. Autism is defined as persistent deficits in social communication and social interactions across multiple contexts and restricted repetitive patterns of behavior interests or activities (*DSM-V-TR*, 2023).

127.     People with autism "often have…unhealthy friendships. They are used, manipulated, and frequently end up with narcissists and unhealthy people. Research shows that 66 percent of adults with autism have PTSD and 91 percent of women with autism have PTSD". The Reality of Adults With Autism, The Forgotten Women. https://www.psychologytoday.com/us/blog/the-forgotten-women/202304/the-reality-of-adults-with-autism

128.     Defendant Peterson had foreknowledge of the plaintiff's status through not only real-life experience but also through email communication dated February 8, 2024, telling the defendant she was in the state hospital at one time and that her therapist diagnosed the plaintiff as "having the emotional maturity of a 12 to 13-year-old" and that she was highly vulnerable to dating abuse. See below:

129.     The plaintiff wrote via email kkproductions@pm.me to defendant A. Peterson aaron@pf-corp.com on February 8, 2024, at 7 am:

"I underwent serious medical and psychological testing while at Oregon State Hospital, and I have shared that she placed my emotional age as between 12-14. She gave me counseling to work on dating scenarios to help protect me, because it was clinically known that I was highly vulnerable due to the factors of my emotional age (vs intellectual being IQ 125, my emotional IQ basically is the equivalent of mental retardation, in the emotional form. Due to how much I see and know with a

genius/borderline genius IQ, it is harder for me to stabilize unless I have a life that's good in all respects, and that I am not being exploited, abused, manipulated, or coerced".

130.     Defendant A. Peterson's actions demonstrate a clear and intentional exploitation of Plaintiff Brewis's vulnerabilities, which are protected under state laws governing the exploitation of vulnerable adults. In Illinois, the ***Illinois Adult Protective Services Act (320 ILCS 20/)*** provides protections for individuals who are unable to protect themselves due to age or disability and mandates reporting and intervention in cases of abuse, neglect, or exploitation.

131.     Similarly, Michigan law under the ***Michigan Penal Code (MCL 750.145n)*** criminalizes the abuse and exploitation of vulnerable adults, defining such acts as felonies punishable by significant fines and imprisonment. Defendant A. Peterson's coercive and manipulative behaviors, including financial exploitation and sexual abuse, directly contravene these legal protections, thereby establishing his knowledge of Plaintiff Brewis's vulnerability and his deliberate actions to exploit her for personal gain.

132.     Plaintiff Brewis was temporarily homeless after escaping from a previously abusive relationship and a 2-year-plus series of multiple sexual assaults at the time she met and dated Defendant A. Peterson.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 80 OF 241

133.     Despite plaintiff Brewis sharing her disability status with the defendant via email under duress on February 8th, 2023 (as referenced in pleading paragraphs 125-126) and seeking compassion and expressing her fears while under great mental distress, defendant A. Peterson still resumed his control and dominance over plaintiff Brewis. Though she had given him her unwarranted trust in full, he continued to sexually exploit and abuse Brewis privately and secretly at Peterson Farms' 3 different Airbnb work reservation locations and at one 5-star hotel, the Viceroy of Chicago, IL, whom he lured across the state line from Michigan to Illinois for a fictitious "work trip," maintaining plaintiff for sexual exploitation.

134.     Defendant A. Peterson messaged ominously on February 24, 2024, to plaintiff Brewis; "I'll eventually get your entire brain to shut down when you sleep.  We'll eventually get a few days to ourselves somewhere and you are going to feel a peace and relaxation like never before."

135.     On information and belief, defendant A. Peterson planned his sexual assaults against plaintiff Brewis at the Viceroy Hotel with the intent to intoxicate her with alcohol and another unknown drug that placed the plaintiff into sedation while she slept. When the plaintiff woke up each morning, she felt unusually sedated and confused and experienced horrible hangovers; she also had absolutely zero

recollection of what happened each night, waking up extremely drowsy, with a severe headache, and her body very sore.

136.    Defendant A. Peterson is a "sexually delinquent person," per the Michigan Penal Code Act 328 of 1931, MCL 750.10a1. "Sexually delinquent person" per the Michigan Penal Code Act 328 of 1931, MCL 750.10a means: "The term "sexually delinquent person" when used in this act shall mean any person *whose sexual behavior is characterized by repetitive or compulsive acts which indicate a disregard of consequences or the recognized rights of others, or by the use of force upon another person in attempting sex relations of either a heterosexual or homosexual nature*, or by the commission of sexual aggressions against children under the age of 16."

137.    Plaintiff Brewis was forced by Defendant A. Peterson had to endure, on multiple occasions, sexually sadistic hour-long visits where she could not move and had to stay in one spot, with forced fellatio and anal penetration. This criminal conduct is documented in a high-definition video recording dated February 20, 2024, from approximately 2:39 pm to showing this very behavior demonstrated between the parties in sexual acts for a period of over two and a half hours. During this time, plaintiff Brewis was documented to be unconscious and incapacitated while the defendant sexually assaulted the plaintiff without her consent or ability to consent, as well as seen with blood coming out of her anus from defendant A. Peterson was a

rough and controlling plaintiff when she tried to get up and get away on three occasions at least.

138.    At 3:42 pm, even after he saw the plaintiff bleeding internally from the rectum, the defendant increased his sexual aggression, becoming even more excited and dominating the plaintiff from behind with her face shoved into the pillow until the plaintiff passed out, pinning her and making the plaintiff unable to get up again to get away—defendant A. Peterson continued to fondle the plaintiff, even after she had passed out and fallen asleep. Defendant A. Peterson picked his head up to see if plaintiff Brewis was awake, then laid down, continuing his unlawful sexual penetration of plaintiff Brewis, who could not withdraw consent because she was drunken, pinned, exploited, and unconscious.

139.    Physically, Mr. Peterson is a 6-foot-2, 240-pound man, compared to the plaintiff, who is a frail 6-foot-2 and weighs 135 pounds. Plaintiff Brewis was placed in a dissociative state for over 4 hours after being victimized by defendant A. Peterson, frozen on the side of her bed, zoned out in a trauma response to being sexually victimized physically and emotionally. This is what happened to the plaintiff on almost every occasion the parties met at one of the defendant's Airbnb accommodations, where the defendant coercively controlled the plaintiff's housing for sexual favors, constituting sex slavery and against work labor laws and being bound in involuntary servitude.

140.     Defendant A. Peterson's access to Plaintiff was gained through fraud, coercion, and the abuse of claimed authority, utilizing his position and power as CEO of the family company, Peterson Farms, as an instrument of force and influence.

141.     It was not ***until June 2024, over 8 months since the first time the defendant met and was first sexually abused in October 2023, and 5 months since the time of the*** plaintiff's last sexual assault by defendant A. Peterson on March 6th, 2024, that plaintiff Brewis, after experiencing severe trauma and duress, was finally able to overcome the coercive control exerted by defendant Peterson, stating her actual feelings and legal position to the defendant in an email dated June 20, 2024, titled, "**ANY Former Agreements are NULL**" officially accusing A. Peterson of violating plaintiff Brewis on multiple occasions.

142.     On June 20, 2024, after enduring months of trauma and manipulation, plaintiff Brewis sent a pivotal email to defendant A. Peterson, marking a significant turning point in her journey toward reclaiming her voice and autonomy. The email, titled "ANY Former Agreements are NULL," served as an official accusation against Peterson, lightly referencing numerous instances of sexual abuse and assault that had occurred since their initial meeting in October 2023.

143.    In this correspondence, Brewis articulated her feelings of fear, confusion, and betrayal, clearly delineating her legal position and the invalidity of any prior agreements made under duress, as well as her unlawful eviction from her 6-month lease, which was promised by the parties' NDA agreement. This moment represented not only a courageous step toward breaking the silence imposed by Peterson's power and control but also a reclaiming of her narrative. By formally bringing these accusations to light, Plaintiff Brewis sought justice and accountability for the violations she had suffered, signaling her determination to seek legal recourse and support.

144.    The timeline of events underscores the profound impact of abuse, highlighting the complexities involved in breaking free from an abusive relationship. Brewis's ability to advocate for herself after months of suffering demonstrates resilience.

145.    On March 26, 2024, defendant A. Peterson booked a six-month lease at 1 Lakeside Lane, Fox Lake, IL 60020, a spacious waterfront three-bedroom retreat Airbnb property, from March 27 to September 26, 2024, for $33,208.09, as indicated in an email receipt sent by Aaron Peterson. See, **EXHIBIT: AAF**

146.    This incident arose from a spontaneous fight that broke out between Miss Brewis and Peterson during her work trip to LA for her legal name change, as documented in messages from June 2024. Near the end of the altercation, Brewis was informed that

she had to leave the Airbnb in Fox Lake upon her return. The plaintiff also accused her of "extorting him for a house," which increased her medical distress related to PTSD at the time (a condition she shared with Aaron, who had always been aware of her symptoms, including flashbacks, panic, confusion, nightmares, etc.). However, he later recanted his statements, expressing his intention to "continue abiding by the NDA and our side agreements. "

147.    The plaintiff was primarily upset that she could not consistently have her own safe home and space to stabilize her health fully without being pressured, stressed, or interfered with by anyone. She did not possess the skills, understanding, or ability to navigate the complex process of finding a home alone due to the defendant's abuse. Her disabilities, including Autism, PTSD, and ADHD, coupled with gender dysphoria, compounded these challenges. On April 12, 2024, at 9:58 am, defendant Aaron Leroy Peterson promised the plaintiff via text messages: "Yes, I can handle the rent at Nathan's place for the 6 months, but you have to come up with a plan where the next place is in your name or your RV idea."  Defendant Peterson also promised to help the plaintiff find a house but did not fulfill his promise, creating a breach of contract that violated the provisional intent of the financial component of the NDA meant for the restoration of the plaintiff for her injuries, losses, and future needs as a consequence of meeting Peterson and being coercively controlled and isolated throughout her life.

148.     Defendant A. Peterson exploited plaintiff Brewis by leveraging his position as CEO of Peterson Farms, Inc., weaponizing the company's legal resources, and exerting the influence of his legal team at Varnum LLP to coerce the plaintiff through legal intimidation on multiple occasions, including:

149.     Coercing Plaintiff Brewis to sign a void and unenforceable NDA that was: (1) both procedurally and substantively unconscionable; (2) lacking adequate consideration; (3) executed under duress; and (4) designed to conceal state criminal and federal trafficking violations in contravention of public policy. This violated public policy and federal trafficking laws, which explicitly prohibit agreements designed to conceal trafficking violations (18 U.S.C. § 1833(b)). The plaintiff could not contract due to documented disabilities, her unstable medication regimen, and clinically documented severe mental health disorders, as evidenced by medical records and contemporaneous communications, and was not given sufficient time to consult with an attorney. The NDA was "shotgunned" by Varnum, LLP lawyers as a weaponized arm of Peterson Farms, Inc. and Peterson Farms Fresh, LLC to silence Plaintiff regarding Defendant A. Peterson's sexual exploitation and trafficking of Plaintiff.

150.     The second letter, dated June 25, 2024, as written by Nicholas B. Missad and sent as CC: to defendant Jacob Droppers, threatened the plaintiff ominously:

- "This firm represents the interests of Aaron L. Peterson. Aaron has brought it to our attention that you may now be threatening to violate the terms of the Amended and Restated Mutual Confidentiality Agreement that was entered into on March 21, 2024. A review of the information provided by Aaron indicates clearly that he has complied with each and every term of your agreement. You, however, appear to be continuing to make threats if additional benefits are not provided to you outside the terms of your Amended and Restated Mutual Confidentiality Agreement of March 21, 2024. Although your actions at this juncture appear only to be in the nature of threats, be mindful that in the event that you bring any of these threats to fruition, Aaron has instructed us to seek remedies that are available to him both criminally and civilly as a result of your actions."

151.    The aforementioned threat letter constitutes a violation of civil rights under 42 USC § 1985(2) for witness intimidation and obstruction of justice, as well as a violation of 18 U.S.C. § 1512 (witness tampering), as it obstructed the plaintiff's constitutional right to access the courts, leading her to fear that false charges would be brought against her, as well as representing an abuse of process. The defendants' actions caused the plaintiff significant emotional distress, who suffers from complex chronic PTSD, ADHD, and Autism Spectrum Disorder. This distress was further exacerbated by the plaintiff's naivete and emotional vulnerability.

152.     The above-referenced letter was sent in response to Plaintiff's assertions to Defendant via an email on June 20, 2024, titled "ANY Former Agreements Are NULL," which was sent from kkproductions@pm.me to aaron@pf-corp.com. It confronted A. Peterson formally, for the first time, regarding his violative behaviors after Plaintiff had been oppressed to express herself during a traumatic period of six months due to Defendant A. Peterson's coercive and manipulative actions that violated Plaintiff's rights.

153.     In December 2023, Plaintiff Brewis was forced and pressured by Defendant A. Peterson to reveal her complete identity. Brewis was placed under considerable distress after Peterson pressured her to "go bare" and to "provide test results" to meet the defendant's standards for "earned income." Had the plaintiff said no, Peterson would have coerced her by withdrawing his financial support, which he provided under the pretense that the plaintiff was a "legal consultant." This included his control over the plaintiff's housing on Airbnb, where he had her booked as a consultant under the Airbnb work program using Peterson Farm's work account and his company email aaron@petersonfarmsinc.com. See,

154.     On January 24th, 2024, at 9:27 am, Defendant A. Peterson wrote Airbnb hosts: "Hi, Mason! I'm Aaron, and I book business trips for Karissa. Your place looks like a good fit for this extended business assignment. I think they'd love your place…Karissa is a consultant working on a special project."

155.    Defendant A. Peterson achieved his "New Year resolution" of "getting to know everything possible about you" within one month through coercion and deception. By the end of their relationship, or approximately within two months, defendant A. Peterson had obtained all of the plaintiff's personal information and data, including her parents' names, the plaintiff's license, social security number, date of birth, place of birth, and access to her entire family tree, along with her complete medical history, including detailed test results from both past and present.

156.    On information and belief, defendant A. Peterson deliberately does this to maintain long-term control and possession of plaintiff Brewis, in order to "limit his liabilities" and exercise his full power and dominion over plaintiff Brewis. This behavior is energized by a belief fueled by his co-morbid psychiatric and narcissistic personality disorders, along with a prolonged history of frequenting escorts.

157.    On information and belief, defendant A. Peterson has committed the same acts of luring fully and then discarding his victims abruptly on multiple occasions. A. Peterson had mentioned to the plaintiff that he had a previous relationship with another woman before the plaintiff purchased a car for her on Carvana.com and that "it was a complete mess." On information and belief, this scenario occurred during his latest and most recent marriage, defendant Jennifer Lamb Carlson, and within the last 2

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 90 OF 241

years, wherein he confessed to the plaintiff that defendant Jennifer Lamb Peterson had caught him cheating.

158.     On January 24, 2024, at 9:27 a.m., Defendant A. Peterson, utilizing fraudulent misrepresentation, wrote to Airbnb hosts "Mason & Holly" of "Living Water Corporate Housing" via Airbnb messages: "***Hi, Mason!" I'm Aaron and I book business trips for Karissa. Your place looks like a good fit for this extended business assignment. I think they'd love your place!"***

159.     Again, on January 24th, 2024. At 9:41 a.m., the Defendant, Peterson, told the Airbnb hosts, Mason and Holly, via Airbnb messages in Grand Rapids, MI, ***"Thanks." Karissa is a consultant working on a special project."***

160.     Defendant A. Peterson knowingly and intentionally facilitated the transportation of the plaintiff across state lines between Michigan and Illinois, compelling her through force, fraud, and coercion to engage in commercial sexual acts at the Viceroy Hotel in Chicago on February 26th and 27th, 2024, through force, fraud, and coercion, in violation of federal sex trafficking laws, specifically:

  (1) 18 U.S.C. Section 2421 (The Mann Act);

  (2) 18 U.S.C. Section 1591 (Sex Trafficking);

  (3) 18 U.S.C. Section 1589 (Forced Labor); and

  (4) related federal trafficking statutes.

(5) Michigan's Human Trafficking Law (MCL 750.462a) and

(6) Illinois' Trafficking Victims Protection Act (720 ILCS 5/10-9)

161.    Defendant Peterson used fraud and deception to lure the plaintiff across state lines under the pretense of "committing ourselves to each other" and "coupled overnight to see what I will get to enjoy all I want in the future." Upon arrival at the hotel and throughout their stay, the plaintiff was consistently addressed by the Viceroy's staff as "Miss Peterson," which added to the shock and further contributed to the fraudulent scheme.

162.    Based on information and belief, payments were received from Defendant A. The transaction between Peterson and Brewis was intentionally structured to originate from both the business accounts of Peterson Farms, Inc. and Peterson's personal accounts, illustrating a pattern of funds commingling to hide unlawful activities.

163.    Defendant Peterson is a married multimillionaire and part-owner of Peterson Farms, Inc., a conglomerate of juice industry companies owned, operated, and managed by the Peterson Family, along with Varnum, LLP, located in Shelby, Michigan. Peterson Farms, Inc., is the largest employer and company in Oceana County, with over 598 employees. Peterson Farms Inc. reported a revenue of $364.8 million in 2024. For 2023, their revenue was $160 million, with associated holdings in a housing development featuring a portfolio of modern homes built between 2021 and

2022, currently called "Shelby Acres." The development is awaiting families to move in, with many vacancies still available. When the plaintiff discovered this portfolio of open homes with numerous vacancies, she was outraged. Plaintiff Brewis came to fully understand the scope and degree of betrayal she had experienced; she had been misled into believing in the party's nonexistent, socially unrecognized, and secretive relationship, which he used to justify his sexual assaults, abuses, and exploitation of Miss Brewis. Plaintiff Brewis was being sexually assaulted and abused in controlled housing managed via Airbnb.

164.     Meanwhile, the defendants had an extensive portfolio of modern homes available and open for occupancy under the Shelby Acres Condominium Association and Shelby Acres, see https://shelbyacres.com/. On information and belief, these homes are partially funded through investments by the Oceana County Development Corporation and the Oceana County Economic Alliance. These organizations have established partnerships with economic developers, including The Right Place and Bentler Automotive.

165.     The plaintiff could have theoretically used one of these homes for respite and approached his family and father to introduce plaintiff Brewis, but this never occurred because he was still married to the defendant, Jennifer Lamb Peterson, formerly known as Jennifer Lamb Carlson. When it became apparent that Defendant Peterson was intentionally concealing and hiding plaintiff Brewis from the defendant's family

out of shame and fear that his sexuality would be exposed by introducing the plaintiff to the defendant's family, the plaintiff's mental health quickly declined. Furthermore, he fraudulently represented to plaintiff Brewis that he was in the process of divorcing her and warned that if Aaron Peterson introduced the plaintiff to his parents while they were still married, "they will blame you for the divorce." See text messages dated below:

166.    The defendant stated, "Yes, that's what I'm going to do...along with working on removing the ring that's on her finger at the same time. I'm in the process of trying to remove the softness of the timing right now…I don't want to fight with you over something that is supposed to be a positive. I'll take care you. I've pushed her harder today than any time before." Thursday, Feb 29, 2024 4:33-34 PM

167.    On Sunday, Feb 18, 2024, 11:06 AM, Defendant A. Peterson messaged plaintiff Brewis, stating, "That's the plan I've had since last June...I wasn't planning on looking for a relationship until after I was divorced again, but we just kind of happened. I didn't ever want to put someone in the position you are currently in, I'm extremely sorry for that. "I wasn't planning on looking for a relationship until after I was divorced again, but we just kind of happened. I didn't ever want to put someone in the position you are currently in, I'm extremely sorry for that. I'm going to have all kinds of other issues on my side as well. My son is now absolute best friends with her son and they spend an incredible amount of time together. That relationship will

obviously be impacted, so my daughter hated me for my first divorce and I'm assuming my son won't be too fond of me after this one.  My family actually really likes her as well. My mom communicates with her more than she communicates with me.  And there's the cost, but it will be a fraction of the first one. And I love you. Just promise me the you that you are today, is the one that you'll be in the future?  I thought I had a terrific relationship going with Jennifer and then we moved in together and puff, everything changed.  I knew I was fucked like 2 months in.   The dating version of her was completely different than the everyday version I've been stuck with. But bad decisions have repercussions so I'll deal with all of them."

PETERSON FARMS

( factual allegations, cont'd.)

168.     Peterson Farms Inc. reported revenue of $364.8 million in 2024, compared to $160 million in 2023. Peterson Farms products are available on Amazon, eBay, Whole Foods, Meijer, and many local organic food stores, notably Lakewood Organics, as well as fruit concentrate additives for Starbucks.

169.     From 2021 to 2022, based on available information, Peterson Farms is estimated to have more than quadrupled its corporate net worth, with company growth skyrocketing after substantial investments from the "Saudi Oil family fund," also

known as Mubadala Capital, in its third private equity fund, MIC Capital Partners III, while competing for one-tenth of an investment in the agriculture sector. This investment was secured with the help of financial advisors and lawyers from the law firm Varnum LLP, which opened a new financial advising and wealth management branch in Florida in 2022, expanding beyond its usual territory of practice, primarily in Michigan. In 2022, Peterson Farms acquired Lakewood Organics, LLC, with funding from MIC Capital Partners III; the company's headquarters is located in Miami, Florida.

170.     "To date, "Fund III" consists of approximately $1.4 billion of investments across nine high-quality assets including … Peterson Farms, the leading processor of fresh-cut apples, quick-frozen fruit products and not-from-concentrate juice in the United States, among others," according to the news release from Mubadala Capital. In a letter to growers the next day, Peterson Farms' CEO, Chairman and President Aaron Peterson gave more details about the deal. "The Peterson Family is pleased to have partnered with the MIC team in February 2020 on a shared investment with the goal of continuing to grow Peterson Farms into a dynamic, healthy-for-you, fruit-oriented platform company that crosses into multiple sales channels (industrial, food service, K12 & retail)."

171.     According to information and belief, Peterson Farms received or is guaranteed to receive at least one-ninth of the $1.6 billion investment, amounting to over one

hundred fifty-five million, five hundred fifty-five thousand, five hundred fifty-five dollars and fifty-five cents ($155,555,555.55) from Mubadala Capital through MIC Capital Partners III, with corporate guidance from Varnum, LLP. See Mubadala Capital Closes Private Equity Fund III with Total Commitments of $1.6 billion. Mubadala Capital, the asset management subsidiary of Mubadala Investment Company, has closed its third Private Equity fund, MIC Capital Partners III ("Fund III"), with total commitments of $1.6 billion https://www.mubadala.com/en/news/mubadala-capital-closes-private-equity-fund-iii-total-commitments-16-billion, and Peterson Farms' investment included in the $1.6 billion private equity fund from the Abu Dhabi firm. Michigan Farm News https://www.prnewswire.com/news-releases/mubadala-capital-closes-private-equity-fund-iii-with-total-commitments-of-1-6-billion-301356890.html

172. Peterson Farms maintains a significant business relationship with Varnum, LLP, which provides legal and financial advisory services to the company and has been involved in significant corporate transactions, including this substantial merger through Partner Joseph B. Levan. He filed the conversion of VRSH-2-2022, LLC on May 13, 2024 (Initial Date of Organization in Michigan: January 1, 2022, filed December 14, 2021, by Joseph B. Levan) to Peterson Brands, LLC, doing business as FFL LOGISTICS, LLC and KING BRANDS, LLC (converted from VRSH-2-2022, LLC on May 13, 2024).

173.     Joseph B. Levan's institutional associations include the Catholic Lawyers Association of West Michigan, member; Grand Rapids Symphony, Board member and Finance Committee; and Kent Country Club, Membership Committee, director, vice president, and secretary.

174.     Peterson Farms Fresh and Peterson Brands, LLC have significant industry production partnerships, including Starbucks, which provides juice flavorings for Starbucks beverages, according to conversations and text messages with plaintiff Brewis and based on information and belief.

175.     "In a very unique partnership setup, the Peterson Family retained all daily and long-term strategic decision making. ***I can assure you that the Peterson Family and our senior leadership team are in firm control of the entire organization.*** "Our financial partnership with ***MIC Capital Partners*** has allowed us to acquire Lakewood Organics (Florida Bottling), a premiere organic juice company located in Miami, Florida, in December 2020," Peterson's letter continued.

176.     Plaintiff Brewis, a highly skilled legal assistant with executive office skills, implored A. Peterson for any executive assistant job on multiple occasions but was rebuffed each time with little consideration, stating that he "hasn't even employed his own family to work for him", "I'll look in my files and see if there is something you can do," and another time "Are you hiring me as your executive assistant? 🫤😵‍💫"

Monday, Feb 26, 2024 9:17 AM" plaintff asked. A. Peterson responded blankly, "No

sweetie, I don't have or have I ever had an executive assistant...we don't have any in

the entire company.  We're pretty lean when it comes to non-production employees."

Monday, Feb 26, 2024 9:24 AM.  Plaintff responded, "I've always wanted to be an

executive assistant honestly never told no one that. Well good no problem I can still

help you😊" Monday, Feb 26, 2024 9:24 AM. A. Peterson defelcted the convesatin an

demotinally hijaked the conversation about sex sayong, "I can't wait to relieve some

stress together in a little while... I'm excited to see you 😍" deflected and redirected to

statements about sex with plaintff and ignoring plaintff's request.


177.      On Sunday, March 3, 2024, at 11:55 AM, plaintiff Brewis approached A.

Peterson to inquire about work, asking, "If you have anything for me to research or

something work-related, that would be great. I love to research, and I appreciate you

utilizing my [mind] all the time, but I'm also very [physical]. I can promise you, no

one in this world can research like I can. " A. Peterson responded, "Okay...let me go

through my files and see if there is anything to research." However, by 11:58 AM. on

the same day, the defendant had not followed up, failing to act on his promise to

Rebekah Brewis.


178.      The defendant was well aware of the plaintiff's extensive work history in law,

nonprofits, and social services, including positions as a litigation paralegal, former

Executive Legal Director of PDX Trans Pride, and a Consumer representative member

at the Oregon Health Authority, Office of Equity and Inclusion, as well as a former

Field Director for a county-level commissioner political campaign.

179.     It is preposterous to compare defendant Peterson's immediate "family" to the

plaintiff's situation, as they are multimillionaires who own a conglomerate of

companies and even a full housing development named Shelby Acres. They come

from entirely different socioeconomic circles, with a disparity best illustrated as elite

upper-class millionaires versus plaintiffs from the low to middle class financially.

180.     174. Plaintiff Brewis messaged defendant A. Peterson, asking, "Are you hiring

me as your executive assistant? I don't want any payroll matters between you and me; I

want our relationship to stay fluid. The only thing I would need to do is improve my

typing skills, which could be easily updated within a few weeks of work." Monday,

Feb 26, 2024, 9:18 AM.

181.     This request by the plaintiff was reflective of the plaintiff's desire to become truly

employed and receive regular checks for bonafide work, to escape sexual slavery

servitude, and, as suggested by the plaintiff's therapist, to become financially

independent from defendant A. Peterson (see therapy notes, Michigan Center for

Traumatic Stress, dated February 2024 by Lyz Luidens, LLMSW)

182.     On Monday, Feb 26, 2024 9:25 AM, Defendant A. Peterson replied: "I can't wait to relieve some stress together in a little while... I'm excited to see you 😍", deflecting the plaintiff's request for a real job that wasn't forced and unregulated labor in the form of being mistreated like a sex slave that was his "property," and truly characterizing the true nature of the intended sexual arrangements, further distressing plaintiff, reducing plaintiff's self-worth and autonomy to grow and work freely.

183.     Defendant A. Peterson deliberately engineered and maintained a relationship of financial dependency through his role as CEO of Peterson Farms, Inc., systematically exercising coercive control over plaintiff Brewis for sexual exploitation, which constitutes a pattern of predatory behavior.

184.     This pattern of sexual and emotional abuse continued until plaintiff Brewis informed defendant Peterson of her significantly worsening mental health and suicidal thoughts, illustrating the profound psychological impact of the defendant's actions.

185.     On Saturday, March 9, 2024, at 2:39 AM, as a direct result of Defendant A. Peterson's ongoing abuse and exploitation, Plaintiff Brewis was forced to message Defendant A. Peterson documents her severe emotional distress and psychological trauma: "There are times when I feel very hurt and suicidal because of things not being how I feel they should be…I think you should know that. I almost drove myself off the bridge about 4 days ago in anger and hurt while crying." This communication

demonstrates the severe psychological impact of Defendant's actions and his deliberate

indifference to Plaintiff's mental health crisis.

186.    Upon sharing the plaintiff's emotional state with defendant A. Peterson, he treated

her harshly, proclaiming, "That type of talk is way above my pay grade," and cut the

plaintiff off from any contact cold turkey for 5 days straight.

187.    In the aftermath of a series of sexual assaults, Plaintiff Brewis faced intense

emotional pain and mental health challenges, including feelings of disgust and

profound depression. The plaintiff has cried almost daily in the months following

being narcissistically "discarded" by the defendant.

188.    Due to the defendant's actions, the Plaintiff has been compelled to adopt extensive

security measures and completely alter her lifestyle to become unpredictable and

difficult for others to locate. This strategy includes installing a comprehensive

surveillance system, retaining a trained protection dog, and maintaining constant

situational awareness because of reasonable fears of retaliation from the defendants.

Furthermore, she has had to sell most of her highly valuable and easily identifiable

vehicles to ensure her privacy out of fear of being tracked down.

189.    The plaintiff has experienced a significant impact on her personal life due to

PTSD and IIED inflicted by defendant A. Peterson, Peterson Farms Fresh, LLC, and

several other defendants collectively against plaintiff Brewis. She has neither dated nor had sexual relations since the last assault against her by defendant A. Peterson on March 6, 2024, and she often struggles to maintain even friendly relationships due to the assaults, seeking isolation and extreme privacy to feel safe in the aftermath of the trauma. The plaintiff has been so scared and frightened that she has taken several precautions, including getting a guard dog, regularly performing "drone (UAV) security sweeps" during heightened alertness, installing a professional monitoring system with four cameras, setting up a Cobra SC-400 2 K vehicle radar and video monitor, keeping a canister of bear spray to thwart a group attack non-lethally potentially, carrying pepper spray for individual attacks, carrying a pocketknife, taking her dog with her wherever she goes, and always maintaining a high level of situational awareness.

190.    Plaintiff Brewis cannot use any dating apps to seek relationships without facing mistrust and paranoid fears of being tracked, located, and possibly seriously hurt or murdered by the plaintiff and his associates due to defendant A. Peterson's violation of the NDA and breach of the plaintiff's private identity.

191.    Plaintiff Brewis has even attempted to preemptively ban the defendant from dating sites she has used by contacting business support on January 11, 2024, at 7:24 am via email, as seen in her communication with the dating app Bumble, located in Austin, Texas. Bumble was the safest platform on which the plaintiff felt comfortable

until she learned that their app did not offer the option to stop tracking unless users were coerced into purchasing the "premium" option.

192.    The plaintiff's business, Aero Swift, LLC, is a domestic drone (UAV- Unmanned Aerial Vehicle) and legal consulting corporation that was incorporated in Cook County, Chicago, Illinois, on August 1, 2024, with its principal place of business located at 230 E Ohio Street, Suite 410 #1901. Plaintiff Rebekah Katherine Brewis is identified as the operator/manager in public filings. The resident agent is Resident Agent Solutions, Inc., which has a mailing address of 901 S. 2nd St., Ste. 201, Springfield, IL 62704-7909. At all relevant times, Rebekah Katherine Brewis has owned and operated Aero Swift, LLC.

193.    Defendant A. Peterson interfered with the plaintiff's work and personal life by breaching the NDA and disclosing the plaintiff's identity to several family and individual associates, as well as to third parties, who then conveyed her identity as "Karissa Beach" to even more friends and associates. This led to a surge of unsolicited visitors from the Grand Rapids, Kentwood, and Muskegon regions, many with known gang ties —all documented through screenshots with dates and times. The plaintiff has blocked over 50 individuals on Facebook who are interrelated due to a pattern of stalking and targeting behavior directed at plaintiff Brewis, as evidenced by preserved social media documentation, screenshots, and a police report (Case #24-063052) filed with the Grand Rapids Police Department on September 26, 2024.

194.   The conduct, as mentioned earlier, is forbidden under the NDA, "AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT 1. Confidentiality Obligations (a)-(b) dated March 21, 2024:

- "Without limitation to the terms of Section 1(a), the Receiving Party further agrees, without the prior written consent of the Disclosing Party and subject to Sections 3 and 4 below:

   (A) keep all of the Disclosing Party's Confidential Information strictly confidential,

   (B) not use any of the Disclosing Party's Confidential Information,

   (C) not to copy, transmit or otherwise reproduce any Confidential Information and

   (D) not to export or reexport (within the meaning of U.S. or other export control laws or regulations) any Confidential Information; and to not, directly or indirectly, disclose or make available, in whole or in part, any of the Disclosing Party's Confidential Information to any other person (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages)."

195.   In the plaintiff's **EXHIBIT: AAB** titled, ***NDA Agreement: Contract Law Critical Review, Metrics, and Metanalysis***, plaintiff Brewis came to discover the complete incompetency of the original drafting of the NDA titled "AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT," March 21, 2024. In

particular, the contract missed 43 metrics of contract law elements out of 55

quantified, giving a contract rating of only *22%*

>**FAIL:** *22% coverage*
>
>**All Terms,** 55 metrics
>
>"AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT dated March

19, 2024"

>**MISSED**
>
>*43* legal metrics, *78%* of 55 metrics

196.     ** Summary of Results:

- ** ** <u>Contract Grossly Invalid</u> ** The contract seems to have been signed under
  duress and without the benefit of legal representation, which could render it voidable.
  This should be documented and challenged immediately. The overly broad definition
  of confidentiality may prevent Ms. Brewis from reporting potential crimes or seeking
  legal counsel regarding the circumstances of this agreement. This could violate public
  policy and be unenforceable. The three-day destruction requirement is excessively
  aggressive and might eliminate evidence needed for potential legal proceedings
  related to the validity of this agreement or other claims. Communication restrictions
  are unreasonably broad and could hinder legitimate business or social interactions
  with an undefined group of people. It may also impede the reporting of illegal
  conduct. This sweeping release of claims, especially when signed under duress and
  without the benefit of counsel, could be contested as unconscionable and
  unenforceable. The current language is too restrictive and might deter the reporting of

crimes or seeking legal counsel. The release "forever releases and discharges Peterson and his affiliates" should not encompass claims related to the possibly improper circumstances surrounding the execution of the agreement. The venue restriction could become cumbersome if Ms. Brewis relocates and needs to contest the deal. Consider requesting more flexible venue options.

197.     Defendant Aaron Peterson intentionally and unlawfully breached the plaintiff's right to privacy and disclosed the plaintiff's online identity of "Karissa Beach" to his malevolent street connections. The serious subsequent stalking, both online and in person, escalated rapidly between late August and mid-September 2024, resulting in multiple incidents near the plaintiff's former residence at 2751 Ogden Avenue, Downers Grove, IL 60515, at the Woodspring Suites.

198.     Unauthorized disclosures have occurred from December 2024 to the present, as evidenced by defendant Peterson's family visiting the plaintiffs' Facebook profile multiple times. This is indicated by Facebook's "Suggestions" service, which includes recommendations such as Gabrielle Peterson, Mark Peterson, R.J. Eliot, Earl Peterson, Curtis Burdette, and Richard.  Raffaelli is among the known real profiles used. However, a Facebook discovery request for user data can verify the actual origin and frequency of these visits, as well as reveal the true identities and their associations. The plaintiff has secured numerous screenshots proving the activity of the Defendants and the dates of discovery.

199.     On or about August 30th, 2024, plaintiff Brewis, increasingly aware of a severe pattern of stalking and unwanted contact, both in person and online, responded by immediately fleeing her apartment at 2751 Ogden Avenue #234, Downers Grove, IL 60515. She quickly relocated all her belongings to Lock Up Self Storage, located at 431 Ogden Avenue, Lisle, IL 60532.

### ACTUAL DAMAGES AND LOSSES

**FACTUAL ALLEGATIONS**, *cont'd*

200.     In August 2024, the plaintiff initiated the lengthy and arduous process of selling all her known vehicles, identified by type, color, and description, to Defendant A. Peterson to prevent him from stalking her further by providing accurate descriptions of her cars to his known and active street gang associates and/or any other malevolent agents. During this challenging period, the plaintiff was filled with grief for what she had to sacrifice to maintain her safety by remaining as anonymous as possible. With clear descriptions of her vehicles readily available and her trust completely betrayed and broken, she felt she had no choice but to sell everything that could be used against her in the future, thereby undermining her privacy and safety in any way.

201.     The property that the plaintiff sold was her personal property, with plans to transition all her holdings from self-ownership to business ownership under an LLC structure. To achieve this, she established her LLC to reflect her ongoing business activities, which commenced in March 2024, following her previous status as an independent contractor. In March 2024, defendant A. Peterson drafted an NDA through the defendant's lawyer, Jacob Droppers, Associate at Varnum, LLP. See, **EXHIBIT: AAC**. According to available information, this NDA document was directed, overseen, and ultimately approved by Varnum LLP's senior partner, attorney Nicholas B. Missad.

202.     The defendants made it very clear to the plaintiff that if she "stepped out of line," as defined in their NDA, she would be promptly corrected, and the defendants would sue her, consequently seizing her property. Consequently, the plaintiff developed concrete plans to transfer all her assets to her LLC, Aero Swift, LLC, and classified them as capital investments to improve her business's appearance, style, and reputation while also ensuring legal protections against control by defendant A, Peterson, and his legal and corporate entities.

203.     The plaintiff's most significant quantifiable financial loss was her vehicle, a 2023 Ford Explorer ST. She purchased it on May 11, 2024, for $65,435.28, making a verifiable down payment of $5,100 on the same date and a documented additional deposit of $21,440 on May 13, 2024, from Chase Bank (See **Exhibit AAG,**

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 109 OF 241

Carvan.com receipt). The plaintiff had equity in her brand-new Ford Explorer, which had only 1,000 miles on it and was specially ordered, with over 40 percent of the purchase price paid off. Plaintiff Brewis acquired her Ford Explorer ST through Carvana.com on May 11, 2024, without any co-signers, for $61,765, and she made a down payment of $26,790. She sold the vehicle solely due to duress from defendant A. Peterson's stalking, fearing that the defendants would track her down.

204.     Plaintiff Rebekah Katherine Brewis is a single intersex female residing in DuPage County, Illinois, without a permanent residential address. She previously maintained a home in her 18-foot Jayco Jay Feather Sport RV. In January, Brewis and her former service animal, Bellah Beach, lost their home after a severe winter storm caused a freeze that burst the trailer's septic tank, leaving Brewis very ill and immediately homeless, which resulted in extreme distress and anxiety.

205.     Plaintiff Brewis previously resided at 521 Miller Ave, Apt 211, Grand Haven, Michigan, in Ottawa County, before being relocated by defendant A. Peterson through Airbnb to 1 Lakeside Lane, Apt 5, Fox Lake, Illinois. The plaintiff's current business mailing address is 230 E Ohio Street, Suite 410 PMB1901, Chicago, IL 60611.

206.     Plaintiff Brewis currently lacks a residential address due to the retaliatory actions of the defendants, who have exploited her vulnerable status as a member of multiple protected classes. This includes her identity as a transgender and intersex individual,

which makes her a primary target for sexually predatory individuals, such as defendant A. Peterson.

207.    Defendant Aaron Peterson has made multiple attempts to ascertain the whereabouts of plaintiff Brewis and continues to maintain unwanted contact to this day via the Facebook profile "R.J. Elliot." This was discovered in February 2025, prompting the plaintiff to immediately block the profile, with the date and time verified through a saved screenshot. "R.J. Elliot" is the same fraudulent name that defendant Aaron Leroy Peterson uses to hide his clandestine and questionable legal activities.

208.    Plaintiff Brewis alleges that between November 2023 and March 6, 2024, during approximately 20 sexual encounters, defendant A. Peterson sexually exploited plaintiff Brewis. The first two sexual encounters occurred with protection; thereafter, defendant A. Peterson employed coercion and exploited power dynamics to engage in unprotected sexual acts.

209.    These sexual acts occurred while defendant Aaron Peterson was married and engaged in sexual relations with his wife, Jennifer Lamb Peterson, without protection or disclosure to either party. This is evidenced by defendant A. Peterson's text messages, which demonstrate numerous acts of sexual abuse and intrusion against the

plaintiff's body, exposing both women to potentially dangerous STD cross-infections. The defendant had previously told the plaintiff that they "rarely touched and kissed" and complained about the lack of sexual activity, which he cited as a reason for "pursuing a divorce." The plaintiff was extremely shocked and disturbed to learn that he was having sex with both parties without a condom and without her knowledge until questioned by plaintiff Brewis in March 2024. At that moment, the plaintiff became increasingly anxious, depressed, emotionally unstable, and suicidal.

210.     Defendant A. Peterson wrote plaintiff Brewis on Thursday, Feb 8, 2024, 11:24 AM,"From your email...I hope you haven't ever felt that I was exploiting, abusing, manipulating or coercing you." This was in response to the plaintiff's confrontation with Aaron Peterson via an email dated February 8, 2024, which was 1,948 words long, equivalent to three pages, and written under great emotional duress. The message from the defendant was a scare quote of the plaintiff's email sent that morning.

211.     Defendant A. Peterson did not tell plaintiff Brewis that he "loved her" until the very first time, on February 10, 2024, after plaintiff Brewis had to go to the emergency room, where it was discovered that she had a fever of 100.5 and tested positive for Covid-19. Plaintiff Brewis told A. Peterson: "You didn't say I love you back when I'm really sick, I'm totally all alone. You can't make assumptions about life and people and take things for granted. You never know if someone will drop dead in the next 10 minutes for whatever reason ".

212.    Plaintiff Brewis was shocked to learn from defendant A. Peterson that he was having sex with defendant Jennifer Lamb Peterson simultaneously, yet the plaintiff never gave consent to A. Peterson. Learning of the degree of duplicity he had engaged in to keep us all separate and silenced for the furtherance of his fraudulent, clandestine, and narcissistically fueled hypersexual activities.

213.    Peterson Farms Fresh, LLC, Peterson Brands, LLC, and Lakewood Organics, LLC (collectively referred to as "Corporate Defendants") violated federal and state laws through both deliberate actions and grossly negligent failures to implement and maintain reasonable monitoring, supervision, and compliance programs required under federal and state law, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Trafficking Victims Protection Act (TVPA), Title VII, and applicable state anti-trafficking statutes.

214.    The Corporate Defendants' failure to maintain adequate oversight and compliance programs, despite having actual and/or constructive knowledge of Defendant Peterson's conduct, renders them liable for damages under the theories of respondeat superior, vicarious liability, negligent supervision, and negligent retention. Each Corporate Defendant had specific duties to implement and uphold compliance programs mandated by federal and state law, which they failed to meet.

215.     Defendant A. Patterson's pattern of deception persisted by giving false information to the plaintiff during her safety and identity background checks in her dating life, specifically by providing the defendant's license tied to his first wife, Jenny Peterson, at the permanent residential address of 320 Circle Dr, North Muskegon, MI 49445-2712.

216.     Defendant A. Peterson's actual residential and permanent address is 16180 Highland Drive, Spring Lake, MI 49456, where he resides with his wife, defendant Jeniffer Lamb Peterson, for approximately 2.5 years.

217.     After defendant Peterson's first sexual assault of plaintiff Brewis on November 6, 2023, for which he provided $1,000 as consideration in furtherance of sex trafficking under 18 U.S.C. § 1591, Brewis was forced to remain bedridden for three days, achieving only 50% recovery. This was due to her back being hyperextended during the incident and the rough treatment she received, which also led her to message A. Peterson about her injuries. The plaintiff had to visit the chiropractor multiple times over six months for corrections due to vertebral damage from the forced hyperextension of her legs and hips, as she was fully pinned and unable to move. These sexual scenarios were extremely painful for the plaintiff, who could not say to stop or gasp in pain, as doing so would only heighten defendant Peterson's arousal, leading him to dominate her with powerful hip thrusts that tore her anal tissues and caused visible bleeding.

218.     These sexual encounters caused severe physical injury to the plaintiff, who was unable to withdraw consent or express pain due to defendant Peterson's aggressive escalation of force when the plaintiff showed signs of distress, resulting in documented anal tissue damage and bleeding. This can be seen in 4 K footage evidence preserved from the plaintiff's pet cam, which she had installed at the defendant's Airbnb apartment in Grand Rapids, Michigan, on February 20, 2024. The apartment was rented and controlled wholly by defendant A. Peterson and Peterson Brands, LLC.

219.     On November 6, 2023, during the plaintiff's first encounter, defendant A. Peterson demonstrated clear predatory intent by making disturbing statements sexualizing minors and expressing attraction to vulnerability. Specifically, Peterson stated that the plaintiff "had the body of a 14-year-old girl" and declared, "I love how vulnerable you make yourself," evidencing a pattern of predatory grooming behavior.

220.     On November 6, 2023, during the plaintiff's first encounter, defendant A. Peterson made disturbing statements comparing the plaintiff's body to that of a minor and expressing his attraction to her vulnerability, demonstrating predatory intent. Peterson claimed the plaintiff "had the body of a 14-year-old girl" and "I love how vulnerable you make yourself."

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 115 OF 241

221.     Per information shared in conversations and via text messages, Defendant Peterson was going through a painful emotional separation from his daughter due to his divorce from her mother, who was a "daddy's girl." Defendant A. Peterson seemed unusually hyper-focused on his daughter. On information and belief, the defendant patterned his grooming based on pedophilic desires and his efforts to exploit a disabled woman sexually, physically, and emotionally, as well as further increasing the degree of the plaintiff's previous longstanding disabilities based on the plaintiff's extreme vulnerability emotionally and physically.

222.     Defendant A. Peterson told the plaintiff that he "injects steroids," accounting for his aggressive and insatiable sex appetite, as well as hyper bulky build.

223.     As a direct result of Defendant A. Peterson's sexual assaults, Plaintiff Brewis sustained permanent physical injuries including but not limited to documented tissue damage to her sex glands, anal trauma, and disfigurement of her right breast, some of which has been demonstrated via 4k video, and they continue to cause ongoing physical and emotional distress.

224.     Per defendant A. Peterson's text messages, such as on Tuesday, Jan 16, 2024, 9:30 AM wherein he proclaimed "I see a couple other local women on a regular basis (monthly or so). These are people that I have formed connections with over time and

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 116 OF 241

completely enjoy still seeing occasional.  These are all completely protected encounters."

225.     In total, from text evidence and personal conversations, plaintiff A. Peterson had been seeing over five different women across multiple cities spanning from Grand Rapids and Grand Haven, Michigan, to Miami, Florida, and Los Angeles, California. And this whilst married to his 2nd wife, Jennifer Lamb Peterson, and within 3 months, he was cheating on Mrs. Peterson, whom he married in 2022 in Ottawa County, Michigan, claiming via messages dated Sunday, Feb 18, 2024, 11:25 AM, saying:

226.     "I thought I had a terrific relationship going with Jennifer and then we moved in together and puff, everything changed.  I knew I was fucked like 2 months in.   The dating version of her was completely different than the everyday version I've been stuck with."

227.     Defendant A. Peterson had been married to Jenny Peterson for over 26 years and divorced on or about 2021 due to infidelity, among other differences, upon information and belief.

228.     Defendant A. Peterson had five different active sexual arrangements established in at least three states, which Peterson developed consecutively and without the plaintiff's knowledge before their first sexual encounter. Additionally, the plaintiff

conducted executive business with an active sexual arrangement planned for the state of Illinois and in the city of Chicago on February 26-28, 2024.

229.    Defendant Peterson told the plaintiff that he had only had unprotected sex with three people in the 25 years of his sexual life, namely his previous wife, Jenny Peterson, his current wife, Jennifer Peterson, and lastly, the plaintiff, Rebekah Katherine Brewis. This implies that he was "permanently bonded sexually and romantically in love," making superficial commitments to enhance his charades for added effect and to manipulate and control the plaintiff's emotions while maintaining her loyalty.

230.    The defendant led the plaintiff to believe that he was actively divorcing his wife and would do so in the spring of 2024, which, he said, was the best timing for financial reasons and his current life needs.

231.    At the end of December 2023, A. Patterson quipped before leaving on our third date that he "was making it his New Year's resolution to learn everything he could" about plaintiff Brewis. This left plaintiff Brewis feeling chills and trepidation, as she is a very private individual, especially considering her immediate mental health and physical health disabilities, which are protected by HIPAA.

232.     Defendant A. Peterson pressured Ms. Brewis to "go bare" during their subsequent sexual encounter, stating that he would share his test results with plaintiff Brewis. The plaintiff was extremely hesitant due to the level of intimacy it would involve, especially after just discovering that he was married following about three dates, among other personal reasons.

233.     As a direct and proximate result of the defendant's superior economic position, control over the plaintiff's housing through corporate resources, pattern of coercive behavior constituting force, fraud or coercion under 18 U.S.C. § 1591(e)(2), and the exploitation of power dynamics as CEO of the defendant corporations, the plaintiff was effectively deprived of her right to medical privacy and autonomy. This deprivation constitutes violations of HIPAA, state medical privacy laws, and the Americans with Disabilities Act, considering the plaintiff's protected status as a disabled individual.

234.     Plaintiff Brewis consistently took her HIV medication, Triumeq, throughout the entire time she was forced or coerced into physical interaction with defendant A. Peterson.

235.     Plaintiff Brewis was also injured by the HIV drug Triumeq, which caused her to suffer from drug-induced systemic lupus. This condition resulted in severe systemic inflammation and chronic low-grade infections. The plaintiff has been off her HIV

medications since July 2024, and her condition has since resolved as if it never existed. The plaintiff was compelled to take Triumeq due to the coercive arrangement established by A. Peterson, as she was forced to engage in sexual activities and take medications to protect A. Peterson from HIV. Since discontinuing her HIV medications, the plaintiff's blood health has improved considerably, as indicated by comprehensive blood lab test panels from October 2023 to the present.

236.     The plaintiff had the means, through a medical regimen involving medical devices, nutrition, and a controlled, safe environment, to prevent her HIV infection. However, after being forced to sell everything she owned and subsequently becoming homeless- losing access to red light therapy, an RV trailer, and her six-month lease in Fox Lake, IL- her health has consistently declined.  This decline is due to an increase in her HIV infection count, which has resulted in lung injuries and breathing problems. Additionally, having gone over a year without health insurance due to these circumstances, the plaintiff had no access to medical care until November 2024.

237.     The plaintiff could not secure a doctor's appointment or obtain medication until March 21, 2024, when she was prescribed Dovato and began her treatment. Since being forced to leave 1 Lakeside Lane under pressure, intimidation, and duress in June 2024, the plaintiff's HIV condition has remained unmanaged in her system for over nine months. This nine-month duration has resulted in lung damage and significant cancer growth due to genetic predisposition. Plaintiff Brewis currently suffers from

poor health, facing daily challenges with breathing and managing stress levels, along with inflammation that has heightened her emotional reactivity, periods of confusion, and mental lethargy.

238.    On January 11, 2024, Brewis shared her most recent STD test results, which indicated negative results across all categories. Peterson first shared his personal test results, prompting the plaintiff to reciprocate based on previous in-person discussions with A. Peterson breached the subject after the 2nd visit, which reflected his exertion of power and control over her life that began in full force in January 2024. By the end of January 2024, defendant Peterson had obtained every possible piece of personal information about Rebekah Katherine Brewis despite being married.

239.    On January 26th, 2024, two days after defendant Peterson requested to book accommodation for plaintiff Brewis via Airbnb using his "Airbnb for Work" account Peterson Farms and the @petersonfarmsinc.com domain, defendant Peterson booked a six-month reservation for the plaintiff in Grand Rapids, Michigan, at Cityscape, located at 1556 Michigan St NE #4, Grand Rapids, MI 49503. This reservation was made via Airbnb for a total of $12,186, covering the period from January 24th, 2024, to July 31, 2024.

240.     Defendant A. Peterson promised the plaintiff a permanent and committed relationship and even bought her 2 different engagement rings and a commitment necklace to deceptively prove his commitment to the plaintiff.

241.     Defendant A. Peterson takes prescription medications, including Paxil and Risperdal, which are typically prescribed for serious mental health conditions such as schizophrenia and bipolar disorder, as disclosed during conversations with the plaintiff. Risperdal is an atypical antipsychotic used to treat schizophrenia, bipolar disorder, and irritability associated with autism.

242.     Defendant A. Peterson consumed two glasses of alcohol during his first public lunch date with the plaintiff at Fishbones Grill in Grand Rapids, Michigan, on February 20, 2024, while also taking his prescribed psychiatric medications, based on available information. Due to intoxication from the combination of alcohol and prescription medications, neither Defendant A. Peterson nor Plaintiff Brewis could legally consent to sexual activity. A. Peterson then sexually assaulted Plaintiff through non-consensual anal penetration, jeopardizing Plaintiff's nine months of sobriety through coercion, which nullified any capacity to provide legal consent to sexual activity- particularly when considering financial coercion and Plaintiff's severe mental health disabilities- aggravated further by a hypersexual and dominating male millionaire using steroids and antipsychotic medications while drinking recklessly and disregarding the law regarding women's bodily autonomy.

243.     Along with being intoxicated due to the coercion of defendant A. Peterson, plaintiff Brewis was also prescribed Adderall and Trazodone, which heightened the sedative effects of the alcohol, resulting in greater impairment than usual for her.

244.     Plaintiff Brewis is a physically and mentally disabled intersexed female with documented diagnoses including but not limited to Autism Spectrum Disorder, Intellectual disability, Chronic Complex PTSD, HIV, Ehlers-Danlos Syndrome, gender dysphoria, and ADHD. These conditions qualify the Plaintiff for protected status under multiple federal and state laws, including the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, the Michigan Elliott-Larsen Civil Rights Act MCL 37.2103, the Illinois Human Rights Act, 775 ILCS 5/ and applicable state LGBT anti-discrimination laws.

245.     When the plaintiff first met defendant Aaron Peterson ("A. Peterson") in November 2023, the plaintiff had been sober from alcohol for over 9 months. Plaintiff shared with Defendant A. Peterson as a "friend" (who was grooming the plaintiff to be isolated as his "submissive sex slave"), due to alcohol in the past is associated with a past rape attempt by a former sex partner and of her being taken advantage of in the past because of her mental disabilities, the plaintiff would never drink alcohol ever again.

246.     The plaintiff had also completed more than six months of trauma therapy at the Michigan Center for Traumatic Stress, focusing on complex PTSD treatment and behavioral therapy resulting from two years of sexual trauma caused by past abusers. At that point, the plaintiff had not been sexually active with anyone for over nine months and had remained single, with only one trusted friend remaining after escaping a history of past abusers.

247.     To escape sexual servitude to the defendant, and following the advice of her therapist, Liz Luidens, LLMSW from the Michigan Center for Traumatic Stress, plaintiff Brewis sought career opportunities for personal and professional growth within Peterson's company, which employs over 500 people. She considered roles such as an executive assistant or a private depth researcher, among others, but A. Peterson continued to force Ms. Brewis into sexual servitude and slavery.

248.     See therapist notes, Michigan Center for Traumatic Stress dated February 15, 2024 @ 7:43 pm by Lyz Luidens, LLMSW, February 24, 2024 by Sylvia Johnson, LMSW Supervisor):

    Goal:

    G1. To address and cope with how trauma and autism affects daily life, decision making, and emotional regulation

    G2. To address issues with their romantic relationship

G101: Client will explore trauma narrative to develop self-awareness and understanding of influence on past and present behavior

G102: Client will learn to identify and express feelings in a healthy and appropriate way

G103: Client will increase relational functioning by exploring and processing narrative.

G201: Client will gain clarity about what they need and expect from a romantic partner

G202: Client will learn to identify and express dissatisfaction within current romantic relationship

G203: Client will pursue employment to relieve dependence on current romantic relationship

249. On 03/07/2024, plaintiff Brewis' therapy was terminated by Lyz Luidens, LLMSW for "no longer making appointments".

250. Plaintiff Brewis was initially a laid-off student worker and a full-time online student at Oakland Community College, where she pursued an associate's degree in business administration. She aspired to own a business and manage other companies in an executive role.

251.     Due to the sexually abusive and toxic situation that defendant Peterson created for the plaintiff, she was compelled to withdraw from her classes, as she could not manage the stress of being involved with the defendant while attending school simultaneously, and informed defendant A. Peterson of this. On Thursday, Feb 8, 2024, 3:51 AM, the plaintiff messaged A. Peterson, "I just dropped all my classes. I cannot deal with the stress of college and the situation at hand, speaking generally."

252.     Plaintiff Brewis was also manipulated into rehoming her two service animals, Luna and Olly. On Monday, Mar 18, 2024, 1:31-:33 AM, Plaintiff messaged Defendant A. Peterson: "They were my total support emotionally, and you insinuated yourself into that and then separated us by your manipulation…It's like you cut me down and down until the point where I couldn't be cut down any further and that this was whole masochistic exploitation of me all along."

253.     Below is the plaintiff's former service animal, "Luna," aka "Luna MoonPom." The plaintiff owned Luna for over two years, from the age of 8 weeks. Once the plaintiff adopted Luna, the plaintiff and Luna were bonded and completely inseparable, traveling broadly together as her official service animal.



Luna

254.     Below is the plaintiff's former service animal, Oliver, an entirely white purebred

Bichon Frise, and Luna's companion brother. It deeply saddens the plaintiff that she

lost these two, whom she considered her babies, due to pressure, coercion, and

narcissistic control that aimed to divert the plaintiff's attention solely to him, adversely

affecting the plaintiff's fragile and vulnerable mental health status.

255.     Defendant A. Peterson, showing a callous disregard for the plaintiff's needs,

wrote to the plaintiff about Luna, illustrating his undue power and influence to

negatively impact the plaintiff and her mental health disabilities: "I'm at an offsite

executive meeting today, but almost done. Happy you found a home for Luna... short-term pain for hopefully a longer-term happiness." Wednesday, Jan 31, 2024, 12:27 PM

256.     Plaintiff Brewis was induced and influenced to obtain her passport, which she received while on the work trip and ordered on the morning of February 27, 2024, after the plaintiff and defendant woke up together to prepare for their separate day plans. The defendant encouraged the plaintiff to part ways with her service animals and cited the prospect of future vacations on trips with him on his Gulfstream jet as a significant reason.

257.     Defendant A. Peterson and Peterson Farms Fresh, LLC engaged in a pattern of sex trafficking through force, fraud, and coercion by establishing a commercial sex arrangement disguised as financial support, including systematic payments of approximately $1,000 to $3,000 per encounter, (Such dates, amounts, and methods include: "Cash App" payments, "for reassurance" on the dates of February 8, 2024 for $2,000, saying, "Reassurance[kisses]", on February 10, 2024 for $2500, on February 13, 2024 for $2,000, February 20th, 2024 for $500, and February 25, 2024 for $1,500 and via Zelle using his Huntington Bank account to the plaintiff's former bank, Credit Union One on the dates of February 16, 2024 for $3000, February 18, 2024, for $3000, February 21, 2024, for $3000, March 1, 2024, for $3000 and March 5, 2024, for $3000.), provision of housing, and other financial benefits in exchange for sexual acts, in violation of 18 U.S.C. § 1591 (Sex trafficking of children or by force, fraud, or

coercion), §2421A (Promotion or facilitation of prostitution and reckless disregard of sex trafficking), the Trafficking Victims Protection Act (TVPA), civil remedy pursuant to 18 U.S.C. § 1595 and related trafficking statutes.

258.     Defendant A. Peterson, along with Peterson Farms Fresh, Inc. and Peterson Farms Fresh, LLC, engaged in a pattern of coercive control and sexual exploitation in violation of 18 U.S.C. § 1591 by conditioning financial support on sexual compliance and establishing a commercial sex arrangement through systematic post-sexual monetary transactions occurring over approximately 20 encounters, with specific dates and amounts to be provided through discovery.

259.     Due to the imposed social restrictions and degree of isolation, the plaintiff was groomed and manipulated by the defendant. This manipulation was achieved through the systematic elimination of all her social supports to maintain power and control over the plaintiff, which caused her to feel excessively submissive in the situation, fearing he could do anything to her at any time, having complete control over her housing, information, finances, and even who she did or did not have sex with.

260.     The defendant maintained possession of all personal information in a file on his computer, including date of birth, place of birth, social security number, parent names, sibling names, past addresses, etc., as well as conducting nationwide deep searches on the internet with follow-up questions about dates, asked while the plaintiff was

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 129 OF 241

influenced by alcohol consumption. Throughout this arrangement, the plaintiff was placed under the complete and direct control of defendant A. Peterson, who provided "breadcrumb" support for the plaintiff's everyday living expenses and monthly housing costs, which the defendant fully controlled.

261.     Defendant A. Peterson used his company work account to book plaintiff Brewis's housing through AirBnB, and under the plaintiff's alternate name, Karissa Beach.



262.     The defendant fraudulently booked a reservation on behalf of the plaintiff through Airbnb's online platform, using his company email and corporate account to falsely certify that Ms. Brewis was on a "consultant job" for Peterson Farms, constituting both wire fraud under 18 U.S.C. § 1343 and corporate fraud through misappropriation of

company resources for illicit purposes. This action constitutes wire fraud under 18 U.S.C. § 1343, conspiracy to commit wire fraud under 18 U.S.C. § 1349, misappropriation of corporate resources, and facilitation of sex trafficking activities in violation of 18 U.S.C. § 1591, causing damages to the plaintiff in excess of $75,000.

263.    On January 24th, 2024, at 9:41 a.m., Defendant Peterson informed the Airbnb hosts, Mason and Holly, via Airbnb messages in Grand Rapids, MI, "Thanks. Karissa is a consultant working on a special project." Defendant fraudulently booked this reservation on behalf of the plaintiff through the online platform Airbnb, using his company email and corporate account to falsely certify that Ms. Brewis was on a "consultant job" for Peterson Farms, which constitutes both wire fraud under 18 U.S.C. § 1343 and corporate fraud through the misuse of company resources for personal criminal activity.

264.    Initially, in such housing, the plaintiff had access to a platform for making complaints, asking questions, and providing suggestions, feedback, or reviews. She also had access to customer service through the app and her Airbnb work account under the name Karissa Beach, using the email karissabeach@pm.me.

265.    On March 26, 2024, defendant A. Peterson booked a six-month lease at 1 Lakeside Lane, Fox Lake, IL 60020, a spacious waterfront three-bedroom retreat Airbnb property, from March 27 to September 26, 2024, for $33,208.09, as indicated

in an email receipt sent by Aaron Peterson (See, **Exhibit AAF**). After the plaintiff left the Grand Haven Airbnb and was reassigned to the Fox Lake, IL Airbnb from the Grand Haven, MI Airbnb reservation, remarkably, they were not added to the booking as they had been previously. Plaintiff Brewis was excluded and unable to access customer service, file complaints, or be officially acknowledged during stressful times of harassment by the plaintiff's RYRE LLC and Nathan Brown, along with his property assistant named Joseph.

266.    On approximately March 21st, 2024, and continuing to the present, Defendant A. Peterson has prevented the plaintiff from escaping the "long arm" of Lakewood Organics, LLC and A. Peterson by refusing and willfully failing to book accommodations for the plaintiff in Los Angeles, California, the plaintiff's hometown. This acts to control the plaintiff's geographic location and increase accessibility for potential "sexually intimate encounters, " serving as a tactic and strategy to oppress plaintiff Brewis. This demonstrates the defendant's ongoing pattern of coercive control through geographic isolation and manipulation within the context of the domestically abusive relationship between the plaintiff and the defendant.

267.    Before being unlawfully evicted by defendant Brown through an illegal self-help eviction in violation of 765 ILCS 705, the Illinois Forcible Entry and Detainer Act, and the Fair Housing Act, 42 U.S.C. § 3601 et seq., due to the plaintiff's protected status, in June 2024, plaintiff Brewis was a lawful legal resident of 1 Lakeside Lane,

Fox Lake, IL, as evidenced by her Illinois State Driver's License, which lists her home

address as 1 Lakeside Lane, along with her voter registration card. Plaintiff Brewis

also had a total of five vehicles valued at over $100,000 registered at the property at

one time and possessed a large home filled with brand-new property exceeding

approximately $40,000, most of which she purchased through Amazon.com. See,

EXHIBIT: AAG

268.    While the plaintiff resided at 1 Lakeside Lane, Fox Lake, IL, in Lake County,

Illinois, Brewis felt very unsafe due to generalized anxiety about being there and the

defendants having full control over her housing with full knowledge of her location.

Nevertheless, she felt she had no other choice but to stay. To cope, she engaged in

various passive-aggressive behaviors to try to "warn off" defendant Peterson in case

he planned to come to her home and cause harm to her or another acquaintance. Miss

Brewis purchased a complete Arlo professional home security system, featuring three

outdoor cameras with professional monitoring, a Ring doorbell, and an additional Ring

indoor camera with a panoramic view.

269.    Plaintiff Brewis also adopted a large female Siberian Husky weighing

approximately 60 lbs. She communicated all security measures to defendant Peterson

through texts and emails due to concerns for Aaron Peterson and as safety precautions

to guard against unwarranted intrusions by the "owner, " defendant Nathan Brown.

This was prompted by an incident that occurred on the very first day of the lease after the plaintiff had already taken possession and placed most of her property in the home.

270.     Plaintiff became increasingly aware over time that Defendant Peterson had concerning connections through his pattern of exploiting vulnerable individuals.

271.     Many of these women, on information and belief, have strong connections to gang affiliations, and it is likely that some of them have pimps or are linked to others involved in sex trafficking. On information and belief, after plaintiff Brewis and the defendant ended the defendant's duplicitous "relationship, " defendant Peterson violated the mutual NDA dated March 21, 2024, around July to August 2024, by revealing the identity of "Karissa Beach" to his street associates, Jane and John Does #1-20.

272.     Defendant A. Peterson has previously mentioned receiving a Tupac Shakur biography for Christmas 2024. On another occasion, defendant Peterson revealed that he had a secret sugar-free beverage deal with Snoop Dogg regarding business matters as his business partner (See, Thursday, Feb 8, 2024, 11:56 AM):

*"So I just found out that New Tree's (company that removes sugar from juice) current biggest customer is a company called The Defiant Ones, it is owned by Snoop Dog and Dr. Dre. They are coming out with a product called "Gin & Juice", but the*

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 134 OF 241

*juice is going to be de-sugared to lower the calorie and carb count. … the world is actually a very small thing".*

273.    On information and belief and supported by documented evidence of interstate travel arrangements and payments, Defendant A. Peterson has engaged in a systematic pattern of trafficking multiple women across state lines between Florida, Michigan, California, and Washington states, using corporate resources to facilitate interstate travel for commercial sexual activity in violation of federal trafficking laws. On information and belief, defendant Peterson has used his companies' resources, i.e., legal and financial, for the specific purpose of satisfying the defendants' hypersexual and sexually hyperactive and explicit jet-set lifestyle. In furtherance, defendant A. Peterson was even preparing the plaintiff for intestate travel, instructing her to get her passport, which the defendant admitted to even paying for via texts in March 2024.

274.    Defendant A. Peterson also told plaintiff Brewis that he owned a "Gulfstream Jet," which led Mrs. Brewis to purchase brand-new Samsonite luggage and influenced her to obtain a passport during her trip to Chicago with Peterson, intending to travel and fly internationally. This situation pressured the plaintiff to detach from her service animals due to Peterson's narcissistic love-bombing with attention, money, and long-term promises, aiming to trick plaintiff Brewis into making the defendant the sole focus of her life. This satisfied the plaintiff's predatory and narcissistic traits, as they sought to isolate and control her. "I'm the first person that you've truly let your guard

down with....it's always been inside of you. **_I'm the lucky one that gets to experience all of that pent-up love and emotion_**." Saturday, Feb 24, 2024, 3:25 PM

275.     Plaintiff Brewis was compelled under duress to relocate her belongings while suffering from HIV and experiencing severe systemic inflammation caused by drug-induced lupus, a condition directly resulting from the circumstances created by the defendants' actions and from medications she was forced to take due to the defendant' coercive sexual exploitation. It was later discovered that the plaintiff's doctor prescribed HIV medications, Triumeq, which were exacerbating her autoimmune disease, drug-induced lupus, as indicated in the plaintiff's comprehensive blood lab tests completed in May 2024 through Function Health.

276.     After the plaintiff stopped taking her HIV medications while adhering to a strict, medically tailored diet, her condition cleared utterly, and her blood test results are healthier than they have ever been throughout her life, despite her chronic HIV condition- until she became homeless and could not properly cook or utilize her medical devices to sustain her health and well-being.

277.      The defendant's retaliatory actions rendered the plaintiff homeless after she confronted defendant A. Peterson about the abuse in June 2024 while on a Los Angeles, CA, work trip to change her name legally from Rebekah Katheirne Brewis to Karissa Love Beach.

278. While homeless, the plaintiff finds it extremely challenging to monitor and manage her health conditions effectively, adhering to her medical regimen for autism spectrum disorder, intellectual disability, complex PTSD, ADHD, Ehlers-Danlos syndrome, and HIV, highlighting the stark reality of her experience with disability discrimination.

279. Tyler Moreno, LLMSW, of the Michigan Center for Traumatic Stress, wrote on behalf of the plaintiff for college disability accommodations due to an intellectual disorder at Oakland Community College in September 2023:

- **"*the implications of this diagnosis moderately impair the client's ability to organize and remember new information, communicate clearly and effectively in a timely manner, focus for long periods of time, and access the full range of their working memory. The moderate impairment of these abilities affects the client's ability to process auditory and written information in a distracted environment and recall new information without guided instruction or access to constant communication*"**

280. The plaintiff requires at least two to three hours of self-care each day in private, quiet, and habitable accommodations to maintain her health and well-being. She finds this challenging due to the difficulties associated with her autism, combined with homelessness, Ehlers-Danlos syndrome, dermatosparaxis type (dEDS), also known as

EDS Type VIIC, which is extremely rare, with only a small number of cases reported worldwide. In the United States, it is estimated that fewer than 1,000 people have this condition, which translates to approximately *1 in 200,000)*. Additionally, she deals with ADHD and the effects of complex PTSD and untreated trauma inflicted by previous experiences. Lacking adequate time for daily self-care leads to what is commonly known as "autistic burnout, " and she experiences a state referred to as "defensive mode" due to the excessive stress of coping with life as a neurodivergent individual, along with sensory processing impairments and coping difficulties.

281.    During the work trip in LA and the ensuing conflict with Defendant A. Peterson, Defendant violated Michigan's Whistleblower Protection Act (MCL 15.361 et seq.), federal whistleblower protections under 18 U.S.C. § 1514A, and anti-retaliation provisions of the Trafficking Victims Protection Act by explicitly threatening to terminate and subsequently terminating Plaintiff's housing and financial support in direct retaliation for Plaintiff's protected activity of attempting to report illegal conduct, including but not limited to trafficking, sexual exploitation, and misuse of corporate resources, to the board of Peterson Farms Fresh, LLC.

282.    This fight occurred while she was at Defendant A. Peterson's Airbnb in Los Angeles, which he had reserved for the plaintiff. This serves as additional evidence that Defendant A. Peterson intended to violate the active NDA agreement provisions,

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 138 OF 241

which allow for six months of continuous housing to provide the plaintiff with a safe and healing environment to "start over fresh. "

283.    Defendants A. Peterson, Nathan Brown, Andrew Twyman, RYCRE, LLC ultimately ousted and unlawfully evicted plaintiff Brewis from her housing residence at 1 Lakeside Lane, Apt 5, Fox Lake, IL, because she began refusing to remain silent about the defendants' illegal activities. These activities caused substantial damage to plaintiff Brewis and her planned business, Aero Swift, LLC, which was incorporated on August 1, 2024, by plaintiff owner Rebekah Brewis. (See Aero Swift, LLC's website at www.aeroswift.org).

284.    After the ensuing eviction, plaintiff was overwhelmed and very hurt and angry by defendant A. Peterson's actions of allowing the self-help eviction to occur, which A. Peterson condoned to bring to fulfilment defendant's threat against plaintiff for engaging in legally protected activities of fighting the forced ouster. One morning in late July 2024, plaintiff Brewis woke up from a nightmare and immediately sleep-texted, believing she was sleeping and dreaming, defendant Peterson, while emotionally anguished by flashbacks caused by plaintiff's PTSD. Plaintiff Brewis panicked and deleted the text about 10 minutes later after waking up, once she realized what had happened and the potential consequences.

285.    Within two weeks, starting in August 2024, while the plaintiff was residing at 2751 Ogden Avenue, Downers Grove, IL, dozens of visitors began accessing the plaintiff's Facebook profile, "Karissa Beach," seemingly directed from Grand Rapids, MI, and Kentwood, MI. This included a group of interconnected employees — multiple friends actively on Facebook — of Benteler Automotive in Grand Rapids, Michigan. The plaintiff also grew highly suspicious as she believed her residential location had been compromised due to a significant amount of unusual interest and activity from several individuals trying to approach and communicate with her over those two weeks. The plaintiff took care to install security cameras in the area where she parked, with 24/7 professional monitoring, exited at unpredictable times, and only with her large dog. She left and reentered quickly, mostly very early or late when it was darker, and never loitered to ensure her safety.

286.    "It is estimated that stalkers are violent toward their victims between 25 and 35 percent of the time, and the group most likely to be violent is composed of those who have had an intimate relationship with the victim.6 Nearly one-third of all women killed in this country die at the hands of a current or former intimate.7 Although no national figures are available, it is estimated that between 29 and 54 percent of female murder victims are battered women.8 A significant number of these murders and attempted murders of women are believed to be preceded by stalking."

287.     "Numerous studies indicate that separation is the most dangerous period for victims of domestic violence.11 Fearing loss of control over their victims, batterers often escalate their abuse when their victims seek escape.12 In the National Violence Against Women (NVAW) Survey, discussed in Chapter 1, victims cited the stalkers' desire to control them as the most frequent reason for the stalking behavior". (Stalking and Domestic Violence The Third Annual Report to Congress under the Violence Against Women Act)

288.     On or about February 6-10th, 2024, Plaintiff Brewis contracted COVID-19 through intimate contact with Defendant Peterson, who plaintiff contends knowingly and recklessly exposed her to the virus, and flippantly told plaintiff Brewis about being infected the previous week without isolating per medically established COVID-19 protocol, the next WEEK with plaintiff Brewis and until AFTER their sexual encounter, disabling her even further which further caused withdrawal from plaintiff's college classes at Oakland Community College, where she was a straight A top student taking business law classes, along with Ethics and Macroeconomics, working towards her degree in Business Administration.

289.     From the middle of November until the middle of February 2024, the defendant's actions led her to sever ties with all her social support, including her trauma therapist and therapy at the Michigan Center for Stress, her college education at Oakland Community College, her former best friend J. Morey, her two service animals, Luna

and Oliver (excluding Bellah in February 2025), and potential legal counsel, attorney Sheldon L. Kay of Sheldon L. Kay & Associates, whom the plaintiff befriended during her classes with Mr. Kay in Business Law at Oakland Community College.

290.    When the plaintiff arrived at 1 Lakeside Lane, Apt 5, Fox Lake, IL, she lacked social support and felt too emotionally numb to reach out and establish new positive relationships. Furthermore, being forced to move by defendant A. Peterson more than four times in six months caused the plaintiff extreme physical and emotional exhaustion, making emotional regulation impossible due to the numerous unstable living arrangements she faced without any recognized legal rights regarding her housing under the control of defendants A. Peterson, Brown, and Airbnb collectively.

291.    This was primarily due to a coercive arrangement in which defendant A. Peterson exercised complete control over the plaintiff's housing and financial security, compelling her to submit to his sexual demands at any time and location of his choosing. This constituted sex trafficking under 18 U.S.C. § 1591 while also expecting her to remain silent about the abuse and not disclose anything, facing immediate punishment through the withholding of financial support care.

292.    On February 19th, 2024, Defendant Peterson knowingly engaged in interstate transportation for purposes of commercial sexual activity in violation of 18 U.S.C. § 2421, constituting sex trafficking by force, fraud, or coercion under 18 U.S.C. § 1591,

as evidenced by the following pattern of payments and transportation arrangements: by paying for Plaintiff's transportation arrangements through Carvana, LLC, and through making "Cash App" payments "for reassurance" on the dates of February 8, 2024 for $2,000, saying, "Reassurance [kisses]," on February 10, 2024, for $2500, on February 13, 2024 for $2,000, February 20th, 2024 for $500, and February 25, 2024 for $1,500 and via Zelle using his Huntington Bank account to the plaintiff's former bank, Credit Union One on the dates of February 16, 2024, for $3000, February 18, 2024, for $3000, February 21, 2024, for $3000, March 1, 2024, for $3000 and March 5, 2024, for $3000.

293.     Defendant Peterson also employed trickery, coercion, enticement, and deception to involve Plaintiff in prostitution in Chicago, IL. He deliberately misrepresented the nature of his relationship with the Plaintiff, fraudulently concealing his married status while engaging in a pattern of emotional manipulation and control. Although he was fully married and had not initiated any divorce proceedings, he only verbalized fantasy plans to the Plaintiff. The extent of this deception aimed at Plaintiff Brewis, due to her autism, was a narcissistic love bombing that Plaintiff was not psychologically or emotionally equipped to handle, given her complete loss of control over her life and her total forced reliance on Defendant A. Peterson, which robbed her of her bodily autonomy and control.

294.     The plaintiff felt apprehensive about going to Chicago because she feared that Defendant A. Peterson was setting her up. Defendant Peterson drove his Porsche with another passenger, John Doe 1, and would not disclose to plaintiff Brewis who it was (wife for a setup and retaliation? A secret friend? Work subordinate/associate?). At the defendant Viceroy Hotel, Defendant A. Peterson sexually assaulted Plaintiff Brewis while she was incapacitated and unable to provide legal consent due to alcohol consumption that Defendant had deliberately encouraged and facilitated, constituting sexual assault under 720 ILCS 5/11-1.20, which Defendant had coercively pressured her to engage in, constituting battery and sexual assault under Illinois law. This rendered her unable to consent and caused periods of unconsciousness during which additional assaults may have occurred.

295.     **Alarmingly,** the plaintiff has no memory of any nights spent with defendant A. Peterson, consistently waking up in an extraordinarily groggy and disoriented state that is inconsistent with typical alcohol consumption. This provides strong evidence that defendant A. Peterson deliberately incapacitated her by serving her drinks each night. It was the only other time she had consumed alcohol since she last drank two glasses at Fishbones on a date on February 20, 2024, when defendant A. Peterson took advantage of the plaintiff sexually after her intoxication caused her to pass out. The plaintiff woke up and darted into the bathroom, crying convulsively before returning later to lie down, curled on her side in the fetal position, and dissociating with flashbacks.

296.     The defendants' charade was furthered by instructing staff that I was "Mrs. Peterson" and A. Peterson even took the plaintiff to the jewelers the next morning and bought her a $3,000 diamond "commitment" ring and a brand-new pair of black Louis Vuitton sandals.

297.     Plaintiff wished to be treated normally just like any other individual by defendant and not to be marginalized and in shame "erased" through the NDA agreement, attempting to cripple plaintiff's association rights by contacting and applying for positions at Peterson Farms and approaching the company through plaintiff's drone and legal consulting business, Aero Swift, LLC. The NDA agreement, which is void as against public policy, obtained through duress, and constitutes an unlawful contract designed to conceal federal crimes in violation of 18 U.S.C. § 1512, explicitly attempted to forbid plaintiff Brewis from reaching out to any employees or businesses associated with Aaron Peterson, in violation of plaintiff's First Amendment rights and whistleblower protections, showing the immense fraud he perpetuated in disguising having any type of subjugated relationship with plaintiff Brewis.

298.     With the bitter knowledge that through his company he had committed personal offenses against the plaintiff, and that the plaintiff believed she deserved better and more appropriate legal treatment, she approached defendant Peterson respectfully, professionally, and non-threateningly to make a legitimate request for contact

information of the Peterson Brands, Inc Human Resources Department. On January 2, 2025, plaintiff Brewis approached defendant Peterson Brands, LLC, and Aaron Peterson, asking him to introduce her to the HR department of Peterson Brands, LLC:

299.    "Dear Mr. Peterson,

We greatly appreciate your time and attention and are excited about reaching out to share news of our 2025 Grand Opening! Aero Swift LLC would like to request Peterson Farm's https://www.petersonfarmsinc.com/ HR contact information. Will you please share your company's HR department phone number, email, lead contact, etc.? Aero Swift LLC is intentionally working on cultivating and growing relationships with local farmers in Michigan who may be interested in contracting our drone and legal consulting services. Our website can be found below for review, and if you have any questions, please feel free to reach out anytime. We work on a contract-project basis and can be hired at any time to work collaboratively on dedicated drone work projects that enhance your company's public image and more. Thank you for your time; we appreciate you forwarding our information. Sincerely, Rebekah Brewis Owner, Aero Swift, LLC."

300.    Defendants deliberately obstructed Plaintiff's attempts to gain legitimate employment, constituting unlawful retaliation and discrimination in violation of public policy, Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act. Furthermore, while maintaining that the NDA is void ab initio, Defendants

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 146 OF 241

additionally breached their own purported agreement by ceasing required payments after December 2024, demonstrating a systematic pattern of economic control, coercion, and retaliation in violation of state and federal employment laws, including but not limited to Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act. They systematically discriminated against Plaintiff and denied reasonable accommodations while also refusing to share the contact information and identity of the Peterson Farms, Inc. Human Resources Director, thereby obstructing any accountability in reporting the defendants' gross deviation from corporate standards for unethical, illegal, discriminatory, and adverse treatment within the company and its executives.

301.     The plaintiff contacted defendant A. Peterson via phone and email on March 5, 2025, regarding the plaintiff's RV trailer's septic tank freezing and bursting during the prolonged sub-zero winter storms, which left the plaintiff unexpectedly homeless. The RV trailer, a 2008 Jayco Jay Feather Sport, was purchased on October 15, 2024, for $4,500 using savings from NDA contractual obligations as stipulated by A. Peterson, which A. Peterson had only ***partially*** fulfilled.

302.     According to the NDA Agreement dated March 21, 2024, Defendant A. Peterson was contractually obligated to provide the plaintiff with adequate funding to secure suitable housing. However, he was forced to vacate 1 Lakeside Lane, Fox Lake, IL, in a hurry to purchase an adequate RV trailer but failed to meet this obligation by sending

only $20,000 instead of the requested $30,000. This shortfall directly prevented the plaintiff from acquiring a new trailer capable of safely accommodating both herself and her service animal, Bellah Beach.

303.    As a direct and foreseeable result of Defendant A. Peterson's material breach of the NDA Agreement, the plaintiff was forced to purchase a substandard used trailer under extreme duress. She could not maintain her residence during the winter without incurring thousands of dollars in furnace upgrades, as the furnace was sold to her broken and ultimately did not function. The trailer became uninhabitable due to the septic tank freezing and bursting, caused by subzero winter storms in December 2024 in the Midwest. The plaintiff had to vacate the trailer after vomiting multiple times and becoming ill from sewage backing up into the cabin.

304.    The plaintiff had Progressive Insurance coverage as a full-time employee; however, her claim, if approved, would only provide her with the actual cash value of the trailer rather than the replacement cost due to its 18-year-old age. Any trailer insured must be at least 5 years old or less to qualify for complete replacement. Since the plaintiff would have received only about $ 1,500 from insurance if the claim were approved, and Progressive did not inspect the trailer for over three weeks after the claim was initiated, the plaintiff was forced to sell it on February 15, 2025, for $900 to Trent Gentry of Joliet, IL, to secure alternative housing and avoid homelessness.

305.     The plaintiff had been living out of a rented vehicle for more than a month, from February to March 2025, and became increasingly ill due to her conditions and insufficient rest to recover, which made daily planning and survival very difficult for her.

306.     Due to defendant A. Peterson forcing and causing plaintiff Brewis to relocate multiple times to maintain her and her service animal's safety since the unlawful eviction in June 2024 by the defendants, her personal work life has been disrupted, resulting in thousands of dollars in lost income, as well as the loss of two new motorcycles: a 2024 Yamaha MT-07 and a 2024 Yamaha XT-250. She purchased both in full at Dupage Honda in Dupage County, Illinois, in April and May 2024 for a total of approximately $20,000.

307.     Due to the plaintiff being forced to move to Illinois, she never received her car title and registration for her 2019 GMC Terrain, which defendant A. Peterson paid off the amount of $20,757.40 on March 20, 2024, until August 5, 2024, at the State of Michigan DMV office. This interfered with her handling of business and sales of her vehicles, resulting in thousands of dollars in losses, as stipulated in the NDA agreement. The plaintiff was forced to sell her vehicle for $14,000 on August 6, 2024, resulting in a total vehicle loss and depreciation of over $6,000.

308.     The plaintiff's temporary registration ended on May 6, 2024, forcing her to purchase another vehicle under duress from Carvana LLC and Aaron Peterson in combination, which is part of another anticipated pending lawsuit. This situational strain cost the plaintiff Brewis over $40,000 in losses between the deposit for her 2023 Ford Explorer ST, which amounted to approximately $26,000 in total, and the loss of sale value from being unable to sell her 2019 GMC Terrain SLE Sport due to the title being improperly processed and withheld by Carvana LLC for over three months past the requirements.

309.     Plaintiff, due to the online stalking by defendant A. Peterson and fears of his vindictiveness, was also forced to sell her 2023 Ford Explorer ST under duress, on which she had nearly 50 percent paid off, retaining equity and having made no missed payments. The plaintiff owed $38,000 remaining on her 70-month car loan with Carvana.

310.     Plaintiff Brewis purchased her Ford Explorer ST through Carvana.com on May 11, 2024, without any co-signers, for $61,765, making a down payment of $26,790. After experiencing stalking at her previous residence, the plaintiff felt she had no choice but to flee as quickly as possible and sell or exchange as much of her property as she could in order to travel light and maximize her chances of entirely escaping any known locations that the defendant might associate with her, including storage providers, particularly U-Haul storage in Spring Grove, Illinois.

311. Defendants have cost the plaintiff thousands of dollars in losses from electronics purchased as capital assets for her business, Aero Swift, LLC. This includes Aero Swift, LLC's work drone, Nighthawk, and her service animal, Bella Beach, which she had to surrender due to her inability to maintain a home as a result of A. Peterson's negligence. This reckless behavior continues to impact the plaintiff and her disabilities to this day negatively.


Bellah Beach with "Nighthawk", Aero Swift, LLC's work drone

312. Defendants A. Peterson and Peterson Farms Fresh, LLC, along with the defendants at Varnum, LLP, have engaged in discriminatory and unlawful conduct under the guise of state law. This was accomplished through their coordinated use of governmental and institutional authority, involving the defendants Oceana County Development Corporation and its Director, Richard Raffaelli, who also serves as the COO and primary executive assistant to CEO Aaron Peterson of Peterson Farms

Fresh, LLC. Their actions include leveraging connections with state banking regulators and financial institutions, facilitated by their access to information and influential, unchecked corporate partnerships.

313.     Defendants Varnum, LLP, CEO Aaron Peterson, and the Oceana County Development Corporation, in partnership through the Oceana County Economic Alliance, are entities that collectively employ over 1,000 professionals. Two of these entities hold authority from the state of Michigan as Directors, including defendant Richard Raffaelli, who maintains two professional roles linking Peterson Farms Fresh, LLC to the state as state actors operating under the apparent authority of the state. Collectively, the defendants possess and act upon the plaintiff's confidential personal information and Social Security Administration records due to privacy breaches caused by defendant A. Peterson and Varnum, LLP. They are collectively attacking the plaintiff's private banking through underhanded partner policy requirements invoked by private parties acting under color of state law as Michigan State attorneys. This culminated in the plaintiff losing banking access with two different banks in the last month, one in the last week and 3 in the previous 3 months, almost immediately after she approached Peterson for assistance due to her being rendered homeless.

314.     The plaintiff, whose credit score is currently 665, has had accounts closed at over three different banks, including Chase, Huntington, and PayPal Business, with a total of approximately five accounts shut down in the last three months. This activity

suggests coordinated economic retaliation. Due to the prolonged controversy and its impact on the plaintiff, Brewis, the defendants' coordinated actions pose an ongoing and immediate threat of irreparable harm, necessitating prompt court intervention through preliminary injunctive relief. These accounts, particularly the PayPal Business account, were shut down based on information and belief due to the type of services the plaintiff was purchasing through her business account for legal purposes and their policies aimed at protecting their partnerships from "legal harm. "

315.    In a letter dated January 15, 2025, The Huntingtin National Bank, addressed to plaintiff Rebekah Brewis at 230 E Ohio St, Suite 410 PMB 2741, Chicago, IL 60611-5288, stating, "We're writing you about your Huntington account(s). After a careful review, we have decided to end our relationship with you and close your account(s) referenced above for exceeding our risk tolerance. As stated in your account agreement, we can close your account at any time, for any reason, with or without notice to you. We will restrict your account(s) on February 12, 2025. The account will be closed within seven business days of this date."

316.    In violation of the NDA agreement and contravening domestic violence anti-stalking protection laws, Plaintiff Brewis discovered from February to March 2025 that multiple individuals from Petersons Farms Fresh, LLC, including directors, officers, family members, and former executive management, learned of her online and legal identity. These individuals took independent and collective actions to

research her Facebook profile, prompting plaintiff Brewis to attempt to file a lawsuit against the defendants. However, she faced interference when her PayPal banking account was compromised, immobilized, and restricted. Additionally, her contract arrangements for a car rental through Enterprise, LLC were severely disrupted during her mid-trip. At the time, plaintiff Brewis was already homeless, living with her service animal in a 2024 Pacifica van rented through her business at a reduced rate.

317.    Due to the previously mentioned service disruption and interference with her personal and work activities, while using an Aero Swift, LLC rental, plaintiff Brewis and Aero Swift, LLC lost the remaining deposit after the rental was to be returned, causing the plaintiff to return the car and lose all modes of transportation concurrently homeless.

318.    On or about March 8th, 2025, Plaintiff Brewis was also forced to surrender her service animal, Bellah Beach, to the DuPage County Animal Shelter while crying convulsively because she could no longer provide a home for her. After searching for a whole month to rehome her, she prepared for the worst, which ultimately came to pass.

319.    The defendants' actions constitute intentional and systematic unlawful discrimination based on gender identity and sex characteristics, violating Title VII of the Civil Rights Act of 1964, as interpreted by Bostock v. Clayton County, 140 S. Ct. 1731 (2020), the Michigan Elliott-Larsen Civil Rights Act, 1976 PA 453, as amended

by 2023 PA 6, the Illinois Human Rights Act, 775 ILCS 5/, and other applicable federal and state anti-discrimination laws protecting LGBTQ+ individuals.

320.    Defendants engaged in discriminatory conduct by creating a hostile environment in her living and working conditions at 1 Lakeside Lane, Fox Lake, IL, and attempting to build her business without interruption. This resulted in adverse actions against the plaintiff due to her gender identity and sex characteristics. Defendants RYCRE LLC, Nathan Brown, Andrew Twyman, and A. Peterson unlawfully evicted the plaintiff by failing to include her in the Airbnb reservations, which would have allowed her to file formal complaints as a "guest" on the reservation controlled and managed by Aaron Peterson. Additionally, they wholly failed to provide the necessary accommodations requested by the plaintiff under the ADA. They did not follow the state eviction process protocols as outlined in the Illinois Revised Statutes.

321.    The defendants' actions demonstrate discrimination against transgender individuals and intersex women, violating established civil rights protections. This is evidenced by their deliberate indifference and negligent recklessness in handling the legal controversy involving plaintiff Brewis, particularly given her limitations in mental, physical, and emotional capacities, which shows a callous disregard and animosity detrimental to the plaintiff's health and welfare.

322.     Defendant A. Peterson is utilizing his power and influence, his role as CEO, and his firm, Varnum LLP, to target plaintiff Brewis in any way they believe is legally permissible, given their flawed legal perspectives and beliefs regarding their treatment of plaintiff Brewis in these matters.

## STATUTE OF LIMITATIONS

323.     The plaintiff hereby asserts that all claims herein are being brought well within the applicable statute of limitations, with the most recent actionable events occurring since contact was made by Defendant A. Peterson on February 18, 2025, through accessing the plaintiff's Facebook profile. Furthermore, three other known individuals associated with Defendant A. Peterson, including Defendant Earl Peterson, Defendant Gabrielle Peterson, Peterson Farms Fresh, LLC, COO Richard Raffaelli, and her husband Mark Peterson, former Vice President of Peterson Farms, LLC, continue uninterrupted as of March 29, 2025.

324.     Furthermore, around March 5th, 2025, the plaintiff's business banking through PayPal was restricted after the plaintiff sent a request to defendant A. Peterson via PayPal for emergency assistance, in accordance with the parties' NDA Agreement dated March 21, 2024. This action preserves the legal right to pursue these claims and demonstrates the active need to file for a preliminary injunction.

**LEGAL THEORIES**

325.    The legal theories underlying this complaint are rooted in various areas of law, including civil rights, anti-discrimination, contract law, tort law, and federal trafficking statutes. For each cause of action listed below, a brief explanation of the underlying legal theory will be provided to establish the basis for the claim:

326.    The legal theories underlying this complaint are based on the systematic violation of the plaintiff's fundamental rights through coordinated misconduct and particularly egregious violations of Michigan's LGBTQ+ antidiscrimination laws, as outlined in the Elliott-Larsen Act 456 of Michigan, MCL 37.2103 (f)(h)(k) (i-iii), among others.

327.    The plaintiff, having sustained direct, concrete, and particularized injuries, asserts standing to bring the following causes of action, with elements outlined for each as mandated by law. For each cause of action listed below, the specific elements will be detailed to ensure compliance with legal requirements.

328.    These elements will include, but are not limited to:

    (1) the duty or obligation owed by the defendant,

(2) the breach of that duty,

(3) causation linking the breach to the plaintiff's harm, and

(4) damages suffered by the plaintiff. Each cause of action will be followed by a clear statement of its elements and how they apply to the facts of this case:

329. Specifically**,**

***Civil Rights Conspiracy (42 U.S.C. § 1983):*** The defendants, while acting in concert with state actors and utilizing state legal processes and institutional authority, conspired to systematically deprive Plaintiff Brewis of her constitutionally protected rights to due process, equal protection, and access to courts, in violation of 42 U.S.C. § 1983. On or about March 5th, 2025, the defendants coordinated to restrict the plaintiff's PayPal business banking after she sought emergency assistance, which appears to be a targeted action aimed at obstructing her legal and economic rights. This action directly caused financial harm and obstruction of the plaintiff's ability to pursue legal remedies. This action follows a pattern of discriminatory behavior, as evidenced by violations of Michigan's Elliott-Larsen Act, specifically targeting the plaintiff's LGBTQ+ status and systematically undermining her professional and personal autonomy through coordinated institutional actions, resulting in ongoing emotional distress and economic losses to the plaintiff.

330. Specifically, the defendants leveraged their institutional authority and connections with state actors to deny the plaintiff access to banking services, legal

remedies, and other fundamental rights. These actions directly caused the plaintiff to suffer financial losses, emotional distress, and deprivation of constitutional rights. For example, the defendants' restriction of the plaintiff's PayPal account on March 5, 2025, as described in paragraph 487, directly resulted in financial harm and business disruption for the plaintiff. The defendants' actions represent a deliberate infringement on the plaintiff's First and Fourteenth Amendment rights to personal autonomy, dignity, and professional freedom, causing ongoing harm to the plaintiff's civil liberties and economic interests.

331.    On the dates from March 19th to March 21st, 2024, and again in a June 2024 letter threatening the plaintiff, who is a member of a protected class and disabled, defendants A. Peterson, Peterson Farms Fresh, LLC, Peterson Farms Inc, and Varnum, LLP engaged in a coordinated campaign of legal intimidation. They deliberately restricted plaintiff Brewis's access to the courts with the specific intent to chill her from asserting her constitutionally protected civil rights. They used legal intimidation and restricted access to the court to prevent plaintiff Brewis from asserting her civil rights, employing pressure by threatening civil and criminal charges against her.

332.    On March 5th, 2025, defendants A. Peterson and Varnum, LLP engaged in a coordinated effort to interfere with the plaintiff's banking relationships, leading to the termination of her PayPal and other financial accounts. This action constituted a direct

deprivation of her property rights and significantly impaired her ability to conduct legitimate business operations.

333.    On March 5th, 2025, defendants, acting as private citizens in various intergovernmental capacities, coordinated to restrict the plaintiff's banking under the guise of Michigan law, effectively barring attorneys in the banking industry from accessing services through PayPal and other financial institutions. This action directly led to the deprivation of the plaintiff's property rights and ability to conduct business.

334.    This coordinated interference with the plaintiff's banking relationships was a deliberate attempt to undermine her financial stability, professional capabilities, and ability to bring this cause of action, causing significant harm and necessitating legal redress.

335. Civil Rights Conspiracy (42 U.S.C. Section 1983) and Constitutional Rights

(a) Defendants Aaron Peterson, Peterson Farms Fresh, LLC; Earl Peterson; PFI HOLDCO, LLC; Oceana County Development Corporation (a Michigan state governmental entity); Ocean County Economic Alliance (a Michigan state governmental entity); Nicholas Missad; Jacob Droppers; and Katherine Koskam of Varnum, LLP, while acting in concert with state actors such as Richard Raffaelli and Earl Peterson, both Directors of the governmental entities listed above, acted unlawfully under the color of Michigan state law and exploited state and county legal

processes. They interfered with the plaintiff's banking partnerships with PayPal, Inc. and Huntington Bancshares Incorporated d/b/a Huntington Bank from December 2024 to the present, specifically in January 2025 and on March 5, 2025.

336.     Defendants Aaron Peterson, Nicholas Missad, Jacob Droppers, and Katherine Koskam of Varnum, LLP conspired to deprive the Plaintiff of a constitutional right.

337.     A deprivation of constitutional rights occurred, specifically the plaintiff's First Amendment right to petition the courts for redress of grievances and the Fourteenth Amendment right to due process. Defendants Aaron Peterson, Nicholas Missad, Jacob Droppers, and Katherine Koskam of Varnum, LLP legally intimidated plaintiff Brewis from filing a lawsuit or contacting the police to report crimes due to the coercive collective pressure placed on Rebekah Brewis, a severely disabled and vulnerable adult, to comply with an illegal NDA agreement. This direct intimidation and coercion caused Brewis to refrain from exercising her constitutional rights, resulting in tangible harm, including delayed access to legal remedies and prolonged exposure to ongoing misconduct.

338.     Plaintiff Brewis suffered concrete and specific damages as a direct result of the conspiracy, including being denied timely access to the courts, violating her First Amendment right to petition and her Fourteenth Amendment right to due process.

339.     Plaintiff Brewis has personally experienced direct constitutional violations and can demonstrate specific injuries resulting from the defendants' coordinated efforts to deprive her of fundamental rights, thereby giving her standing.

340.     Breach of Constitutional Rights (First and Fourteenth Amendments): As the individual directly affected by the violation of her constitutional protections, plaintiff Brewis has a personal and immediate legal interest in seeking redress for the systematic denial of her civil liberties, granting her standing.

341.     ***Sex Trafficking and* Interstate Commerce Claims: Article III of the United States Constitution and related federal commerce regulations**

342.     **:** 18 U.S.C. § 1591 and § 1595 of the Trafficking Victims Protection Act (TVPA)

- Elements of a Claim for Civil Damages and Equitable Relief Under the Federal Trafficking Victims Protection Act:

    (1)     Defendant A. Peterson knowingly and intentionally recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited plaintiff Brewis through a systematic pattern of coercive behavior, including financial manipulation, psychological pressure, and the exploitation of power dynamics, and the use of intoxicating substances without consent, as evidenced by specific transactions, communications, and events occurring between January 2024 and February 2024;

(2)    Defendant A. Peterson and Peterson Farms Fresh, LLC knew or recklessly disregarded that force, fraud, or coercion would be employed to compel the plaintiff to engage in a commercial sex act;

(3)    The sex trafficking impacted interstate or foreign commerce, as evidenced by defendant A. Peterson's numerous payments to the plaintiff online through Cash App, Huntington Bank, and Zelle.

(4)    The plaintiff incurred damages due to the defendant's conduct.

343.    Evidence of commercial purpose in the context of sex trafficking claims under 18 U.S.C. Section 1591 and Section 1595 typically includes specific factual allegations that demonstrate the defendant's intent to engage in commercial sexual activity. This can be shown through various forms of evidence, such as:

(a) Financial Transactions: Payments to the victim for sexual acts, facilitated via platforms such as Cash App, Huntington Bank, and Zelle.

(b) Interstate Commerce: Evidence indicating that the sex trafficking affected interstate or foreign commerce, such as transportation arrangements and payments for travel.

(c) Business Resources: Using corporate resources to facilitate trafficking, such as booking housing through Airbnb with company accounts.

(d) Pattern of Behavior: Demonstrating a systematic pattern of coercion, manipulation, and exploitation for commercial sexual activity. These elements collectively support the claim that the defendant engaged in sex trafficking with a commercial purpose.

344.    Plaintiff Brewis, a direct victim of the alleged sex trafficking scheme, seeks legal redress for actions that have caused her substantial personal harm, trauma, and economic damages. She attributes her significant personal, professional, and economic losses directly to the defendants' systematic and intentional actions.

345.    Defendant A. Peterson's sex trafficking scheme, which occurred from February 26 to February 28, 2024, at the Viceroy Hotel in Chicago, Illinois, directly caused severe psychological trauma, loss of professional opportunities, and significant emotional distress. Between January 2024 and February 26, Peterson fraudulently claimed to be in a relationship and that he was preparing to divorce his wife to commit to the plaintiff in a long-term relationship. The defendant purchased a ring for the plaintiff, which was sized and placed on her engagement finger the night after they engaged in non-consensual intercourse. The plaintiff has no recollection of the events due to the suspected non-consensual administration of intoxicating substances, strongly suggesting the use of an incapacitating substance without her knowledge or consent. After the trip, the defendant systematically distanced himself from the plaintiff, particularly after learning that he was having sexual relations with both his wife and the plaintiff simultaneously and without protection. This revelation made Aaron Peterson extremely angry and defensive, insisting it was "none of your business" until he ultimately abandoned the plaintiff and executed an unconscionable non-disclosure agreement designed to oppress, coerce, and control her from reporting

the criminal actions of A. Peterson. This instrument served as a silencing tool that excessively restricted the plaintiff's rights to associate and communicate.

346.    ***Tortious Interference:*** The defendants intentionally and maliciously disrupted the plaintiff's business relationships through calculated interventions that exceeded legitimate business interests, resulting in substantial economic harm.

- Elements:

(a) Tortious Interference: The elements of this claim are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) intentional interference causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff. The defendants intentionally disrupted the plaintiff's business relationships and professional opportunities through malicious and calculated interventions, causing significant economic and professional harm.

347.    Standing: Plaintiff Brewis can demonstrate direct economic and professional harm resulting from the defendant's intentional interference with her business relationships and opportunities.

348.    **Civil Rights Violations:** through coordinated interference, Defendant A. Peterson and Peterson Farms Fresh, LLC abused their positions and corporate powers as CEO to deny plaintiff Brewis access to Aero Swift, LLC's banking, which was necessary

for her work, thereby directly infringing on her right to professional freedom. This denial of resources resulted in the plaintiff being unable to complete critical projects, leading to a loss of approximately $200,000 per year in income. This was due to quarterly business planning for Spring 2025, which was delayed by three months because of unsafe winter flight conditions. The defendant also employed legal intimidation and weaponized Varnum, LLP to conceal criminal activity using an unconscionable NDA, post-sexual assaults, and prolonged abuse of plaintiff Brewis. As a result of failing to adequately administer the NDA agreement financially, as pleaded, the plaintiff suffered financial and property losses exceeding $250,000.

349.    Specifically, on March 6, 2025, Defendants Aaron Leroy Peterson, Jennifer Lamb Peterson, Peterson Farms, LLC, and the Varnum, LLP defendants collectively, based on specific facts and evidence, knowingly and intentionally made materially false and fraudulent reports to PayPal Inc., causing Aero Swift, LLC's bank account to be restricted and nonfunctional on that date. Consequently, it was unable to accept payments for potential drone sales, legal consulting, or business property sales, severely impacting its ability to raise capital and generate essential revenue. PayPal, Inc. specifically stated in writing: "We're unable to continue processing payments for this account," illustrating the direct and immediate impact of the defendants' tortious interference with the plaintiff's business relationships.

350.     This interference alone directly resulted in a loss of $5,000 in potential sales and consulting fees over the following month. The time between the plaintiff's request for $2,000 from defendant R.J. Eliot, also known as Aaron Leroy Peterson, and the restriction of the plaintiff's account was only 48 hours, establishing a causal nexus. The tortious interference by the defendants deliberately disrupted plaintiff Brewis' business relationships, leading to quantifiable economic losses and career impediments.

351.     ***Non-Disclosure Agreement Challenge:*** The agreement constitutes an unconscionable attempt to suppress the plaintiff's rights, violating public policy and fundamental principles of contract law by imposing an undue burden on her professional and personal liberty.

339. ***Void Non-Disclosure Agreement:***

(a) Standing: As the party subjected to an unconscionable and illegal agreement, the plaintiff holds a direct legal interest in contesting the validity and enforceability of the Non-Disclosure Agreement due to legal principles and potential contract irregularities, as argued and plead herein.

(a)    Plaintiff Brewis seeks relief due to the Non-Disclosure Agreement:

(b) Unreasonably restricts professional association opportunities,

(c) Was established through a process that denied meaningful negotiation,

(d) Contains terms that violate established legal standards protecting individual rights.

(e) Was poorly written by Varnum, LLP, and partners Jacob A. Droppers and Nicholas B. Missad, as Varnum, LLP only possesses 22% of the common elements of the NDA agreement under Contract Law, failing a critical review See, EXHIBIT: AAB

352.    Specifically, the agreement's provisions demonstrate a pattern of overreach that violates established legal principles:

(b) First, the NDA's restrictive clauses go beyond protecting legitimate business interests and instead create an undue burden on the plaintiff's ability to associate without interference freely.

353.    The circumstances surrounding the formation of the agreement constitute clear procedural and substantive unconscionability, as it was presented under extreme duress and contains grossly one-sided terms that no reasonable person would accept. The plaintiff was explicitly denied the chance to seek independent legal counsel despite her request and was pressured into signing via DocuSign while experiencing emotional distress and time constraints, without any meaningful opportunity for negotiation or review of the terms. Although the plaintiff sought legal representation, she was pressured into signing the NDA, with the defendants being aware of her situation.

354.     At the time of execution, the plaintiff was in an exceptionally vulnerable position

due to:

(1) documented disabilities,

(2) immediate housing insecurity,

(3) a compromised mental state from prescribed psychiatric medications and

(4) ongoing emotional trauma from the defendants' alleged abuse, which violates the

Elliott-Larsen Civil Rights Act of Michigan (MCL 37.2101 et seq.), with no

explanation provided regarding its extensive consequences and conducted through

"text message" communications between plaintiff Brewis and Defendant A. Peterson.

 The unconscionable Non-Disclosure Agreement served as a direct mechanism for the

defendants to suppress the rights of plaintiff Brewis and prevent her from seeking

justice, resulting in ongoing harm and professional limitations.


346. **Contract Law Violations: Breach of Non-Disclosure Agreement, with**

**remedies under state contract law:**

(1) Existence of a valid contract;

(2) Breach of the contract terms;

(3) Resulting in damages.

Breach of Non-Disclosure Agreement: The NDA was created as a means of

control aimed at silencing the plaintiff and preventing her from disclosing the full

extent of the defendant's misconduct, thereby further infringing on her rights and

perpetuating a culture of suppression. Defendants unilaterally disclosed the plaintiff's identity to a wide range of family members, associates, subordinates, co-directors, and Ocean County governmental officials, in violation of the NDA protecting the plaintiff's identity, from June 2024 to the present.

***Breach of Contract:*** The Plaintiff's specific requests outlined in the NDA agreement were not fulfilled, and the agreement was not fully implemented. Any benefits that were to be received were abrogated, leaving Plaintiff Brewis unable to meet her essential and basic needs for housing and funding related to her disabilities and health conditions. These needs were largely misappropriated or lost during the subsequent flight and escape of Plaintiff from Defendant A. Peterson, his street associates, and Varnum, LLP. On March 26, 2024, defendant A. Peterson booked a six-month lease at 1 Lakeside Lane, Fox Lake, IL 60020, a spacious waterfront three-bedroom retreat Airbnb property, from March 27 to September 26, 2024, for $33,208.09, as indicated in an email receipt sent by Aaron Peterson (See, **Exhibit AAF**). By June 1, 2024, the defendants collectively yet separately began the process of evicting and pressuring plaintiff Brewis to leave the reservation.

355.    The factors mentioned above, along with the agreement's excessively broad and punitive terms, establish a clear basis for judicial intervention and relief. Defendants A. Peterson, Peterson Farms Fresh, LLC, and the collectively named defendants herein breached specific contractual obligations to protect the plaintiff Brewis's name,

identity, and personal information, which were disclosed under significant pressure and coercion, resulting in direct financial harm to the plaintiff. These obligations included the following stipulations:

- Within five (5) days following the Effective Date, Peterson shall make a payment in the amount of $20,899.88 to Brewis' Bridgecrest Loan #200270014801 secured by Brewis' 2019 GMC vehicle.

- Within five (5) days following the Effective Date, Peterson shall make a one-time, lump sum payment to Brewis in the amount of One Hundred Thousand Dollars ($100,000) via cash, wire transfer, cashier's check or other immediately available funds to the account designated by Brewis.

- Brewis is currently occupying an apartment located at 529 Miller, Apartment #211 Grand Haven, MI 49417 via an Airbnb rental (the "Current Airbnb Rental"). Brewis may continue to occupy the Current Airbnb Rental, without cost to Brewis, subject to the terms and conditions of Airbnb, through March 31, 2024 and Peterson will make all required rent payments on such Current Airbnb Rental through March 31, 2024. Brewis will vacate the Current Airbnb Rental no later than March 31, 2024.

- In addition, Peterson agrees to pay up to $25,000 to Airbnb (or similar service) (at the direction of Brewis) for Airbnb (or similar service) rentals of Brewis, in each case, to be used between April 1, 2024, and September 30, 2024 in a city of Brewis' choosing.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 171 OF 241

356.     The withdrawal of promised housing funding for the plaintiff's long-term housing and the failure to remit the proper amount owed to the plaintiff- accounting for the housing promise combined with the documented housing depreciation resulting from Defendant Nathan Brown's and RYCRE, LLC's negligent and reckless actions against a disabled plaintiff, including invasion of privacy, sexual harassment, and unlawful "self-help eviction"- amounts to $60,000. Additionally, the failure to finalize the plaintiff's car purchase of her 2019 GMC Terrain, which was co-signed by Defendant A. Peterson in February 2024 through Carvana.com (See **Exhibit AAG**), making him partially responsible for the execution of the sale and for full legal possession of the car without limitations. The vehicle was never fully registered and titled within the applicable timeframes of Illinois and Michigan, forcing the plaintiff to sell her 2019 GMC Terrain due to the expiration of the 90-day temporary state registration on May 6, 2024, rendering it legally undrivable.

357.     As a direct result of the Defendants' actions, Plaintiff Brewis was forced to garage the vehicle and return the plates, incurring insurance costs of $250 per month for three months (totaling $750) while the vehicle remained unusable due to the Defendants' failure to provide proper registration and title documentation for over four months. Furthermore, Plaintiff Brewis had to either garage the vehicle and return the plates to avoid continuing to pay her Geico Insurance premium, which was approximately $250 per month at the time. This totaled three months of being insured without driving the vehicle due to the absence of permanent registration and title

documentation, which were not provided to the Plaintiff until more than four months had passed.

358.    During this time, her vehicle's trade-in value depreciated significantly. It was initially offered for sale or trade-in on Carvana.com for approximately $16,000 in May 2024, but by September 2024, the offer had dropped to only $11,000, resulting in a net loss of $5,000. This figure does not account for the time lost while owning the vehicle, which remained parked and unused while still incurring premium insurance costs. At one point, the Plaintiff was paying insurance for two cars simultaneously, until she finally divested herself of the 2019 GMC Terrain Sport, with which she had been legally entangled for over seven months without any fault or contributory negligence on her part.

359.    Defendant A. Peterson's post-relationship stalking and harassment of plaintiff Brewis on the social media platform Facebook, Inc. has caused direct financial and emotional harm to the plaintiff in the long term, including documented psychological trauma, therapy expenses, and loss of business opportunities due to reputational damage. Plaintiff Brewis has endured an ongoing and ambiguous state of fear resulting from the actions of the Defendants, both individually and collectively.

360.    **Fraudulent Misrepresentation:**

   (1) False representation of a material fact;

(2) Knowledge or belief of its falsity;

(3) Intent to induce reliance;

(4) Justifiable reliance by the plaintiff;

(5) Resulting damage.

Plaintiff Brewis was fraudulently misclassified as an independent contractor by Defendants A. Peterson and Peterson Farms Fresh, LLC as part of a systematic scheme of exploitation, during which she was subjected to severe and ongoing sexual abuse, coercion, and trafficking. This is evidenced by defendant's online assertion on January 24th, 2024, at 9:27 am. Defendant A. Peterson, utilizing fraudulent misrepresentation, wrote Airbnb hosts "Mason & Holly" of "Living Water Corporate Housing" via Airbnb messages: "Hi, Mason! I'm Aaron and I book business trips for Karissa. Your place looks like a good fit for this extended business assignment. I think they'd love your place!" Again, on January 24th, 2024. At 9:41 a.m., Defendant Peterson told the Airbnb hosts Mason & Holly via Airbnb messages in Grand Rapids, MI, "Thanks. Karissa is a consultant working on a special project." The defendant led the plaintiff to believe that she was being hired for a special position and that he had genuine romantic intentions toward her for the long term, claiming that he was "in the process of divorcing his wife." This was stated once the plaintiff discovered the wife in late December 2023, approximately six weeks after the parties had originally met.

361.    However, the plaintiff discovered it was all an expertly fabricated lie and a pattern of deception by the defendant. As of December 2024. No records were produced upon inspection and request from the Ottawa County Family Services Department indicating any pending divorce between Aaron Leroy Peterson and Jennifer Lamb Carlson. Defendants engaged in a systematic pattern of misconduct that included establishing or allowing to be established through neglect and deliberate indifference, a coercive work environment characterized by manipulation and sexual exploitation while exerting their institutional power to maintain control over the plaintiff, and failed to take any accountability for the extreme trauma caused to the plaintiff long term.

**JURY DEMAND**

362.    The plaintiff hereby demands a trial by jury on all claims in this action triable by jury as a matter of right under the Seventh Amendment

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 175 OF 241

1. For sex trafficking violations under 18 U.S.C. § 1591 and § 1595: compensatory damages, punitive damages, mandatory restitution under 18 U.S.C. § 1593, and such other relief as provided by law;

2. For civil rights violations under 42 U.S.C. § 1983: compensatory damages, punitive damages, declaratory relief, and permanent injunctive relief

3. For tortious interference: economic damages and injunctive relief;

4. For breach of contract: compensatory damages;

5. For fraudulent misrepresentation: compensatory and punitive damages;

6. For intentional infliction of emotional distress: compensatory damages and punitive damages

7. For violations of the Americans with Disabilities Act: compensatory damages and injunctive relief;

8. For violations of the Elliot-Larsen Act of Michigan: compensatory damages and punitive damages

9. A declaration that the Non-Disclosure Agreement is void and unenforceable;

10. Attorneys' fees and costs;

11. Any other relief the Court deems just and proper, including but not limited to:

      a) Specific performance requiring Defendants to implement comprehensive workplace reforms

      b) Rescission of the Non-Disclosure Agreement

      c) Mandatory injunctive relief to prevent future misconduct

    a. Awarding compensatory damages in an amount to be determined at trial, but no less than $50,000,000 (Fifty Million Dollars), calculated based on documented losses including: (1) lost business revenue of $200,000 annually projected over 20 years; (2) medical expenses and ongoing psychological treatment costs; (3) property damages; (4) lost future earning capacity; and (5) severe emotional distress and trauma (the detailed documentation of actual losses, medical expenses, and long-term impacts provides strong support for this figure, substantiating with expert testimony), such amount representing documented actual losses including medical expenses, lost business revenue, property damage, and ongoing psychological treatment costs, with such amount supported by detailed documentation of actual losses, including but not limited to medical records, financial statements, lost business opportunities, and expert testimony regarding long-term impacts, plus

punitive damages as appropriate under federal and state law, including economic damages, non-economic damages, and special damages, with such amount justified by the extensive documented physical, emotional, financial, and professional damages suffered by Plaintiff, including but not limited to damages for severe emotional distress, loss of business opportunities, physical injuries, psychological trauma, economic losses, family and social disruption, and an unlawful eviction from plaintiff's legal residence at 1 Lakeside Lane, Apt 5, Fox, Lake, Illinois, of Lake County, and other harm, in an amount to be determined at trial.

b. Awarding punitive damages in an amount to be determined at trial, but no less than three times the compensatory damages awarded, as authorized under 18 U.S.C. § 1964(c) for RICO violations and other applicable statutes, and in an amount sufficient to punish and deter such conduct to punish and deter Defendants' egregious conduct, based on Defendants' malicious intent, pattern of exploitation, and substantial financial resources as evidenced by their operation of a 500+ employee company.

c. Awarding attorneys' fees and costs pursuant to 42 U.S.C. § 1988 (for civil rights claims), 18 U.S.C. § 1964(c) (RICO) and the Elliot-Larsen Civil Rights Act of Michigan (MCL 37.2101 et seq.) and any other applicable fee-shifting provisions.

d.  Awarding pre-judgment interest at the rate of the maximum rate allowed by law, but not less than 5.00% per annum from the date of the first incident of harm (to be determined at trial) until the date of judgment, and post-judgment interest at the federal maximum statutory rate pursuant to 28 U.S.C. § 1961 from the date of judgment until paid in full, on all such damages, fees, and/or costs, compounded annually.

e.  **Moving for immediate attachment under Michigan Court Rule 3.103(A) and seeking emergency ex parte relief pursuant to Federal Rule of Civil Procedure Rule 65(b)(1)(A) and (B) of any and all of Defendants' trusts, offshore accounts, real property, personal property, financial accounts, business interests, cryptocurrency holdings (utilizing blockchain forensics and wallet tracking to prevent asset concealment through cryptocurrency transfers), intellectual property rights, and other assets, including those held by shell companies or nominees and other assets located in all states where Defendants may have assets, including but not limited to Michigan, Florida, California, Texas, Delaware, Nevada and Washington states, including internationally pursuant to state and the U.S. attachment procedures and requesting expedited pre-judgment attachment under Federal Rule of Civil Procedure 64 and 65, applicable state laws to prevent dissipation of assets, with particular focus on assets that may be subject to forfeiture under 18 U.S.C. § 1594.**

f. Requesting permanent injunctive relief pursuant to the court's equitable powers under Federal Rule of Civil Procedure 65 and applicable state law, to prevent any further contact, harassment, retaliation, interference, surveillance, or economic coercion, with monetary penalties for each violation. This relief is sought based on the irreparable harm doctrine as established in cases such as, ***eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)*** ("Plaintiff has demonstrated a strong likelihood of success on the merits of their claims, including violations of civil rights, tortious interference, and breach of contract. The evidence presented supports the plaintiff's allegations and establishes a prima facie case for relief. Irreparable Harm: Plaintiff is likely to suffer irreparable harm in the absence of injunctive relief. The ongoing actions of the defendants have caused significant emotional distress, financial instability, and harm to the plaintiff...") and includes, including but is not limited to a minimum distance requirement of 1500 feet, with enhanced restrictions near Plaintiff's residence, workplace, and commonly frequented locations, ***with GPS monitoring and real-time violation alerts to law enforcement*** if necessary to ensure compliance, with costs borne by Defendants, and prohibition of any direct or indirect communication through any medium with Plaintiff's personal or professional life by Defendants, their agents, employees, or representatives, or any third parties acting on their behalf, including through digital communications, social media platforms, or any other means of communication or surveillance via third-party contacts.

g. Granting declaratory judgment pursuant to 28 U.S.C. § 2201 that the NDA is void and unenforceable ab initio due to: (1) duress and exploitation of Plaintiff's documented disabilities and vulnerable housing situation; (2) unconscionability evidenced by grossly unequal bargaining power; (3) violation of public policy as it attempts to conceal illegal activities; and (4) lack of mental capacity at time of execution due to documented psychological trauma due to duress, unconscionability, and violation of public policy, as evidenced by plaintiff's documented disabilities, immediate housing insecurity, and compromised mental state at the time of execution as contrary to public policy and obtained through duress, and permanently enjoining Defendants from attempting to enforce or rely upon any provision of the void agreement due to both procedural and substantive unconscionability under Michigan law, to protect plaintiff Brewis' rights, ***and ordering immediate cessation of any enforcement attempts by Defendants, with sanctions for any continued attempts to enforce the void agreement*** due to duress, unconscionability, violation of public policy for concealing illegal activities (e.g. California Business & Professions Code § 16600), fraudulent inducement, and lack of mutual assent due to Plaintiff's compromised capacity and defendant's intentional exploitation of Plaintiff's known disabilities at the time of execution.

h. Requesting the Court to apply the blue pencil doctrine, as established in Michigan case law, see Coates v. Bastian Brothers, Inc., 276 Mich. App. 498 (2007), to preserve only those NDA terms that protect Plaintiff's legitimate privacy interests

and confidential personal information, while specifically voiding any provisions that would prevent reporting of unlawful conduct to law enforcement or regulatory authorities that protect Plaintiff's privacy rights pursuant to Michigan Compiled Laws § 445.1901 et seq., while maintaining that provisions concealing illegal conduct are void and unenforceable with grounds rooted in the fundamental principles of contract law and the need to prevent irreparable harm from continued unauthorized disclosures. Federal courts have consistently limited NDAs in cases involving harassment and exploitation, as evidenced by the Speak Out Act (Public Law No: 117-224) and related precedent.

i.  Awarding other and further equitable relief as this Court may deem just and proper, including, but not limited to, mandatory counseling and mental health treatment at the Defendants' expense, with provider selection at the Plaintiff's sole discretion from licensed and accredited mental health professionals within the United States who have specific expertise in trauma-informed care and experience working with trafficking survivors; establishing the Plaintiff an irrevocable medical trust fund of no less than $2,000,000 (Two Million Dollars), with annual adjustments for inflation based on the Consumer Price Index for Urban Consumers (CPI-U), for future medical expenses, mental health treatment, housing, transportation, personal assistance as needed, and ongoing therapy, indexed for inflation; and implementation of comprehensive workplace reforms to prevent similar misconduct, including mandatory training programs and enhanced reporting mechanisms, conducted by a

third-party firm with expertise in workplace harassment prevention, to be determined at trial, subject to and in compliance with the procedural rules and jurisdictional requirements of this Court.

Respectfully submitted,

_____

Rebekah Katherine Brewis, Pro Se Plaintiff
Dated: April 1, 2025

230 E Ohio St, Suite 410 PMB1901

Chicago, IL 60611

872-222-7490

owner@aeroswift.org

rebekahbrewis@pm.me

**EXHIBIT: AAA Page 1 of 7**

### DEFENDANT ADDRESSES AND CAPACITIES

1. John and John Does #1-20: Unknown currently. The plaintiff will provide these addresses to the court as soon as they become available and hereby requests leave to amend the complaint to include this information once obtained. For all other parties whose addresses are not provided in this complaint, the plaintiff will make diligent efforts to obtain and provide this information to the court promptly. A comprehensive list of all known addresses for parties will be attached as an exhibit to this complaint. Current addresses are as follows:

2. Aaron Leroy Peterson's (aka R.J. Eliot) current residential address is 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County. A. Peterson's registered agent corporate addresses are:

   • Peterson Farms Fresh, LLC, President/CEO: 3104 W Baseline Rd, Shelby, MI 49455

   • Peterson Farms, Inc., President, Treasurer, Secretary, and Director: 3104 W Baseline Rd, Shelby, MI 49455

   • Oceana County Freezer Storage, LLC, President: 4730 W Shelby, MI 49455

   • Peterson Brands, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

   • Lakewood Organics, LLC, AP: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455CT and CORPORATION SYSTEM, 1200 S PINE ISLAND RD, PLANTATION, FL 33324

   • PFI HOLDCO, LLC, AP: THE CORPORATION TRUST COMPANY CORPORATION TRUST CENTER 1209 ORANGE ST, WILMINGTON, New Castle County, DE 19801

   • Fresh Innovations, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

   • PFI Leverage Lender, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 184 OF 241

**EXHIBIT: AAA Page 2 of 7**

- JVC LOGISTICS, LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

- JVC ENTERPRISES LLC: 3104 W Baseline Rd, Shelby, MI 49455. Mailing address: PO Box 115, Shelby, MI 49455

3. Jennifer Lamb Peterson's current residential address is:
   - 16180 Highland Drive, Spring Lake, Michigan 49456, in Ottawa County.

4. Curtis Burdette's registered agent corporate addresses are:

   - 844 S GRISWOLD St, STE 500, HART, MI 49420. Executive Director, Ocean County Economic Alliance; Executive Director, Right Place; Economic Development Director, The Right Place

5. Sarah Schlukebar's current residential address is 929 W Woodrow Road, Shelby, MI 49455. S. Schlukebar's registered agent corporate addresses are:
   - Director, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI 49455 and 4730 W Shelby Road, MI 49455
   - Director, Oceana County Freezer Storage, LLC: 4730 W Shelby Road, Shelby, MI 49455

6. Earl Peterson's current residential address is 1105 S 88th Ave, Shelby, MI 49455S. E. Peterson's registered agent corporate addresses are:
   - Director, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI 49455

   - Director, Oceana County Freezer Storage, LLC: 2999 Timber Dunes Road, Shelby, MI 49455

   - President & Treasurer, Oceana County Development Corporation: 2999 Timber Dunes Road, Shelby, MI 49455

   - Director, Oceana County Freezer Storage, LLC: 4730 W Shelby, MI 49455

**EXHIBIT: AAA Page 3 of 7**

7.  Linda Peterson's current residential address is 1105 S 88th Ave, Shelby, MI 49455. L. Peterson's registered agent corporate addresses are:

    •   Treasurer & Secretary, Peterson Farms Fresh, LLC: 3104 W Baseline Rd, Shelby, MI 49455

    •   Director, Shelby Acres Condominium Association: 2999 S Timber Dunes Road, Shelby, MI 49455

    •   Treasurer & Secretary, Oceana County Freezer Storage, LLC: 4730 W Shelby Road, Shelby,    MI, 49455

8.  Mike Agosta's current corporate address is:

    •   3104 W Baseline Rd, Shelby, MI 49455

9.  Richard Raffaelli's current residential address is 975 S. 96th Ave, Shelby, MI 49455. R. Raffaelli's registered agent corporate addresses are:

    •   Director, Shelby Acres Condominium Association: 975 S. 96th Ave, Shelby, MI 49455

    •   Director, Oceana County Development Corporation: 975 S. 96th Ave, Shelby, MI 49455

10. Gabriela Peterson's current residential address is:

    •   3025 S Scenic Drive, Shelby, MI 49455. G. Peterson's registered agent corporate addresses are:

    •   Director, Oceana County Development Corporation: 3025 S Scenic Drive, Shelby, MI    49455

    •   MARK AND GABRIELA PETERSON FOUNDATION: 3025 S Scenic Drive, Shelby, MI 49455

11. Defendant Mark Peterson's current residential address is 3025 S Scenic Drive, Shelby, MI 49455. M. Peterson's registered agent corporate addresses are:

## EXHIBIT: AAA Page 4 of 7

•MARK AND GABRIELA PETERSON FOUNDATION: 3025 S Scenic Drive, Shelby, MI 49455

• Owner, Sportsman Tracker Inc.: C T CORPORATION SYSTEM, 40600 ANN ARBOR RD E STE 201, Plymouth, MI 48170

12. Jacob A. Droppers's current corporate address is:
   • Varnum, LLP, 333 Bridge Street NW #1700, Grand Rapids, 49504

13. Katherine Koskam's current corporate address is:
   • Varnum, LLP, 333 Bridge Street NW #1700, Grand Rapids, 49504

14. Nicholas B Missad's current residential address is:
   • Varnum, LLP 333 Bridge Street NW #1700, Grand Rapids, 49504

15. Nathan Brown's current residential and corporate addresses are:
   • 1464 W. Webster Avenue, Chicago, IL 60614

16. Andrew Twyman's current residential address is:
   • 2036 Melrose St, Chicago, IL, 60618

17. Myra J. Dudley-Staten's current residential and work addresses are:
   • 1512 Van Auken St SE, Grand Rapids, MI 49508
   • Benteler Automotive Corporation, Grand Rapids plant, 3721 Hagen Dr SE, Grand Rapids, MI 49548

18. Peterson Farms Fresh, LLC's registered agent and address for service are:
   • C T Corporation System: 3104 W Baseline Road, Shelby, MI 49455

19. Peterson Brands, LLC's registered agent and address for service is:
   • C T Corporation System: 3104 W Baseline Road, Shelby, MI 49455

**EXHIBIT: AAA Page 5 of 7**

20. Huntington Bancshares Incorporated d/b/a Huntington Bank('s) registered agent and address for service are:

- CT CORPORATION SYSTEM, Resident Agent: 4400 EASTON COMMONS WAY, SUITE 125, COLUMBUS OH 43219

21. PayPal, Inc. registered agent and address for service is:

- C T Corporation System, Resident Agent: 208 South Lasalle St, Suite 814, Chicago, IL      60604

22. Fresh Innovations, LLC's registered agent and address for service are:

- Ashlee Lange, resident agent: 3104 W Baseline Road, Shelby, MI 49455

23. Lakewood Organics, LLC, doing business as King Brands, LLC; PFI Leverage Lender, LLC's registered agent and address for service are:

- CT Corporation System: 1200 S Pine Island Rd, Plantation, FL 33324

24. PFI HOLDCO, LLC's registered agent and address for service is:

- THE CORPORATION TRUST COMPANY, CORPORATION TRUST CENTER, 1209 ORANGE ST,      WILMINGTON, New Castle County, DE 19801, Phone: 302-658-7581

25. Shelby Acres Condominium Association's registered agent and address for service are:

- Earl Peterson, President, 2999 S Timber Dunes Road, Shelby, MI 49455.

26. BENTLER AUTOMOTIVE FUNDING NAO, LLC's registered agent and address for service are:

- DANIEL SARBANDI, 1780 POND RUN, AUBURN HILLS, MI 48326-2752

27. The Right Place's registered agent and address for service are:

## EXHIBIT: AAA Page 6 of 7

- Randy Thelen, Executive Director, 125 OTTAWA AVE. NW SUITE #450, GRAND RAPIDS MI       49503

28. Oceana County Development Corporation's registered agent and address for service are:
   - Earl L. Peterson, 2999 S Timber Dunes Road, Shelby, MI 49455

29. JVC Logistics, LLC's registered agent and address for service are:
   - Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

30. JVC Enterprises, LLC's registered agent and address for service are:
   - Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

31. Peterson Farms, Inc's registered agent and address for service are:
   - Aaron L. Peterson, 3104 W Baseline Road, Shelby, MI 49455

32. Oceana County Freezer Storage, Inc's registered agent and address for service is:
   - Aaron L. Peterson, 4730 W Shelby Rd, Shelby, MI 49455

33. Airbnb, Inc's registered agent and address for service are:
   - Rebecca Vang, 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA 95833

34. RYCRE, LLC's registered agent and address for service are:
   - Nathan Brown, Manager, 1464 W. Webster Avenue, Chicago, IL 60614.

35. Defendant Sportsman Tracker Inc's registered agent and address for service are:

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 189 OF 241

**EXHIBIT: AAA Page 7 of 7**

- C T CORPORATION SYSTEM, 40600 ANN ARBOR RD E STE 201, Plymouth, MI 48170

36. Varnum LLP's registered agent and address for service are:
   - 333    BRIDGE STREET, N.W. SUITE 1700, GRAND RAPIDS, MI 49504

37. The Viceroy Hotel Management, LLC registered agent and address for service are: REGISTERED AGENT SOLUTIONS, INC. 901 S 2nd St. Suite 201, Springfield, IL 62704

   Viceroy Hotel Management, LLC's principal place of business is
   - 545 E JOHN W CARPENTER FWY, SUITE 1400, IRVING, TX 75062. The Manager is WILLIAM GRAHAM RUMBLE, and the registered agent address for service is:
   - REGISTERED AGENT SOLUTIONS, INC. 901 S 2nd St. Suite 201, Springfield, IL 62704

38. WILLIAM GRAHAM RUMBLE, Manager of Viceroy Hotel Management, LLC's registered agent address for service is:
   - REGISTERED AGENT SOLUTIONS, INC. 901 S 2nd St. Suite 201, Springfield, IL 62704

39. Senator Jon Bumstead, R-Muskegon, PO BOX 30036 LANSING, MI 48909 USA; Director, Ocean County Development Corporation

40. Republican House Rep. Dist-102, Curtis Vanderwall, registered agent address for service is: 4906 Rasmussen Road, Ludington, MI 49431

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 190 OF 241

**Exhibit: AAB Page 1 of 11**

**NDA Agreement Critical Review**, *metanalysis:*

Note (on the missing "Relationship of Parties" metric): After reviewing the document, *I cannot find any clause that explicitly states the agreement is not creating a partnership or other legal business entity between the parties.* The document establishes a confidentiality relationship between Rebekah Katherine Brewis and Aaron L. Peterson 1, includes various obligations regarding confidential information 2, and contains provisions about payments 3 and accommodations 4. However, nowhere in the agreement is there language clarifying that the agreement does not create a partnership, joint venture, agency relationship, or other legal business entity between the parties. This is a standard provision in many confidentiality agreements to avoid any misinterpretation of the legal relationship between the parties, but it is absent from this document.

## AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT

THIS AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT (the "Agreement") is dated as of March 21, 2024, and is made and entered into by and between REBEKAH KATHERINE BREWIS, a Michigan resident ("Brewis"), and AARON L. PETERSON, a Michigan resident ("Peterson") (Brewis and Peterson are collectively referred to as the "Parties" and each individually a "Party").

## BACKGROUND

The Parties previously entered into that certain Mutual Confidentiality Agreement dated March 19, 2024 (the "Prior Agreement") and desire to amend, restate and replace the Prior Agreement in accordance with the terms of this Agreement.

Each of the Parties has in the past disclosed (each, in such role, a "Disclosing Party"), directly or indirectly, certain confidential or sensitive information to the other Party (in such role, the "Receiving Party") and may in the future disclose additional confidential or sensitive information to the Receiving Party.

**Exhibit: AAB Page 2 of 11**

NOW, THEREFORE, in consideration of the covenants set forth herein and disclosure of certain confidential information, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

**Comprehensive NDA Contract Review rating of AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT dated March 19, 2024**

**METRICS RESULTS and METANALYSIS**

**_FAIL: 22% coverage_**

**All Terms,** 55 metrics

"AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT dated March 19, 2024"

**MISSED**

**_43_** legal metrics, **_78%_** of 55 metrics

** Summary of Results: ** ** Contract Grossly Invalid ** The contract seems to have been signed under duress and without the benefit of legal representation, which could render it voidable. This should be documented and challenged immediately. The overly broad definition of confidentiality may prevent Ms. Brewis from reporting potential crimes or seeking legal counsel regarding the circumstances of this agreement. This could violate public policy and be unenforceable. The three-day destruction requirement is excessively aggressive and might eliminate evidence needed for potential legal proceedings related to the validity of this agreement or other claims. The communication restrictions are unreasonably broad and could hinder legitimate business or social interactions with an undefined group of people. It may also impede the reporting of illegal conduct. This sweeping release of claims, especially when signed under duress and without counsel, could be contested as unconscionable and unenforceable. The current language is too restrictive and might deter the reporting of crimes or seeking legal counsel. The release "forever releases and discharges Peterson and his affiliates" should not

**Exhibit: AAB Page 3 of 11**

encompass claims related to the possibly improper circumstances surrounding the execution of the agreement. The venue restriction could become cumbersome if Ms. Brewis relocates and needs to contest the deal. Consider requesting more flexible venue options.

### _Definition of Confidential Information_

_3 of 6 MISSED_, See:

    1. Exclusions from Confidential Information
The contract must specify any information that is not considered confidential, such as publicly available or independently developed information

    2. Definition of Derivative Information
The contract should address whether derivative information based on confidential information is also considered confidential.

    3. Marking Requirement
The contract should specify if confidential information needs to be marked or identified as such when disclosed.

### _Obligations of Parties_

_6 of 8 MISSED_, See:

    1. Standard of Care
The contract must define the standard of care required by the parties in protecting the confidential information, which should be at least as protective as the care used to protect their own confidential information.

    2. Access Limitation

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 193 OF 241

**Exhibit: AAB Page 3 of 11**

The contract must state that access to confidential information is limited to individuals who need to know the information for the purpose of the agreement and who are bound by similar confidentiality obligations.

3. Notification of Unauthorized Use

The contract must require parties to promptly notify each other upon discovery of any unauthorized use or disclosure of the confidential information.

4. No Implied Licenses

The contract must include a clause stating that no license or rights to the confidential information are granted or implied, except as expressly provided in the agreement.

5. Training and Supervision

The contract must require parties to provide adequate training and supervision to their employees to ensure compliance with the confidentiality obligations.

6. Compliance with Laws

The contract must obligate the parties to comply with all applicable laws and regulations in the handling of confidential information.


**Permitted Disclosures**

*4 of 6 MISSED*, See:

1. Identification of Parties Authorized to Receive Information

The contract must specify which parties or categories of individuals are authorized to receive confidential information.

2. Disclosure to Employees

The contract must state that disclosure of confidential information to employees is permitted only if they are under an obligation to protect its confidentiality.

3. Disclosure to Third Parties

The contract must outline the conditions under which confidential information can be disclosed to third parties, including the requirement for a written agreement to maintain confidentiality.

4. Emergency Disclosures

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 194 OF 241

**Exhibit: AAB Page 4 of 11**

The contract must specify the protocol for emergency disclosures of confidential information, if applicable.

**Duration of Confidentiality Obligations**

*4 of 5 MISSED*, See:

    1. Termination Conditions

The contract must outline specific conditions under which the confidentiality obligations can be terminated early.

    2. Extension Terms

The contract must include terms under which the confidentiality obligations can be extended beyond the initial duration.

    3. Survival Clause

The contract must contain a survival clause specifying that certain confidentiality obligations will continue after the termination of the agreement.

    4. Notice Period for Termination

The contract must specify the notice period required for early termination of the confidentiality obligations.

**Return or Destruction of Confidential Information**

*5 of 8 MISSED*, See:

    1. Existence of Return or Destruction Clause

The contract must explicitly state the obligation to return or destroy confidential information upon termination of the agreement or at the request of the disclosing party.

    2. Method of Destruction

The contract must specify the method of destruction for confidential information to ensure it is done securely and effectively.

    3. Exceptions to Return or Destruction

**Exhibit: AAB Page 5 of 11**

The contract must outline any exceptions where the receiving party is not required to return or destroy the confidential information.

### 4. Audit Rights for Compliance
The contract must grant the disclosing party the right to audit the receiving party's compliance with the return or destruction obligations.

### 5. Consequences of Non-Compliance
The contract must specify the consequences, such as penalties or legal action, for the receiving party's failure to comply with the return or destruction obligations.

**Breach and Remedies**

*6 of 8 MISSED*, See:

1. Inclusion of Breach Definition
The contract must explicitly define what constitutes a breach of confidentiality.

2. Notice Requirement for Breach
The contract must require the non-breaching party to provide notice to the breaching party upon discovery of the breach.

3. Cure Period for Breach
The contract must allow a specified period for the breaching party to cure the breach, if applicable.

4. Liquidated Damages Provision
The contract may include a liquidated damages provision that quantifies damages for breach of confidentiality.

5. Alternative Dispute Resolution
The contract may outline alternative dispute resolution mechanisms, such as arbitration or mediation, to be used in the event of a breach.

6. Attorneys' Fees and Costs
The contract may specify that the prevailing party in any dispute will be entitled to recover reasonable attorneys' fees and costs.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 196 OF 241

**Exhibit: AAB Page 6 of 11**

**Non-Circumvention**

***8 of 8 MISSED***, See:

1. Explicit Non-Circumvention Clause
The contract must contain an explicit non-circumvention clause that prohibits the parties from engaging in activities that would circumvent the agreement's purpose.

2. Definition of Circumvention
The contract must clearly define what constitutes 'circumvention' in the context of the agreement.

3. Scope of Non-Circumvention
The contract must specify the scope of the non-circumvention clause, including any specific actions or transactions that are prohibited.

4. Duration of Non-Circumvention Obligations
The contract must state the duration for which the non-circumvention obligations apply.

5. Third-Party Beneficiary Clause
The contract should specify whether third parties are intended beneficiaries of the non-circumvention clause.

6. Acknowledgment of Non-Circumvention
The contract must include an acknowledgment by the parties of the non-circumvention obligations.

7. Integration with Other Clauses
The contract must ensure that the non-circumvention clause is integrated with other relevant clauses, such as confidentiality and intellectual property rights.

8. Remedies for Breach of Non-Circumvention
The contract must outline the remedies available to the non-breaching party in the event of a breach of the non-circumvention clause.


**Residuals Clause**

***7 of 7 MISSED***, See:

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 197 OF 241

## Exhibit: AAB Page 7 of 11

1. Explicit Residuals Clause

The contract must contain an explicit residuals clause that allows the receiving party to use residual knowledge gained from the confidential information.

2. Definition of Residuals

The residuals clause must clearly define what constitutes 'residuals' to prevent ambiguity.

3. Non-Disclosure of Residuals

The residuals clause must specify that the receiving party is prohibited from disclosing residuals to third parties.

4. Limitation on Use of Residuals

The residuals clause must limit the use of residuals to purposes that do not conflict with the confidentiality obligations of the agreement.

5. Exclusion of Specific Information from Residuals

The residuals clause must explicitly exclude certain types of information from being considered residuals, such as trade secrets or patented material.

6. Documentation of Residuals

The residuals clause must require the receiving party to document the information that qualifies as residuals.

7. No Obligation to Wipe Residuals

The residuals clause must state that the receiving party is not obligated to wipe or destroy residuals from their memory or unrecorded knowledge.

### ***Elements of Contract Invalidity***

Importance: Critical

Name: Contract Validity Issue

Description: *The contract appears to have been signed under duress and without legal representation, which could make it voidable. This should be documented and challenged immediately. This extremely broad confidentiality definition could prevent Ms. Brewis from*

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 198 OF 241

**Exhibit: AAB Page 8 of 11**

*reporting potential crimes or seeking legal counsel about the circumstances of this agreement. This could be against public policy and unenforceable. The 3-day destruction requirement is extremely aggressive and could destroy evidence needed for potential legal proceedings regarding the validity of this agreement or other claims. Communication restrictions are overly broad and potentially unenforceable as it could prevent legitimate business or social interactions with an undefined group of people. It may also prevent reporting of illegal conduct. This broad release of claims, particularly when signed under duress and without counsel, could be challenged as unconscionable and unenforceable. The current language is too restrictive and could prevent reporting of crimes or seeking legal counsel. The release* "forever releases and discharges Peterson and his affiliates" *should not cover claims related to the potentially improper circumstances of the agreement's execution. The venue restriction could be burdensome if Ms. Brewis relocates and needs to challenge the agreement. Consider requesting more flexible venue options.*

Original: "The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent that it is required by law"

Name: Overbroad Confidentiality

Description: *This extremely broad confidentiality definition could prevent Ms. Brewis from reporting potential crimes or seeking legal counsel about the circumstances of this agreement. This could be against public policy and unenforceable.*

Original: "The term "Confidential Information" shall include (i) any and all information, data, records, statements, specifications related to Disclosing Party, any relationships that the Disclosing Party has had in the past or is considering (including any relationship between the Parties) and any prior communications between or relating to the Parties, including, phone calls, videos, text messages, emails, photos or other recordings or videos related to, or referencing, Disclosing Party or the Parties"

--

Importance: Critical

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 199 OF 241

**Exhibit: AAB Page 9 of 11**

Name: Evidence Destruction Concern

Description: *The 3-day destruction requirement is extremely aggressive and could destroy evidence needed for potential legal proceedings regarding the validity of this agreement or other claims.*

Original: "Promptly following the execution of this Agreement (and in any event within 3 days following the execution of this Agreement), the Receiving Party shall permanently destroy"

--

Importance: High

Name: Unreasonable Contact Restriction

Description: *This restriction is overly broad and potentially unenforceable as it could prevent legitimate business or social interactions with an undefined group of people. It may also prevent reporting of illegal conduct.*

Original: "Brewis shall not, directly or indirectly, contact (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages) any person or entity related to or known by Peterson"

--

Importance: Critical

Name: Release Under Duress

Description: *This broad release of claims, particularly when signed under duress and without counsel, could be challenged as unconscionable and unenforceable.*

Original: "Brewis, on behalf of herself and all of her representatives, agents, insurers, successors and assigns, and all others who may claim through her, forever releases and discharges Peterson"

--

Importance: Critical Name: Legal Rights Protection

**Exhibit: AAB Page 10 of 11**

Description: *The current language is too restrictive and could prevent reporting of crimes or seeking legal counsel*

Original: "The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent that it is required by law"

Modification: "The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent that it is required by law or necessary to report potential criminal conduct, seek legal counsel, or protect the Receiving Party's legal rights"

--

Importance: Critical

Name: Release Limitation

Description: *The release should not cover claims related to the potentially improper circumstances of the agreement's execution*

Original: "forever releases and discharges Peterson and his affiliates"

Modification: "releases and discharges Peterson and his affiliates, except for any claims arising from duress, fraud, criminal conduct, or the circumstances surrounding the execution of this Agreement"

--

Importance: Medium

Name: *Venue Restriction*

**Exhibit: AAB Page 11 of 11**

*Description: The venue restriction could be burdensome if Ms. Brewis relocates and needs to challenge the agreement. Consider requesting more flexible venue options.*

Original: "Any and all actions concerning any dispute arising hereunder shall be filed and maintained in the Circuit Court of Kent County, Michigan or the federal District Court for the Western District of Michigan.

==**EXHIBIT: AAC Page 1 of 4**==

### AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT

THIS AMENDED AND RESTATED MUTUAL CONFIDENTIALITY AGREEMENT (the "Agreement") is dated as of March 21, 2024, and is made and entered into by and between **REBEKAH KATHERINE BREWIS**, a Michigan resident ("Brewis"), and **AARON L. PETERSON**, a Michigan resident ("Peterson") (Brewis and Peterson are collectively referred to as the "Parties" and each individually a "Party").

### BACKGROUND

The Parties previously entered into that certain Mutual Confidentiality Agreement dated March 19, 2024 (the "Prior Agreement") and desire to amend, restate and replace the Prior Agreement in accordance with the terms of this Agreement.

Each of the Parties has in the past disclosed (each, in such role, a "Disclosing Party"), directly or indirectly, certain confidential or sensitive information to the other Party (in such role, the "Receiving Party") and may in the future disclose additional confidential or sensitive information to the Receiving Party.

NOW, THEREFORE, in consideration of the covenants set forth herein and disclosure of certain confidential information, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

1.      **Confidentiality Obligations.**

(a)      The Receiving Party hereby agrees, to treat as strictly confidential and in accordance with this Agreement all Confidential Information (as defined below) of the Disclosing Party. The term "Confidential Information" shall include (i) any and all information, data, records, statements, specifications related to Disclosing Party, any relationships that the Disclosing Party has had in the past or is considering (including any relationship between the Parties) and any prior communications between or relating to the Parties, including, phone calls, videos, text messages, emails, photos or other recordings or videos related to, or referencing, Disclosing Party or the Parties (in each case (A) whether in verbal, written, electronic, graphic, or other format, and whether or not subject to patent, copyright, or other legal protection and (B) regardless of who prepared, captured or possesses such items or when they were received, prepared or captured), and (ii) the fact that the Parties have entered into this Agreement or that Disclosing Party has provided any information to the Receiving Party. Receiving Party acknowledges and agrees that the Confidential Information is proprietary to and valuable confidential information of the Disclosing Party, and that any disclosure or unauthorized use thereof may cause irreparable harm and loss to the Disclosing Party.

(b)      Without limitation to the terms of Section 1(a), the Receiving Party further agrees, without the prior written consent of the Disclosing Party and subject to Sections 3 and 4 below:

(i)     to (A) keep all of the Disclosing Party's Confidential Information strictly confidential, (B) not use any of the Disclosing Party's Confidential Information, (C) not to copy, transmit or otherwise reproduce any Confidential Information and (D) not to export or reexport (within the meaning of U.S. or other export control laws or regulations) any Confidential Information; and

(ii)     to not, directly or indirectly, disclose or make available, in whole or in part, any of the Disclosing Party's Confidential Information to any other person (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages).

2.     **Destruction of Confidential Information.**  Promptly following the execution of this Agreement (and in any event within 3 days following the execution of this Agreement), the Receiving Party shall permanently destroy (and, upon the Disclosing Party's written request, send written confirmation (by email being sufficient) of any such destruction to the Disclosing Party) all tangible or intangible representations of all of the Disclosing Party's Confidential Information (whether provided to the Receiving Party by the Disclosing Party, or whether created by the Receiving Party or a third party), including, without limitation any Confidential Information (which, for the sake of clarity, includes phone calls, videos, text messages, emails, photos or other recordings or videos related to, or referencing, Disclosing Party or the Parties) stored on Receiving Party's phone, computer, tablet or other electronic device(s) and physical copies of any such information.

3.     **Additional Covenants.**

(a)     From and after the date on which both Parties have executed this Agreement (the "Effective Date"), Brewis shall not, directly or indirectly, contact (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages) any person or entity related to or known by Peterson, including, without limitation, any family member, friend, colleague or business relationship of Mr. Peterson or any employee, consultant, customer or vendor of any entity to which Peterson is associated. Brewis shall refrain from communicating orally, or in writing, or by any other manner whatsoever (in any form or nature, including in-person contact, phone calls, text messages, e-mails, and/or any form of social media posts, comments or messages) to any third party, any disparaging claim, remark, allegation, statement, opinion, comment, innuendo or information of any kind or nature whatsoever, the effect or intention of which is to cause embarrassment, damage or injury to the reputation, business, or standing in the community of Peterson, regardless of whether any such communication is or may be true or founded in facts, and which relates to any contact between the Parties before the Effective Date.

(b)     Within five (5) days following the Effective Date, Peterson shall make a payment in the amount of $20,899.88 to Brewis' Bridgecrest Loan #200270014801 secured by Brewis' 2019 GMC vehicle.

(c)     Within five (5) days following the Effective Date, Peterson shall make a one-time, lump sum payment to Brewis in the amount of One Hundred Thousand Dollars ($100,000) via cash, wire transfer, cashier's check or other immediately available funds to the account designated by Brewis.

(d)     Brewis is currently occupying an apartment located at 529 Miller, Apartment #211, Grand Haven, MI 49417 via an Airbnb rental (the "Current Airbnb Rental"). Brewis may continue to occupy

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 204 OF 241

the Current Airbnb Rental, without cost to Brewis, subject to the terms and conditions of Airbnb, through March 31, 2024 and Peterson will make all required rent payments on such Current Airbnb Rental through March 31, 2024. Brewis will vacate the Current Airbnb Rental no later than March 31, 2024.

(e)     In addition, Peterson agrees to pay up to $25,000 to Airbnb (or similar service) (at the direction of Brewis) for Airbnb (or similar service) rentals of Brewis, in each case, to be used between April 1, 2024 and September 30, 2024 in a city of Brewis' choosing.

4.     **Exclusions.**   The Parties may disclose a copy of this Agreement (but not any other Confidential Information) to their respective legal advisors or financial advisors; provided, that Receiving Party shall be responsible for compliance by Receiving Party's advisors with the terms of this Agreement. In the event of any breach of this Agreement by the other Party, the non-breaching Party may disclose the content of this Agreement (but not any other Confidential Information) in connection with the enforcement of the obligations under this Agreement.

5.     **Obligations of Law.**  The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent that it is required by law, regulatory authority, or other applicable judicial or governmental order (collectively, "Law") to disclose such Confidential Information, as advised in writing by Receiving Party's counsel, provided that, the Receiving Party furnishes the Disclosing Party with written notice of the disclosure, a reasonable period of time prior to the disclosure, to the extent practicable in the circumstances, and allows the Disclosing Party the option of (and, upon the Disclosing Party's request, reasonably assists in) challenging the obligation to disclose the information, and further provided that any such disclosure is limited to that required by Law and that the Receiving Party uses reasonable efforts to continue to preserve the confidentiality of any Confidential Information so disclosed, including, but not limited to, seeking a protective order (upon the written request of the Disclosing Party) to ensure that any such information is treated as confidential.

6.     **Release**. Brewis, on behalf of herself and all of her representatives, agents, insurers, successors and assigns, and all others who may claim through her, forever releases and discharges Peterson and his affiliates and each of their subsidiaries, parent entities, sister entities and other affiliates, and its and their respective officers, directors, employees, owners, members, shareholders, partners, agents and representatives, from any and all claims, suits, demands, obligations, allegations, responsibilities, rights, administrative actions and causes of action (and all related damages, liabilities, costs and expenses), of any kind or character, whether now known or unknown, asserted or unasserted, liquidated or unliquidated, secured or unsecured (collectively, "Claims"), which any of them may have or may hereafter acquire with respect to any action, omission or period of time prior to the Effective Date; provided, however, that nothing in this Agreement shall in any way release any Claim with respect to a breach of this Agreement. Brewis agrees, for herself and the other releasing parties described above, not to institute any lawsuit or other proceeding or bring any claim or action with respect to any Claim released by her or them pursuant to this Agreement.

7.     **Remedies.**  Each Party hereby acknowledges that a violation by it of this Agreement would result in irreparable harm to the non-breaching Party, and that damages may be an inadequate remedy.  Each Party, therefore, agrees that in addition to all remedies at law, the non-breaching Party shall be entitled to equitable relief, including, without limitation, the right to obtain an injunction to secure the specific performance of this Agreement and/or to prevent a breach or contemplated breach of this Agreement, without any requirement that such non-breaching Party post a bond as a condition of such relief.

8.     **Term.**   The term of this Agreement shall commence on the Effective Date shall continue indefinitely.

9.     **Choice of Law.**   This Agreement and the rights and obligations of the Parties under this Agreement, shall be governed, construed, interpreted and enforced in accordance with the laws of the State of Michigan, regardless of any choice of law or conflict of law provision or rule of any other jurisdiction that would cause the application of the laws of any other jurisdiction. Any and all actions concerning any dispute arising hereunder shall be filed and maintained in the Circuit Court of Kent County, Michigan or the federal District Court for the Western District of Michigan.  The parties specifically consent and submit to the jurisdiction and venue of such state or federal court, and irrevocably waive any objections either may have based on improper venue or *forum non conveniens* to the conducting of any proceeding in any such court.

10.     **Amended and Restated Agreement**.  The provisions of this Agreement shall supersede all contemporaneous written, oral or electronic agreements, communications and understandings and all prior oral and written communications, agreements and understandings between the Parties with respect to the subject matter of this Agreement, including, without limitation, the Prior Agreement.

11.     **Miscellaneous.** This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and lawful assigns. Neither Party may assign all or any part of this Agreement to any person without the other Party's prior written consent, which may be withheld for any reason or no reason. This Agreement may be amended only by a written amendment signed by both Parties. No provision of this Agreement may be waived unless done so in a writing, and no waiver by a Party of any breach or failure to comply with any provision of this Agreement by the other Party shall be construed as or constitute a continuing waiver of such provision or a waiver of any other breach of or failure to comply with any other provision. This Agreement shall be construed as if it was drafted by the Parties jointly and shall not be construed against any party, regardless of which party drafted any specific provision hereof.  In the event of ambiguity, this Agreement shall be interpreted in accordance with the plain meaning of its terms and shall not be construed strictly for or against any of the Parties. The Parties believe that every provision of this Agreement is effective and valid under applicable law, and whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid.  If any provision of this Agreement is held, in whole or in part, to be invalid, the remainder of such provision and this Agreement shall remain in full force and effect, with the offensive term or condition being stricken only to the extent necessary to comply with any conflicting law. This Agreement is the only agreement between the Parties relating to its subject matter, and there are no representations, warranties, or other understandings between the Parties except as expressly set forth in this Agreement. This Agreement may be executed by fax, email, portable document format (.pdf) and in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

**PETERSON**                                              **BREWIS:**


_____          _____
**AARON L. PETERSON**                             **REBEKAH KATHERINE BREWIS**

Dated: March 21, 2024                              Dated: March 21, 2024

**EXHIBIT: AAD Page 1 of 2**

# VARNUM

Bridgewater Place | Post Office Box 352
Grand Rapids, Michigan 49501-0352
Telephone 616 / 336-6000 | Fax 616 / 336-7000 | www.varnumlaw.com

**Nicholas B. Missad**

Direct 616 / 336-6242
nbmissad@varnumlaw.com

June 25, 2024

Rebekah Katherine Brewis a/k/a
Karissa Beach
Via Email: kkproductions@pm.me

     Re:    Aaron L. Peterson

Dear Ms. Brewis:

This firm represents the interests of Aaron L. Peterson. Aaron has brought it to our attention that you may now be threatening to violate the terms of the Amended and Restated Mutual Confidentiality Agreement that was entered into on March 21, 2024.

A review of the information provided by Aaron indicates clearly that he has complied with each and every term of your agreement. You, however, appear to be continuing to make threats if additional benefits are not provided to you outside the terms of your Amended and Restated Mutual Confidentiality Agreement of March 21, 2024.

Although your actions at this juncture appear only to be in the nature of threats, be mindful that in the event that you bring any of these threats to fruition, Aaron has instructed us to seek remedies that are available to him both criminally and civilly as a result of your actions.

Please also be placed on notice that any communications should go through this office going forward. These include but are not limited to any communications that would otherwise be directed to Aaron. If you have legal counsel, please have legal counsel contact us immediately.

**EXHIBIT: AAE Page 2 of 2**

VARNUM

Nicholas B. Missad

NBM/tml

cc:     Aaron Peterson

25831487.1

Ann Arbor | Birmingham | Grand Rapids | Kalamazoo | Naples, FL | Novi

## EXHIBIT: AAE Page 1 of 2 email

**ANY Former Agreements are NULL**

| | |
|---|---|
| From | kkproductions <kkproductions@pm.me> |
| To | aaron pf-corp.com<aaron@pf-corp.com> |
| Date | Thursday, June 20th, 2024 at 4:23 AM |

Any and all of our former agreements are absolutely OVER. You materially breached the agreement through your serious neglect in coordinating my housing. I'll reserve the details for any future lawsuits, or I may potentially coordinate a meeting between our attorneys for a future date, but otherwise we are completely done in all respects and I also reserve the right to file criminal charges against you for sexually abusing me over a 5 to 6 month period. I may consider resting any claims in a last and final agreement wherein I agree in my own words and on paper to excuse any unreported claims in an attempt to ensure justice for what happened to me. I also will aggressively pursue a personal apology from you since you've been so obstinate in caring for my needs. I also think it's time your "wife" knew what has really been going on and that she deserves to know finally. I'm not going to be homeless and on your account especially- I told you what I wanted and you failed to provide it with this last housing scenario per our former agreement. You've taken way too many liberties you're not entitled to except through your design of force, coercion and manipulation. I regret ever meeting you and I hope by the time this is all done that meeting me will be the biggest regret of your decision making life. I tried to settle things between us and patch stuff up some in the last month, but you've developed a callous tone and attitude with me as well as severely neglected me emotionally and caused me even more trauma by your indifference in this housing situation - not putting me active in the reservation so I can file complaints, not reporting and holding Nathan and Joseph responsible for harassing me, etc. I blame you for all of this and not listening to me when I tell you that I don't feel safe. Your callous disregard is abnormal and cold- you manipulated me in this whole situation to the detriment of my health and welfare and ultimately made me homeless just as I am now while you have any and all comforts that life could give you, and I find that completely repulsive.

==**EXHIBIT: AAE Page 2 of 2**==

Sincerely,

Karissa Beach

Sent from Proton Mail mobile

---

**822 bytes**   1 file attached

publickey - EmailAddress(s=kkproductions@pm.me) - 0xEF12CA4C.asc  822 bytes

**EXHIBIT: AAF Page 1 of 4** Airbnb Receipt, Fox Lake

**1 Lakeside Lane, Apt. 5, Fox Lake, IL 60020**

**March 26, 2024 through September 26, 2024 $33,208.09**



# You're all set for Fox Lake



## Waterfront Large 3 B   ed Retreat

Entire home/apt hosted by Nathan



**EXHIBIT: AAF Page 2 of 4**

# Fwd: Reservation confirmed for Fox Lake

Fromaaron pf-corp.com <aaron@pf-corp.com>Tokkproductions<kkproductions@pm.me>DateTuesday, March 26th, 2024 at 6:58 PMTuesday, March 26th, 2024 at 6:58 PM

# You're all set for Fox Lake

## Waterfront Large 3 Bed Retreat

Entire home/apt hosted by Nathan

| Check-in | Checkout |
|---|---|
| **Wed, Mar 27** | **Thu, Sep 26** |
| 3:00 PM | 10:00 AM |

## Address

1 Lakeside Ln, Fox Lake, IL 60020, USA

**Get directions**

**EXHIBIT: AAF Page 4 of 4**

## Payment schedule

**Paid Mar 26**                                $4,331.79

MASTERCARD •••••2111

**Get receipt**


**Due Apr 17**                                $5,264.06

MASTERCARD •••••2111

**Edit payment details**


**Due May 17**                                $6,197.25

MASTERCARD •••••2111

**Edit payment details**


**Due Jun 17**                                $5,741.21

MASTERCARD •••••2111

**Edit payment details**


**Due Jul 17**                                $5,932.58

MASTERCARD •••••2111

**Edit payment details**


**Due Aug 17**                                $5,741.20

MASTERCARD •••••2111

**Edit payment details**

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 213 OF 241

**EXHIBIT: AAF Page 4 of 4**

Change reservation

# We're here to help

## Nathan is your host

Contact Nathan with questions or to coordinate check-in.

**Message host+1 773-294-8242**

## Get in touch with Airbnb

Our support team is available 24/7 from anywhere.

Reservation code: HMRMF5PKCJ

**Visit help centerContact Airbnb**

**Damage responsibility policy.** Airbnb may charge your payment method if you're responsible for damage.

**==EXHIBIT AAG== Page 1 of 1 Amazon Purchases Loss Totals**

**$44,631**

Amazon Retail History CSV for **2024 $44,631 total (house and medical products, business tools for building up Aero Swift, LLC, etc)**



Retail.OrderHistory.1.
csv

==EXHIBIT AAH 1of 3== MH TX Records

DOB:
Provider:
Provider                    #6851 1 1 0716

## Diagnosis and treatment plan

Diagnosis
F43.12 - Post-traumatic stress disorder, chronic
Presenting Problem

This client presents with signs and symptoms that are consistent with the diagnostic impressions of Post Traumatic Stress Disorder as evidenced by her report of delusional thought patterns, racing and unmanageable thoughts, avoidance of stimuli that reminds her of past traumas, flashbacks to past traumas, emotional dysregulation, exaggerated beliefs about herself and the world, and fatigue on a daily basis with difficulty making decisions.
Goal

Gl : To process the trauma to promote self-growth and discovery.
Objective

Gl 01: Client will explore and process trauma narrative to develop self-awareness and understanding of influence on past and present behavior.

Gl 02: Client will explore developmental milestones to understand influence of past on present and past behavior.

G103: Client will explore and process narrative to develop self-awareness and understanding of influence on past and present behavior as it relates to disordered eating behaviors and thoughts.

Treatment frequency: Every two weeks

Provider                                        Supervisor

*Tyler Moreno*                                  *Sylvia Johnson*

Signed by Tyler Moreno                          Signed by Sylvia Johnson
LLMSW                                           LMSW
July 29, 2023 at 5:28 pm                         August 1 0, 2023 at 5:49 pm
iP address: 96.88.139.181                        IP address: 73.1 61 .63.89
        Jul 29,        5:21 pm.  Jul 29,   5:28   1 Jul 29,  5:28    Aug 10,   5:49 pm.
Client:
DOB:
Provider:
Provider                    #68511 10716

## Diagnosis and treatment plan

Diagnosis
F43.12 - Post-traumatic stress disorder, chronic
Presenting Problem

This client presents with signs and symptoms that are consistent with the diagnostic impressions of Post Traumatic Stress Disorder as evidenced by her report of delusional thought patterns, racing and unmanageable thoughts,

Created on        2023 at        Last updated on        2023 at        pm.                    Page ı of
Signed by Tyler Moreno on        2023 at        pm. Locked and Signed by Sylvia Johnson on        2023 at

# ==EXHIBIT AAH Page 2 of 3== MH TX Records

avoidance of stimuli that reminds her of past traumas, flashbacks to past traumas, emotional dysregulatjon, exaggerated beliefs about herself and the world, and fatigue on a daily basis with difficulty making decisions.

Goal

Gl: To process the trauma to promote self-growth and discovery.

Objective

Gl 01: Client will explore and process trauma narrative to develop self-awareness and understanding of influence on past and present behavior.

1 0/17/2023: Client has achieved some progress towards this objective and continues to work towards building rapport and trust with clinician to fully share her trauma narrative.

Gl 02: Client will explore developmental milestones to understand influence of past on present and past behavior.

1 0/17/2023: Client has achieved some progress towards this objective and needs additional time to make marked progress.

G103: Client wilt explore and process narrative to develop self-awareness and understanding of influence on past and present behavior as it relates to disordered eating behaviors and thoughts.

10/17/2023: Client has made some progress towards this objective and needs additional time spent here to continue making progress.

Treatment frequency: Every two weeks

| Provider | Supervisor |
|---|---|
| *Tyler Moreno* | *Sylvia Johnson* |
| Signed by Tyler Moreno | Signed by Sylvia Johnson |
| LLMSW | LMSW |
| October 20, 2023 at 5:10 pm | October 23, 2023 at 9:37 am |
| IP address: 67.149.1 60.1 ↑↑ | FP address: 73.1 .63.89 |

Oct 20,        5:09 pm.              Oct 20,        0                              Oct 23,        9:37                              of↑
Oct 20,        5:10

DOB:
Provider:
Provider                #6851 1 10716

Appointment: Individual Note on November 28, 2023
12:00 pm - 1:00 pm, 60 min

Diagnosis:        F43.12 - Post-traumatic stress disorder, chronic

Billing code: 90837 Psychotherapy, 60 min

## Discharge Summary Note

Initial diagnosis
F43.12

Created on        2023 at        Last updated on        2023 at        pm.
Signed by Tyler Moreno on        2023 at        pm. Locked and Signed by Sylvia Johnson on        2023 at

## EXHIBIT AAH Page 3 of 3 MH TX Records

Discharge diagnosis
F43.12

Services and termination status
Opening date: 07/1 7/2023
Termination date: 1 1/28/2023
Number of sessions: 1 1

Which of the following services were used?
• Individual

Overall status at termination
• No change

Reason(s) for termination
• No longer making appointments
• Have missed excessive appointments

Presenting problem and assessment
This client presents with signs and symptoms that are consistent with the diagnostic impressions of Post Traumatic Stress Disorder as evidenced by her report of delusional thought patterns, racing and unmanageable thoughts, avoidance of stimuli that reminds her of past traumas, flashbacks to past traumas, emotional dysregulation, exaggerated beliefs about herself and the world, and fatigue on a daily basis with difficulty making decisions.

Clinical course
The client was in treatment consistently for a period of 4 months. The client worked to build rapport with clinician and develop a strong, therapeutic alliance. The client spent time discussing her past and the trauma she endured while incarcerated. The client had difficulty with managing disassociate reactions to emotional overwhelm and benefited from learning coping skills and creating routine/ structure. The client was referred to a higher level of care and refused the referral and eventually stopped attending session.

Medical/Psychiatric status
Was the client seen by the psychiatrist for either a psychiatric evaluation or for medications? Include discharge meds, dosages, instructions: None reported or noted.

Post-termination plan
The client is aware that she can return to MCTS at any time in the future for individual psychotherapy.

Client's statement regarding satisfaction of treatment rendered
The client found therapy to be a helpful place to process stress and struggle.

|  | Dec | 4:26 pm. | Dec 1 1, | 4:27 | | 2 |
|--|-----|----------|----------|------|--|--|
|  |     | Dec 1 1, | 4:27     |      | Dec 13, | 10:58 |

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 218 OF 241

**EXHIBIT AAG Page 1 of 2** Carvana

**2019 GMC Terrain Purchased for: $26, 247.40**

**EXHIBIT AAG Page 2 of 2**

DocuSign Envelope ID: E7B61AAD-8AB3-4785-9652-AB952FF23E27

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## ARBITRATION AGREEMENT | WAIVER OF PURCHASER'S RIGHT TO SUE

### SUMMARY OF ARBITRATION AGREEMENT

This document, called "Arbitration Agreement," is part of the Contracts, defined below, that you and we are entering into. In this document, you and we are both promising to accept arbitration for a wide range of our disputes. Certain kinds of disputes are not covered; the Arbitration Agreement states which kinds those are. The Arbitration Agreement covers every other kind of dispute that might come up between you and us (by "us," we are including any company to which we might assign your Contracts and any company hired to enforce the Contracts). A dispute covered by the Arbitration Agreement could still be resolved in court but only if you and we both decide to use the court. If either you or we decide that the dispute should be resolved by arbitration, then the Arbitration Agreement obligates both of us to accept arbitration.

Arbitration is a formal process for resolving disputes that is different from court. An arbitration decision is binding on both sides, but the rules for the process are often more efficient than lawsuits in court.

This Arbitration Agreement means that (except for the disputes that are not covered, as mentioned above), you and we are both giving up our right to go to court to resolve disputes between us. **In** arbitration, our dispute will be decided by a neutral arbitrator and not by a judge or jury. As a result, **for the disputes that this Arbitration Agreement covers, you and we are both waiving our rights to a jury trial.** A dispute could end up before a jury if both you and we decide to use a court and a jury, but the Arbitration Agreement allows either you or we to insist on arbitration where there will be no jury.

If you or we choose arbitration, only our individual claims will be arbitrated. **In this Arbitration Agreement, you and we are waiving rights to obtain relief on a class basis or in a representative capacity.**

Arbitrator decisions are enforceable just like a court order. Unlike court orders, these decisions are subject to very limited review by a court. Once a decision is made it is final, except in very limited circumstances.

In arbitration you are entitled to a fair hearing, but arbitration procedures are generally simpler and more limited than rules that apply in court. The disputes between you and us described below will be governed by the American Arbitration Association Consumer Arbitration Rules, including such rules regarding the arbitrability of any claim or counterclaim, and including, where applicable, the American Arbitration Association Supplementary Rules for Multiple Case Filings.

This Arbitration Agreement gives you a time-limited option to opt out from your promise to accept arbitration. If you opt out, we will also not be obligated to accept arbitration, and certain other promises in this Arbitration Agreement will also end, as noted below. **To choose this option you must notify us in the 30 days after you sign this Arbitration Agreement, and you must follow the instructions under the heading "Your Option to Reject Arbitration Promises." You will need to act by that 30-day deadline or you lose this option.**

This is only a summary. As with all legal agreements, please read the entire Arbitration Agreement carefully before you sign. This Arbitration Agreement will substantially affect your rights.

1

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 219 OF 241

1

## EXHIBIT AAG Page 2 of 2

2

3 DocuSign Envelope ID: E7B61AAD-8AB3-4785-9652-AB952FF23E27

**THIS IS A COPY**
**This is a copy view of the Authoritative Copy held by the designated custodian**

4 **Signature Notices**

By signing below, you agree to the terms of this Contract. You received a copy of this Contract and had a chance to read and review it before you signed it.

*The Annual Percentage Rate may be negotiable with Seller. The Seller may assign this Contract and retain its right to receive a part of the Finance*

5 Warning: The insurance afforded hereunder does not cover liability for injury to persons or damage to property of others unless so indicated hereon.

6 ■ **Electronic Signature Acknowledgment.** You agree that (i) you viewed and read the entire Contract before signing it, (ii) you signed this Contract with one or more electronic signatures, (iii) you intend to enter into this Contract and your electronic signature has the same effect as your written ink signature, (iv) you received a paper copy of this Contract after it was signed, and (v) the authoritative copy of this Contract shall reside in a document management system held by Seller in the ordinary course of business. You understand that Seller may transfer this Contract to another company in the electronic form or as a paper version of that electronic form which would then become the authoritative copy. Seller or that other company may enforce this Contract in the electronic form or as a paper version of that electronic form. You may enforce the paper version of the Contract copy that you received.

**Notice to Buyer. Do not sign this contract in blank. You are entitled to 1 true copy of the contract you sign without charge. Keep it to protect your legal rights.**

7 **Buyer:**

8 

*Rebekah Brewis*
By: Rebekah Katherine Brewis    02/06/2024
Date

9 **Signatures**

10 **Entire Agreement.** Our and our entire agreement is contained in this Contract. There are no unwritten agreements regarding this Contract. Any change to this Contract must be in writing and signed by you and us.

*Rory J Peterson*
By: Aaron Leroy Peterson    02/06/2024
Date

11 *Rebekah Brewis*
By: Rebekah Katherine Brewis    02/06/2024
Date

N/A    N/A
By:    Date

12 *Rory J Peterson*
By: Aaron Leroy Peterson    02/06/2024
Date

**Seller**

13 *Paul Fox*
By: CARVANA, LLC    02/06/2024
Date

14 *Paul Fox*
By CARVANA, LLC    02/06/2024

15 Buyer acknowledges delivery of a copy of this Retail Installment Contract and Security Agreement.

16 *Rebekah Brewis*
By: Rebekah Katherine Brewis    02/06/2024
Date

17 

18 *Rory J Peterson*
By: Aaron Leroy Peterson    02/06/2024
Date

19 *[This area intentionally left blank.*

N/A    N/A
By:    Date

20 

21

22

23

24

25

26

27 COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 220 OF 241

28

==EXHIBIT AAH== ==Page 1 of 4== **Carvana**

**2023 Ford Explorer ST Carvana Purchase May 21, 2024**

**Retail Price sold: $57,590.00**



contracts-3.pdf

**Subtotal: $65,435.28**

**Total Cash Down Payment: $26,790.00**



**EXHIBIT AAH Page 2 of 4**



**EXHIBIT AAH Page 3 of 4**



==EXHIBIT AAH Page 4 of 4==



COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 224 OF 241

## EXHIBIT AAI Page 1 of 1

## Aero Swift LLC Insurance Policy, Hartford Insurance Business

# Owners Insurance

**Form SC 50 63 06 20**                                                    **Page 1 of 1**

© 2020, The Hartford
(May include copyrighted material of Insurance Services Office, Inc., with its permission)

**ACORD®**     **CERTIFICATE OF LIABILITY INSURANCE**     **DATE (MM/DD/YYYY)** 09/06/2024

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATIONIS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| AP INTEGO INSURANCE GROUP LLC<br>76251017<br>375 WOODCLIFF DRIVE STE 103<br>FAIRPORT NY 14450 | PHONE (A/C, No, Ext): (877) 287-1316 | | FAX (A/C, No): (888) 443-6112 |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC# |
| **INSURED**<br>Aero Swift<br>230 E OHIO ST STE 410<br>CHICAGO IL 60611-5288 | INSURER A : Property and Casualty Insurance Company of Hartford | | 34690 |
| | INSURER B : | | |
| | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**     **CERTIFICATE NUMBER:**     **REVISION NUMBER:**

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $1,000,000 |
| | CLAIMS-MADE [X] OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $1,000,000 |
| | [X] Ge neral Liability | | | | | | MED EXP (Any one person) | $10,000 |
| A | | | | 76 SBW BJ9T0H | 09/03/2024 | 09/03/2025 | PERSONAL & ADV INJURY | $1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | [X] PRO-JECT POLICYLOC OTHER: | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | AUTOMOBILE LIABILITY | | | | | | COMBINED SINGLE LIMIT (Ea accident) | |
| | ANY AUTO | | | | | | BODILY INJURY (Per person) | |
| | ALL OWNED AUTOS   SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | |
| | HIRED AUTOS   NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | |
| | UMBRELLA LIAB   OCCUR<br>EXCESS LIAB   CLAIMSMADE | | | | | | EACH OCCURRENCE | |

==EXHIBIT AAJ Page 1 of 2== **Lifestance Health Diagnoses and Services Summary**

# LIFESTANCEHEALTHMICHIGAN

3475 BELLE CHASE WAY                    (517) 882-3732
LANSING, MI 489114252

---

## Patient Details

**Patient :**                    REBEKAH BREWIS
                                 3090 Lake Eastbrook Blvd SE
                                 105
                                 Grand Rapids, MI, 49512 tel(Primary
                                 Home): +1-929-399-4204
                                 tel(WorkPlace): +1-929-399-4204
                                 tel(Cell Phone): +1-586-290-8567
                                 email: rebekahbrewis@pm.me

**MRN :**                        n/a
**Birthdate :**                  March 20, 1980
**Sex :**                        Female
**Race :**                       White
**Ethnicity :**                  Not Hispanic or Latino
**Preferred Language :**         en
**Previous Name :**              n/a

**EXHIBIT AAJ Page 2 of 2**

**Service Event:**

DO LAUREN HENDERSON
08/10/2023

**Service Event:**

AMANDA CARR
08/10/2023

**Service Event:**

ELIZABETH KAHARI
08/10/2023

**Service Event:**

GENEVIEVE EZENNIA
08/10/2023

**Author:**       LAUREN HENDERSON

1

<mark>EXHIBIT AAK Page 1 of 2</mark>

2

## Apple Products Total <mark>$ 4,339.49</mark> losses

3

# A

4

**Apple Woodland**

5

3195 28th Street, Suite #100
Grand Rapids, MI 49512

6

woodland@apple.com
616-956-1420

www.apple.com/retail/woodland/

7

March 23, 2024 11:36 AM

**Apple Watch Series 9 GPS + Cellular, 45mm Graphite**

8

**Stainless Steel Case with Graphite Milanese Loop**

**$ 799.00**

9

Part Number (Case):
MRQN3LW/A

Serial Number (Case):

10

DV0V6PX40W

Part Number (Band):

11

MTJQ3AM/A

Return Date: Apr. 06, 2024

12

For Support, Visit: www.apple.com/support

**Withings Body Comp - Complete Body Analysis Wi-Fi Smart**

13

**Scale - Black**

**$ 199.95**

Part Number: HQYB2ZM/A

14

Return Date: Apr. 06, 2024

**Belkin BOOST↑CHARGE PRO 3-in-1 Wireless Charging Stand**

15

**with MagSafe - White**

**$ 149.95**

Part Number: HQ3G2ZM/A

16

Return Date: Apr. 06, 2024

**iPhone 15 Pro Max FineWoven Case with MagSafe - Black $ 59.00**

17

Part Number: MT4V3ZM/A

Return Date: Apr. 06, 2024

18

For Support, Visit: www.apple.com/support

**OtterBox Lumen Series Case for AirPods Pro (2nd**

**Generation) - Black**

19

**$ 34.95**

Part Number: HQF02ZM/A

20

Return Date: Apr. 06, 2024

**240W USB-C Charge Cable (2 m) $ 29.00**

Part Number: MU2G3AM/A

21

Return Date: Apr. 06, 2024

For Support, Visit: www.apple.com/support

22

**iPhone 15 Pro Max Clear Case with MagSafe $ 49.00**

Part Number: MT233ZM/A

Return Date: Apr. 06, 2024

23

For Support, Visit: www.apple.com/support

**20W USB-C Power Adapter $ 19.00**

Part Number: MHJA3AM/A

24

Return Date: Apr. 06, 2024

For Support, Visit: www.apple.com/support

25

**AirPods Pro (2nd generation) with MagSafe Charging Case**

**(USB-C)**

26

**$ 249.00**

Part Number: MTJV3AM/A

27

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 228 OF 241

28

## <mark>EXHIBIT AAK Page 2 of 2</mark>, Apple

Serial Number: MM4PW0Y9XP
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
**AirTag $ 29.00**
Part Number: MX532AM/A
Serial Number: HW5LQX48P0GV
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
**AirTag $ 29.00**
Part Number: MX532AM/A
Serial Number: HW5LQX84P0GV
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
**Apple Watch Ultra 2 GPS + Cellular 49mm Titanium Case with**
**Blue Alpine Loop - Small**
**$ 799.00**
Part Number: MREK3LW/A
Serial Number: KM424TFK4P
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
**45mm Midnight Sport Band - S/M $ 49.00**
Part Number: MT3D3AM/A
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
**iPhone 15 Pro Max 1TB Black Titanium $ 1,599.00**
Part Number: MU6F3LL/A
Serial Number: DVVHR2VJCJ
IMEI: 357275791547315
Return Date: Apr. 06, 2024
For Support, Visit: www.apple.com/support
Use of iPhone constitutes acceptance of the iPhone terms and conditions and other third party
terms and conditions found in the iPhone box, or at http://www.apple.com/legal/sla/.
If you are not fully satisfied with your iPhone purchase, you can return your undamaged iPhone
within 14 days of purchase for a full refund with no restocking fee.
If you disagree with these terms and conditions you can return the iPhone in accordance with the
Apple Store's return policy http://www.apple.com/legal/sales_policies/retail.html
For information on Apple's privacy policy see www.apple.com/privacy
Sub-Total $ 4,093.85
Tax $ 245.64
**Total $ 4,339.49**
**Payment Method**
Amount Paid Via Cash $ 4,400.00
Total Tender $ 4,400.00
Change Due ($ 60.51)

# *R1321153219*

\* 2 0 2 4 0 3 2 3 R 1 3 2 1 1 5 3 2 1 9 \*
https://www.apple.com/legal/sales-support/sales-policies/retail_us.html
            Learn how to set up your product and transfer your data from home at support.apple.com.

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 229 OF 241

1

2

<mark>**EXHIBIT AAL Page 1 of 4**</mark>

**Aero Swift, LLC 2024 FIN CEN BOI Filing**

 **FINANCIAL CRIMES
ENFORCEMENT NETWORK**

Generated: 11/9/2024

**FILING SUCCESSFUL - Beneficial Ownership Information Report (BOIR) Status**

| Submission Information | |
| --- | --- |
| Status | FILING SUCCESSFUL |
| BOIR ID | 50000006941401 |
| Submission Tracking ID | BOIRnsWa1Vy68w9KIwqM |
| Received Timestamp (UTC) | 2024-11-09T14:13:34Z |
| Reporting Company FinCEN ID | 2000-0319-5003 |

| Validation Information | |
| --- | --- |
| Code | Description |
| No validation errors | |
| Submitter Information | |
| First name | Rebekah |
| Last name | Brewis |
| E-mail address | owner@aeroswift.org |

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 230 OF 241

## EXHIBIT AAL Page 2 of 4

| Filing Information | |
|---|---|
| Type of filing | Initial report |
| Date prepared (assigned upon finalization) | 11/09/2024 |

| Reporting Company Information | Back to top |
|---|---|
| Request to receive FinCEN Identifier (FinCEN ID) | Checked |
| Foreign pooled investment vehicle | |
| Reporting Company legal name | Aero Swift, LLC |
| Alternate name (e.g. trade name, DBA) | |
| Tax Identification type | EIN |
| Tax Identification number | 994255769 |
| Country/Jurisdiction (if foreign tax ID only) | |
| Country/Jurisdiction of formation | United States |
| State of formation | Illinois |
| Tribal jurisdiction of formation | |
| Name of the other Tribe | |
| State of first registration | |
| Tribal jurisdiction of first registration | |

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 231 OF 241

## EXHIBIT AAL Page 3 of 4

| | |
|---|---|
| Name of the other Tribe | |
| Address (number, street, and apt. or suite no.) | 230 E Ohio St, Suite 410 #2741 |
| City | Chicago |
| U.S. or U.S. Territory | United States |
| State | Illinois |
| ZIP Code | 60611 |
| Existing Reporting Company | |

| Company Applicant Information | Back to top |
|---|---|
| FinCEN ID | 3000-0041-4395 |

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 232 OF 241

**EXHIBIT AAL Page 4 of 4**

| Beneficial Owner Information | |
|---|---|
| Parent/Guardian information instead of minor child | |
| FinCEN ID | 3000-0041-4395 |

**EXHIBIT AAM Page 1 of 6**

Name: Karissa K Brewis | DOB: 3/20/1980 | University of Michigan Health - West | PCP: Brian J Hinkley, DO | Legal Name:

Rebekah K Brewis Progress Notes

Brian Hinkley at 03/18/24 1530

---

**Subjective:**
Rebekah K Brewis is here for a complete physical.
Her last physical was 1 year(s) ago.
Her last pap smear was NA.
Karissa's last menstrual period was No LMP recorded. Patient was born without a uterus..
She is doing regular self breast exams.

Work: unemployed currently
Dentist: needs appt
Eye: up to date
ER/Urgent care: UC - COVID/back pain
Immunizations: up to date
Specialists: none
Cancer in family: Colon - none, Breast - none, Pelvic - none
Colonoscopy: none
Mammogram: none
Pelvic/Pap: Inner sex - no
vagina Bone density: NA
Concerns:
Mental Health - previously in therapy, following via telehealth, Lifestance previous mentalt health provider

**Past Medical History:**
Diagnosis                                                                           Date
- ADHD
- Anxiety
- Asperger's disorder
- Asymptomatic human immunodeficiency virus (hiv) infection status (CMS/HCC)
- Depression
- Ehlers-Danlos syndrome

**EXHIBIT AAM Page 2 of 6**

| Procedure | | Laterality | Date |
|---|---|---|---|
| • HAND/FINGER SURGERY UNLISTED *plates and pins* | | Left | |
| • HIP SURGERY | | Left | |
| • RECONSTR NOSE MAJ SEPTAL REPAIR *septorhinoplasty* | | | |
| • REMOVAL TESTIS,SIMPLE(NEW) | | | |

**Family History**

| Problem | Relation | Name | Age of Onset |
|---|---|---|---|
| • Thyroid Disease | Mother | | |
| • Asthma | Father | | |
| • Heart Failure | Father | | |
| • No Known Problems | Sister | | |
| • Thyroid Disease | Sister | half | |
| • Thyroid Disease | Sister | half | |
| • Other *Autism* | Brother | half | |
| • No Known Problems | Maternal Grandmother | | |
| • No Known Problems | Maternal Grandfather | | |
| • Cancer *throat* | Paternal Grandmother | | |
| • No Known Problems | Paternal Grandfather | | |
| • No Known Problems | Maternal Aunt | | |
| • No Known Problems | Maternal Uncle | | |
| • No Known Problems | Paternal Aunt | | |
| • No Known Problems | Paternal Uncle | | |
| • No Known Problems | Other | | |
| • Diabetes | Neg Hx | | |
| • Hypertension | Neg Hx | | |
| • High Cholesterol | Neg Hx | | |
| • Arthritis-rheumatoid | Neg Hx | | |

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 235 OF 241

**EXHIBIT AAM Page 3 of 6**

| | |
|---|---|
| • Arthritis-osteo | Neg Hx |
| • Stroke | Neg Hx |
| • Seizures | Neg Hx |
| • Migraines | Neg Hx |

**Social History Excluding Intimate Partner Violence - This Information is Found in the Social History Activity**

Socioeconomic History
| | |
|---|---|
| • Marital status: | Significant Other |

Tobacco Use
| | |
|---|---|
| • Smoking status: | Never |
| Passive exposure: | Never |
| • Smokeless tobacco: | Never |

Vaping Use
| | |
|---|---|
| • Vaping Use: | Former |
| • Substances: | THC |

Substance and Sexual Activity
| | |
|---|---|
| • Alcohol use: | Yes |
| *Comment: socially* | |
| • Drug use: | Yes |
| Types: | Marijuana |
| • Sexual activity: | Not Currently |
| Partners: | Male |

**Current Outpatient Medications on File Prior to Visit**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • abacavir/dolutegravir/lamivudi (TRIUMEQ ORAL) | Take by mouth | | |
| • cetirizine HCl (ZYRTEC ORAL) | Take by mouth | | |
| • MULTIVITAMIN ORAL | Take by mouth | | |
| • ESTRADIOL ORAL Take by mouth | | | |

No current facility-administered medications on file prior to visit.

Review of Systems:

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL JURISDICTION - 236 OF 241

**EXHIBIT AAM Page 4 of 6**

Constitutional:  no unexpected change in weight, no weakness, no unexplained fevers, sweats, or chills

Eye:  no recent significant change in vision

Ear/Nose/Mouth/Throat:  Ears:  no ear pain and no drainage, Nose/Mouth/Throat:  no complaints of nasal congestion or discharge and no sore throat

Cardiovascular:  no chest pain, no shortness of breath, no dyspnea, no edema, no palpitations

Respiratory:  no chronic cough, sputum, or hemoptysis, no dyspnea on exertion, no wheezing and no shortness of breath

Gastrointestinal:  no abdominal pain, no change in bowel habits, no significant change in appetite, no nausea, vomiting, diarrhea, or constipation and no black or bloody stool GU:  Female: negative for dysuria, frequency, and incontinence and negative for hematuria, no vaginal bleeding and no discharge or pelvic pain Musculoskeletal/Extremities:  no pain, redness, or swelling of the joints

Integumentary (Skin/Breast):  no abnormal skin lesions reported, no report of rash, no new breast lumps or masses, no severe breast pain and no nipple discharge

Neurologic:  no numbness, tingling, or tremor, no weakness

Psychiatric: + anxiety, + depression +PTSD

Endocrine:  denies fatigue, weight changes, heat/cold intolerance, bowel or skin changes, or cardiovascular system symptoms

Hematologic/Lymphatic:  no abnormal bleeding, no swollen nodes, no weight loss

**Objective:**

General:  well developed, well nourished, in no apparent distress

Skin:  warm, no pallor or diaphoresis, no significant moles, warts, or growths

Head:  normocephalic, atraumatic

Eyes:  pupils equal and round, sclera anicteric without injection

Ears:  canals without lesions, TMs shiny without retraction, no obvious effusion, no erythema, external pinna without trauma, no discharge

Nose:  external nares without trauma, no discharge

Throat/Pharynx:  lips and gingiva without lesion; tongue and uvula midline; noninflamed pharynx; no exudates or postnasal drainage

Neck: neck supple, no meningismus

Lymphs:  no palpable lymph nodes in neck

Lungs:  clear to auscultation, breath sounds equal bilaterally, no respiratory distress, no wheezes, no crackles

Cardio:  regular rate and rhythm without murmurs, heart sounds without clicks or rubs

Abdomen:  abdomen soft, nontender; bowel sounds normal; no masses, hepatomegaly or splenomegaly

Musculoskeletal:  symmetrical muscle groups noted without atrophy or deformity

Extremities:  no clubbing, cyanosis, or edema, no deformities, no skin discoloration

Neuro:  alert and oriented to person, place, and time and no cerebellar signs or ataxia noted

**Assessment:**

**EXHIBIT AAM Page 5 of 6**

1.    **Annual physical exam**

2.    Anxiety associated with depression

traZODone (DESYREL) 50 mg tablet
buPROPion (WELLBUTRIN XL) 300 mg XL tablet
REFERRAL TO PSYCHIATRY

3.    PTSD (post-traumatic stress disorder)

traZODone (DESYREL) 50 mg tablet
buPROPion (WELLBUTRIN XL) 300 mg XL tablet
REFERRAL TO PSYCHIATRY
REFERRAL TO PSYCHOLOGY

4.    Hormone replacement therapy (HRT)    REFERRAL TO ENDOCRINOLOGY

5.    Intersex disorder    REFERRAL TO ENDOCRINOLOGY

6.    HIV infection, unspecified symptom status (CMS/HCC)    REFERRAL TO INFECTIOUS DISEASES

7.    Screening for deficiency anemia    CBC WITH DIFF ORDER PANEL FERRITIN

8.    Screening for diabetes mellitus (DM)    COMP. METABOLIC PANEL

9.    Screening for cardiovascular condition    CARDIAC RISK PROFILE

10. Encounter for screening mammogram for malignant neoplasm of breast    MAMMOGRAPHY TOMOSYNTHESIS BILAT SCREENING

11. Screening for thyroid disorder    THYROID CASCADE

12.    Encounter for screening examination for PR BEHAV ASSMT W/SCORE & mental health and behavioral disorders DOCD/STAND INSTRUMENT

13.    Need for hepatitis C screening test    HEPATITIS C ANTIBODY

**Plan:**

1. RHM updated. Screening labs ordered.  Immunizations discussed.  Anticipatory guidance provided.
2. Refer to psychiatry and psychology to establish care and assist with medication management
3. Refer to endocrinology for assistance with hormone replacement therapy
4. Refer to infectious disease for assistance with HIV medication management and lab screening
5. Karissa's screening scores today are:

**EXHIBIT AAM Page 6 of 6**

**PHQ-2 Score: 4PHQ-9 Score: 20**
        **GAD-7 Score: 4    GAD-7 Total Score: 18**
        She has been previously diagnosed with depression/anxiety, is being treated, and will follow for her regular mental health visits. Information regarding depression and anxiety was given to Karissa in her patient instructions.
        Karissa's screening scores today are:
        **PHQ-2 Score: 4        PHQ-9 Score: 20**
        **GAD-7 Score: 4    GAD-7 Total Score: 18**
        Based on our discussion today, we feel it is necessary for her to engage in therapy/ counseling. She will take the initiative to schedule at their convenience. Information regarding depression and anxiety was given to Karissa in her patient instructions.

        Karissa's screening scores today are:
        **PHQ-2 Score: 4        PHQ-9 Score: 20**
        **GAD-7 Score: 4    GAD-7 Total Score: 18**
        Based on our discussion today and the severity of the identified depression/anxiety, we feel it is necessary for her to see psychiatry for further assessment and medication management. Current medications are as noted above. She will follow up in 2 weeks for symptom recheck. Information regarding depression and anxiety was given to Karissa in her patient instructions.

        Return in about 1 year (around 3/18/2025) for CPE, Pending lab results.MyChart® licensed from Epic Systems Corporation © 1999 - 2024

==EXHIBIT AAO Page 1 of 2 RJ Elliott Idenitification link==



February 18, 2025

COMPLAINT AND DEMAND FOR JURY TRIAL WITH PENDENT STATE SUPPLEMENTAL
JURISDICTION - 240 OF 241

**EXHIBIT AAO Page 2 of 2**

